B

# PASTORE CENTER COGENERATION PROJECT

# PROCUREMENT AND CONSTRUCTION AGREEMENT

BETWEEN

NORESCO, LLC

AND

ADP MARSHALL, INC.

MARCH 22, 2002

PASTORE CENTER COGENERATION PROJECT

PROCUREMENT AND CONSTRUCTION AGREEMENT

TABLE OF CONTENTS


ARTICLE 1. DEFINITION OF TERMS ....1
1.1 [Reserved] ....1
1.2 [Reserved] ....1
1.3 Agreement ....2
1.4 Application for Payment ....2
1.5 Auxiliary Boiler ....2
1.6 [Reserved] ....2
1.7 [Reserved] ....2
1.8 [Reserved] ....2
1.9 Business Day ....2
1.10 Certificate of Final Acceptance ....2
1.11 Certificate of Readiness for Startup ....2
1.12 Certificate of Substantial Completion ....2
1.13 Change of Law ....2
1.14 Change Order ....2
1.15 Commencement Date ....3
1.16 Commissioning ....3
1.17 [Reserved] ....3
1.18 CONTRACTOR ....3
1.19 [Reserved] ....3
1.20 [Reserved] ....3
1.21 Equipment ....4
1.22 Events of Default ....4
1.23 Existing Facility ....4
1.24 Facility ....4
1.25 Final Acceptance ....4
1.26 [Reserved] ....4
1.27 [Reserved] ....4
1.28 Force Majeure ....4
1.29 Gas Turbine-Generator ....4
1.30 [Reserved] ....4

1.31 [Reserved] ....4
1.32 Fixed Price....4
1.33 HOST ....4
1.34 HRSG ....4
1.35 [Reserved] ....4
1.36 [Reserved] ....5
1.37 Law....5
1.38 Milestone....5
1.39 Milestone Payment ....5
1.40 Milestone Schedule....5
1.41 Non-Active Area ....5
1.42 [Reserved] ....5
1.43 Notice to Proceed....5
1.44 NORESCO Provided Equipment....5
1.45 Not-to-Exceed Drawdown Schedule....6
1.46 Operations & Maintenance Manuals ....6
1.47 OWNER....6
1.48 Performance Consumables....6
1.49 [Reserved] ....6
1.50 Technical-Specification....6
1.51 [Reserved] ....6
1.52 Punch List....6
1.53 Readiness for Startup ....6
1.54 [Reserved] ....6
1.55 Site....6
1.56 Subcontractor....7
1.57 [Reserved] ....7
1.58 Term....7
1.59 [Reserved] ....7
1.60 Work....7
1.61 NORESCO Supplied Systems ....7

ARTICLE 2. RELATIONSHIP OF NORESCO, CONTRACTOR, AND SUBCONTRACTORS....8
2.1 No Agency; Subcontractors....8

ARTICLE 3. SERVICES BY CONTRACTOR....9
3.1 Start and Completion of Project....9
3.2 No Reliance....9
3.3 General....9
3.4 Certificates, Permits, and Licenses....10
3.5 Site; Scheduling....10
3.6 Personnel....10

3.7 Technical Specification ..... 10
3.8 Access to Site ..... 11
3.9 Review Rights ..... 11
3.10 Progress Reporting, Project Meetings, and Meeting Minutes ..... 11
3.11 Labor Relations ..... 12
3.12 Prevailing Wage Rate ..... 12
3.13 Minority Participation ..... 12
3.14 Authorized Representative ..... 12
3.15 Storage Allocation ..... 12
3.16 Timely Communications ..... 12
3.17 [Reserved] ..... 13
3.18 Responsibilities ..... 13
3.19 Temporary Services ..... 13
3.20 Coordination ..... 14
3.21 Quality Assurance/Quality Control ..... 14
3.22 Provision for Inspection ..... 14
3.23 Cleanup ..... 14
3.24 Protection of the Work ..... 15
3.25 Permits, Fees and Licenses ..... 15
3.26 Assignment ..... 15
3.27 Non-Contracted Services ..... 15
3.28 Storage of NORESCO Provided Equipment ..... 16
3.29 Storage and Protection of CONTRACTOR Provided Equipment ..... 16
3.30 Controls Integration ..... 17
3.31 Shop and Erection Drawings ..... 17
3.32 Record Drawings ..... 17
3.33 Operational and Maintenance Manuals ..... 17

ARTICLE 4. RESPONSIBILITIES OF NORESCO ..... 18
4.1 Engineering Data ..... 18
4.2 Access and Cooperation ..... 18
4.3 NORESCO Representative ..... 18
4.4 Utilities ..... 18
4.5 [Reserved] ..... 18
4.6 [Reserved] ..... 18
4.7 [Reserved] ..... 19
4.8 Tax Exemption ..... 19

ARTICLE 5. COMPLIANCE WITH LAWS, PERMITS AND CODES ..... 19
5.1 Lawful Compliance ..... 19

5.2 Employment Laws ..... 19
5.3 Codes ..... 19
5.4 Existing Facility ..... 19
5.5 Safety ..... 19

ARTICLE 6. PRICE AND PAYMENT ..... 20
6.1. Fixed Price ..... 20
6.2 Method of Payment ..... 21
6.3 Title ..... 24
6.4 Retainage ..... 24
6.5 Final Payment ..... 25
6.6 [Reserved] ..... 25
6.7 Payment of Liquidated Damages ..... 25
6.8 [Reserved] ..... 25
6.9 Payment Disputes; Partial Payment; ..... 25
6.10 Form and Manner of Payments ..... 26
6.11 No Mechanics' Liens ..... 26

ARTICLE 7. CHANGES IN THE WORK ..... 26
7.1 NORESCO Requested Changes ..... 26
7.2 Adjustment for Change in Law ..... 27
7.3 Other Changes ..... 27
7.4 [Reserved] ..... 28
7.5 Effect of Changes ..... 28
7.6 [Reserved] ..... 29
7.7 Work by Others; Subcontractors ..... 29
7.8 NORESCO Designated Subcontractors ..... 29
7.9 Change Order Approval ..... 29

ARTICLE 8. INSURANCE ..... 29
8.1 Coverages ..... 29
8.2 Certificates and Cancellations ..... 30
8.3 Builder's Risk ..... 30
8.4 Non-Waiver ..... 31
8.5 Right to Insure ..... 31
8.6 [Reserved] ..... 31

ARTICLE 9. PERFORMANCE BOND ..... 31
9.1 Bond ..... 31

ARTICLE 10. EVENTS OF DEFAULT AND REMEDIES; LIMITATION OF LIABILITY ..... 31
10.1 Events of Default ..... 31
10.2 Remedies ..... 33
10.3 Failure to Meet Milestone Deadlines ..... 33
10.4 Liquidated Damages ..... 34
10.5 Payment in the Event of Termination ..... 34
10.6 [Reserved] ..... 35
10.7 Limitation of Liquidated Damages ..... 35
10.8 [Reserved] ..... 35
10.9 Consequential Damages ..... 35

ARTICLE 11. GUARANTEES AND WARRANTY ..... 35
11.1 Warranty ..... 35
11.2 Warranty Period ..... 35
11.3 Remedy ..... 36
11.4 Conditions of Warranty ..... 36
11.5 [Reserved] ..... 36
11.6 Warranty Administration ..... 36
11.7 Sole Remedy ..... 36
11.8 [Reserved] ..... 36

ARTICLE 12. TESTING AND ACCEPTANCE OF THE FACILITY ..... 36
12.1 Acceptance Testing ..... 36
12.2 [Reserved] ..... 37
12.3 Readiness for Startup ..... 37
12.4 [Reserved] ..... 37
12.5 [Reserved] ..... 37
12.6 Punch List ..... 37
12.7 Release and Waivers ..... 37
12.8 Completion of Work ..... 37
12.9 Certificate of Final Acceptance ..... 38
12.10 Extensions ..... 38
12.11 [Reserved] ..... 38

ARTICLE 13. TITLE AND RISK OF LOSS ..... 38
13.1 Care, Custody and Control ..... 38
13.2 Title ..... 39
13.3 Risk of Loss ..... 39

ARTICLE 14. INDEMNIFICATION ..... 39
14.1 Indemnification ..... 39
14.2 Compliance with Laws ..... 39

14.3 Patent Indemnity ........ 40

ARTICLE 15. FORCE MAJEURE ........ 40
15.1 Definition and Effect ........ 40
15.2 Obligations Upon Force Majeure ........ 41

ARTICLE 16. DISPUTE RESOLUTION ........ 41
16.1 Disputes ........ 41
16.2 Litigation ........ 41
16.3 Work and Payment ........ 41

ARTICLE 17. REPRESENTATIONS ........ 42
17.1 Representation of CONTRACTOR ........ 42
17.2 Representations of NORESCO ........ 43

ARTICLE 18. MISCELLANEOUS PROVISIONS ........ 43
18.1 Governing Law ........ 43
18.2 Assignment by CONTRACTOR ........ 43
18.3 Assignment by NORESCO ........ 43
18.4 Notices ........ 44
18.5 Non-Waiver ........ 44
18.6 No Personal Liability; Third Parties ........ 44
18.7 Merger; Precedence; Amendment ........ 45
18.8 Jurisdiction; Integration ........ 45
18.9 Binding Agreement ........ 45
18.10 Time of Performance ........ 45
18.11 Entire Agreement ........ 45
18.12 [Reserved] ........ 46
18.13 Term ........ 46
18.14 Pre-Existing Contamination ........ 46
18.15 Exclusive Remedies ........ 46

## ATTACHMENTS

| | |
|---|---|
| Attachment I. | Technical Specifications |
| Attachment II. | NORESCO Provided Equipment |
| Attachment III. | Acceptance Testing |
| Attachment IV. | [Reserved] |
| Attachment V. | [Reserved] |
| Attachment VI. | Milestone Payment |
| Attachment VII. | Performance and Payment Bond |
| Attachment VIII. | Certificate of Readiness for Startup |
| Attachment IX. | Certificate for Final Acceptance |
| Attachment X. | Unforeseen Conditions |
| Attachment XI. | Milestone Schedule |
| Attachment XII. | Owner's WORK |
| Attachment XIII. | Demonstration Program |
| Attachment XIV. | Unknown Conditions |
| Attachment XV. | General Conditions of Purchase |
| Attachment XVI. | NORESCO Minority Participation Plan |
| Attachment XVII. | Sample Equipment Check Lists |
| Attachment XVIII. | Design Documents |
| Attachment XIX | Prepurchased Equipment Shop Drawing List (partial list) |
| Attachment XX | Exclusions and Clarifications |

# PROCUREMENT AND CONSTRUCTION AGREEMENT

THIS AGREEMENT made as of the twenty-second day of March, 2002, between NORESCO, LLC, a Delaware limited liability company having an office at 1 Research Drive, Westborough, MA ("NORESCO") and ADP Marshall, Inc., an Arizona corporation having an office at 75 Newman Avenue, Rumford, RI ("CONTRACTOR").

WITNESSETH:

WHEREAS, OWNER has, in accordance with a certain Design and Construction Agreement dated as of September 25, 2000, engaged NORESCO as an independent contractor to furnish turnkey services to provide design review and comments, permit, build, install, startup, test, and train operators for a cogeneration facility (the "Facility") to be located at the Pastore Center, Cranston, Rhode Island, under the terms and conditions set forth therein;

WHEREAS, NORESCO desires to engage CONTRACTOR to provide comprehensive construction services, and procurement services, in the construction of the Facility, and support for its startup and testing as noted herein.

WHEREAS, NORESCO is relying on the qualifications, skill and expertise of the CONTRACTOR and its experience in the construction of facilities similar to the Facility;

WHEREAS, CONTRACTOR acknowledges and agrees to perform the Work in accordance with the provisions of this Agreement, including without limitation the Technical Specifications attached hereto as Attachment I.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties hereto agree as follows:

## ARTICLE 1. DEFINITION OF TERMS

The following terms when capitalized in this Agreement shall have the following meaning:

1.1. [Reserved]

1.2. [Reserved]

1.3. "Agreement" means this Procurement and Construction Agreement, including all Attachments hereto and any items specifically incorporated by reference, and any amendments hereto agreed to in writing by the parties hereto.

1.4. "Application for Payment" shall have the meaning set forth in Section 6.2 of this Agreement.

1.5. "Auxiliary Boiler" or "Boiler Number 8" shall mean the new auxiliary packaged boiler specified in Attachment I to be installed in the Facility.

1.6. [Reserved]

1.7. [Reserved]

1.8. [Reserved]

1.9. "Business Day" or "Day" shall mean a calendar day that is not a Saturday, Sunday or legal holiday of the OWNER or NORESCO.

1.10. "Certificate of Final Acceptance" shall mean the certificate set forth in Attachment IX to this Agreement.

1.11. "Certificate of Readiness for Startup" shall mean the certificate set forth in Attachment VIII to this Agreement.

1.12. "Certificate of Substantial Completion" shall mean the certificate set forth in Attachment V to this Agreement.

1.13. "Change of Law" means (a) the enactment, adoption, promulgation, modification or repeal, after the date of this Agreement, of any Federal, State, or local Law (as hereinafter defined); or (b) the imposition of any material condition on the issuance or renewal of any government approval after the date of this Agreement which did not exist or could not be reasonably foreseen by CONTRACTOR; or (c) the failure to issue or renew any governmental approval (not due to the fault of CONTRACTOR) which, in any such case, establishes or modifies requirements materially affecting the prosecution of the Work, which will materially change the cost of, or the time of performance of, the Work as compared to the requirements specified in this Agreement.

1.14. "Change Order" means a written order executed in accordance with Article 7 hereof revising the Work, the time of performance, or the Fixed Price or

any other aspect of this Agreement and which complies with the requirements of Article 7 of this Agreement.

1.15. "Commencement Date" means the date specified by NORESCO in a written Notice to Proceed which NORESCO shall provide to CONTRACTOR, as described in Section 3.1 hereof.

1.16. "Commissioning" means those activities associated with making ready for performance testing by NORESCO of the Facility, or any unit, facility or part thereof, including but not limited to (i) running-in of pumps, compressors, turbines, motors, boilers, seals and other machinery and/or mechanical seal systems and lube oil and thrust bearing oil systems, including flushing and circulation, including providing assistance to NORESCO in the operation of the equipment for a sufficient time to demonstrate mechanical operation and stable control of all variable as specified in the applicable ASME Power Test Codes; (ii) adjustments to packing of pumps and valves; removal and/or cleaning of strainers where required; (iii) setting or calibration of instruments and static testing thereof, of relief devices, circuitry or alarms associated with the control systems of the Work, including calibration of all instruments required to be calibrated for the testing in accordance with Attachment III and the test plan, and NORESCO has been provided (a) notice of the calibrations and (b) the opportunity to inspect the calibrations and/or the calibration sheets, both as required by the test plan; (iv) flushing and drying of systems; (v) chemical cleaning; drying of furnaces and refractory lined vessels or Equipment; (vi) hot alignment checks; (vii) charging the Work with lubricants, utilities, chemicals, catalysts and/or other operating materials, including fuel, for the purpose of preparing the Facility for acceptance testing as defined in Attachment III; (viii) development of the test plan pursuant to Section 12.1 and approval thereof by NORESCO; and (ix) demonstration of the capability of the Gas Turbine-Generators, HRSGs and Boiler No. 8 to automatically change from firing natural gas to No. 2 fuel oil.

1.17. [Reserved]

1.18. "CONTRACTOR" means ADP Marshall, Inc., an Arizona corporation.

1.19. [Reserved]

1.20. [Reserved]

1.21. "Equipment" means any or all material, supplies, equipment and facilities, of whatever nature, intended to become a permanent part of the Facility, including but not limited to two combustion turbines and heat recovery systems and ancillary fuel, steam and electrical systems and interconnection equipment related thereto.

1.22. "Events of Default" shall have the meaning set forth in Section 10.1.

1.23. "Existing Facility" means the power plant located at the Pastore Center existing as of the date of this Agreement and more fully described in Attachment I.

1.24. "Facility" or "Renovated Facility" means the Existing Facility and the completed Work, excluding the Non-Active Area, and other additions or renovations to the Existing Facility required hereunder.

1.25. "Final Acceptance" shall mean that NORESCO and OWNER have each signed the Certificate of Final Acceptance as provided in the Design and Construction Agreement.

1.26. [Reserved]

1.27. [Reserved]

1.28. "Force Majeure" shall have the meaning set forth in Section 15.

1.29. "Gas Turbine-Generator" shall mean each gas turbine-generator specified in Attachment I to be installed in the Facility.

1.30. [Reserved]

1.31. [Reserved]

1.32. "Fixed Price" shall have the meaning set forth in Section 6.1 of this Agreement.

1.33. "HOST" means the Pastore Center.

1.34. "HRSG" shall mean each heat recovery steam generator specified in Attachment I to be installed in the Facility.

1.35. [Reserved]

1.36. [Reserved]

1.37. "Law" means any constitution, charter, act, statute, law, ordinance, code, rule, regulation, order, specified standards or objective criteria whether or not contained in any applicable permit or approval, which must be met in order for the Facility to be constructed and operated lawfully, or other legislative or administrative action of the United States of America or the State of Rhode Island or any agency, department, authority, political subdivision or other instrumentality of either thereof or a final decree, judgment or order of a court.

1.38. "Milestone" and "Milestone Deadline" shall be as described in Attachment XI.

1.39. "Milestone Payment" shall be as described in Article 6.

1.40. "Milestone Schedule" shall mean the milestones set forth in Part B of Attachment VI to this Agreement.

1.41. "Non-Active Area" is that part of the Existing Facility designated as the Non-Active Area in Attachment IV [Reserved].

1.42. [Reserved]

1.43. "Notice to Proceed" shall mean the notice sent by the NORESCO to the CONTRACTOR pursuant to Section 3.1 of the Agreement instructing the CONTRACTOR to commence the Work on the date stated in such notice.

1.44. "NORESCO Provided Equipment" means those equipment packages described in Attachment II being provided to the CONTRACTOR for installation and preparation for startup including the following: two gas turbines and auxiliaries, two HRSGs, two duct burners, ductwork assemblies for the gas turbines and the boiler, silencers for the gas turbines, inlet air filters for the gas turbines, one boiler with economizer, two gas compressors, four heat exchangers, two air compressors, three city water booster pumps, one medium voltage switchgear, two MCC lineups, chemical treatment systems, three boiler feed pumps, one condensate return tank and pumping system, one deaerator, one intermittent blowdown tank and one continuous blowdown tank. NORESCO shall be responsible for turbine lube oil and fills of other large reservoirs. The CONTRACTOR shall be responsible for installing and starting up this equipment, and shall provide remaining fluids required for lubrication and transport such as oil and propylene glycol, and shall dispose of its used fluids until such time as the systems are started up. The shop drawings describing the NORESCO supplied equipment are set forth in Attachment XIX.

1.45. "Not-to-Exceed Drawdown Schedule" shall mean Table 1 of Part B of Attachment VI to this Agreement.

1.46. "Operational & Maintenance Manuals" shall have the meaning set forth in Section 3.33.

1.47. "OWNER" means the Rhode Island Department of Mental Health, Retardation and Hospitals.

1.48. "Performance Consumables" includes all consumables and first fills, but is not limited to the following consumables required or consumed prior to Substantial Completion: water, electricity to construct, startup and test the Facility, lubricating oil, and water conditioning and boiler conditioning chemicals.

1.49. [Reserved]

1.50. "Technical-Specification" means the information, engineering data, drawings and conditions, including civil, electrical and mechanical specifications describing the Work, set forth in Attachment I, and in this Agreement.

1.51. [Reserved]

1.52. "Punch List" means the list of items of Work remaining to be completed after the time of Substantial Completion and which are not required for the safe and lawful operation of the Facility.

1.53. "Readiness for Startup" shall mean that the CONTRACTOR and NORESCO have each signed Attachment VIII.

1.54. [Reserved]

1.55. "Site" means the land and building, indicated in Attachment IV [Reserved], at the Pastore Center upon which the Work is to be performed as described in the Technical Specifications.

1.56. "Subcontractor" means any third party supplying goods or services to CONTRACTOR to meet the requirements of this Agreement with or without equipment or construction aids.

1.57. [Reserved]

1.58. "Term" shall have the meaning set forth in Section 18.13.

1.59. [Reserved]

1.60. "Work" means collectively all the services and duties, obligations, and responsibilities required to be undertaken by CONTRACTOR hereunder or in connection herewith, including those relating to the procurement of materials, construction and renovation, coordination and Commissioning, and calibration of skid mounted sensors and transmitters. CONTRACTOR shall provide reasonable trade and supervision support of NORESCO's startup, testing, performance testing and acceptance testing, and related services and incidentals (it being understood that NORESCO is responsible for such activities). The Work shall include all equipment, labor and materials, with sole the exception of the NORESCO Provided Equipment and NORESCO Supplied Systems, required for a complete and fully functioning Facility, provided the Facility design and the NORESCO Provided Equipment is appropriate for satisfaction of Facility performance and function requirements, including all materials and labor needed to interconnect the Facility to gas, liquid fuel, electricity, water, sewer and telecommunication utilities and to interconnect the Facility to OWNER'S existing steam and electrical systems, all as set forth in this Agreement, and its Attachments. CONTRACTOR shall be responsible to familiarize itself with the scope of supply of the NORESCO Provided Equipment and NORESCO Supplied Systems. It is acknowledged that the Design Documents are in some respects conceptual. However CONTRACTOR'S scope of Work includes all items to be depicted on the final drawings, except to the extent the final design materially differs from the Design Documents. It is acknowledged that notwithstanding any provision of the Design Documents to the contrary, CONTRACTOR is to provide for the Facility a pre-engineered metal building.

1.61. "NORESCO Supplied Systems" means the systems being installed by NORESCO specialty contractors as further described in Attachment II. These systems include the Fuel Oil Tanks, the CEM and Opacity Meters, and the Stack. The CONTRACTOR shall be responsible to schedule and coordinate this work so that it is performed efficiently and in the proper sequence, and these contractors shall conform to the CONTRACTOR's comprehensive project safety program.

1.61.1 Interface points for the NORESCO supplied systems are as follows:

1.61.1.1 Fuel Oil Tanks – The NORESCO supplied tanks will sit on the CONTRACTOR provided foundation. These tanks will have nozzles as noted on the P&ID's for interconnection to the CONTRACTOR supplied piping. One tank will have an in tank oil heater for the No. 6 oil. The CONTRACTOR will have to make all of the piping connections to the tank connections for condensate, steam and fuel oil. The rain shield part of the project will be supplied through ADP Marshall as a pre-engineered roof. It will sit on the dike foundation which is located around the tanks. If vent piping needs to go through or around the roof it will be run by the CONTRACTOR. CONTRACTOR will also be responsible for all power and control wiring required.

1.61.1.2 CEM and opacity meters – The CEM requires a 60 amp circuit into the stack to power its operation. The CONTRACTOR shall provide this electrical power circuit to the CEM subcontractor. The installation of the CEM and the interconnecting tubing and wiring will be supplied by the Vendor installing the CEM.

1.61.1.3 Stack – The stack subcontractor will be putting the concrete stack with metal liners on the CONTRACTOR provided foundation The CONTRACTOR shall also supply the connecting ductwork and insulation between the Solar Gas Turbine supplied bypass ducts, the National Dynamics discharge ducts and the three stack connections in the one concrete stack. The expansion joints at the stack connections shall be provided by the CONTRACTOR. The stack subcontractor will use the same electrical circuit as the CEM's subcontractor.

1.62. "Design Documents" include the Drawings and Specifications dated as set forth in Attachment XVIII.

## ARTICLE 2. RELATIONSHIP OF NORESCO, CONTRACTOR, AND SUBCONTRACTORS

2.1. **No Agency; Subcontractors.** CONTRACTOR shall perform this Agreement as an independent contractor and shall not be an agent or an employee of NORESCO. CONTRACTOR shall have the right to cause Work to be accomplished by Subcontractors, pursuant to written subcontracts between CONTRACTOR and such Subcontractors. CONTRACTOR shall provide written

notice to OWNER identifying each proposed subcontractor the value of whose subcontract is expected to equal or exceed $500,000 (provided, however, CONTRACTOR shall not be required to disclose the actual subcontract amounts). CONTRACTOR shall provide to NORESCO copies of unpriced purchase orders and subcontracts, or such other documentation as may be reasonably required, to facilitate NORESCO's invoicing of the project owner. CONTRACTOR shall not enter into any subcontract for performance of the Work with any such subcontractor as to whom NORESCO has reasonably and timely made objection. All such subcontracts shall be subject to and consistent with, and require the Subcontractors to satisfy, all applicable terms and conditions of this Agreement. This Agreement shall create no contractual relationship between NORESCO and any Subcontractor; provided, however, that each subcontract shall be assignable to NORESCO in the event of any termination of this Agreement, and upon request of NORESCO, at NORESCO's option, CONTRACTOR shall assign such contracts to NORESCO after any such termination. CONTRACTOR shall pay each Subcontractor in accordance with the terms and conditions of the subcontract between them. Subject to Article 15 hereof, failure to perform by any Subcontractor shall not constitute an excuse or defense to performance by CONTRACTOR hereunder.

## ARTICLE 3. SERVICES BY CONTRACTOR

3.1. **Start and Completion of Project.** The CONTRACTOR will commence the work required by this Agreement on or before a date to be specified in a written Notice to Proceed from NORESCO , will achieve all Milestones on or before each Milestone Deadline, as set forth in Attachment XI, unless the period for completion is extended in accordance with this Agreement.

3.2. **No Reliance.** CONTRACTOR shall bear such risks as are associated with performance of its obligations under this Agreement, except as is otherwise set forth herein. Except for representations expressly set forth in this Agreement, NORESCO makes no representations and, except as otherwise expressly provided in this Agreement, the CONTRACTOR may not rely upon any statement, whether written or oral, now or hereafter made by an officer, employee, agent or representative of NORESCO. NORESCO hereby disclaims any statement or representation not consistent with this Article.

3.3. **General.** CONTRACTOR shall complete the Work by performing or causing to be performed all Work as set forth in this Agreement. The CONTRACTOR shall furnish all materials, supplies, tools, equipment, labor and other services necessary for the construction and completion of the Work, with the exception of NORESCO Provided Equipment and NORESCO Supplied Systems. CONTRACTOR also agrees to provide for any necessary disassembly

and reassembly and all other items necessary and normal to complete the Work, including without limitation all necessary construction tools and equipment. CONTRACTOR shall pay for all Performance Consumables with the exception of natural gas and fuel oil. CONTRACTOR shall be responsible for overall control of the construction activities on the Site within the requirements of this Agreement from the Commencement Date to the Final Acceptance of the Work.

3.4. **Certificates, Permits, and Licenses.** CONTRACTOR shall secure and pay for all approvals, certificates, permits and licenses as may be required for the proper execution and completion of the Work, in accordance with CONTRACTOR's allowances set forth in Section 6.1.1. CONTRACTOR shall deliver to NORESCO copies of all such approvals, certificates, permits and licenses.

3.5. **Site; Scheduling.** CONTRACTOR has examined the Site, reviewed plans (including site plans showing utility services) and other information available from the HOST with respect to conditions in and around the Site, including the Existing Facility, and through its independent visual investigations, is familiar with all of the conditions affecting the completion of the Work except those which are not known to CONTRACTOR and which are not reasonably ascertainable through due diligence. CONTRACTOR shall phase the construction of the Work to minimize interference with OWNER'S operations. Any construction activities that will interfere with OWNER'S operations shall be described to and coordinated with OWNER by CONTRACTOR and NORESCO prior to CONTRACTOR'S commencement of such work. CONTRACTOR shall use all reasonable efforts, including night and weekend work activities, to schedule and perform the city water, steam and electrical interconnection work to minimize interruptions in supply to HOST. When interruptions are necessary, their duration, time of day and date week shall be coordinated with and approved by OWNER, such approval not to be unreasonably withheld.

3.6. **Personnel.** CONTRACTOR shall appoint well qualified, experienced, and where necessary, licensed personnel to perform the Work. CONTRACTOR shall assign a competent and experienced project manager, who shall not be removed or replaced without the prior consent of NORESCO.

3.7. **Technical Specification.** Technical specifications attached and incorporated as Attachment I recite certain specific and minimum requirements

of the Work and describe certain aspects of the Facility and are incorporated into this Agreement by reference.

3.8. Access to Site. CONTRACTOR shall provide security measures to protect the Site and the materials and supplies stored thereon during the construction period, but shall provide access for OWNER and NORESCO and their respective agents to inspect and review the Work being performed by CONTRACTOR. CONTRACTOR shall keep the Site reasonably clean and presentable at all times.

3.9. Review Rights. CONTRACTOR agrees that all Work shall be performed subject to reasonable review rights of the OWNER and NORESCO or their respective agents, consultants or nominees to determine conformance of the Work with the requirements of this Agreement. The exercise of such review rights shall in no way affect the validity or scope of CONTRACTOR's responsibilities, warranties and guarantees as stated in this Agreement.

3.10. Progress Reporting, Project Meetings, and Meeting Minutes. Beginning with the Commencement Date and ending on the date of Final Acceptance, the CONTRACTOR shall prepare and submit to NORESCO by the fifth (5th) day of each calendar month a written report, including an updated project schedule, that describes the percentages of the Work that have been completed up to and including the last day of the immediately preceding calendar month (including the nature of the Work completed in terms of major categories of Work, such as electrical, mechanical, structural, architectural, testing and the labor, equipment and materials that are committed to these major categories), the Work planned to be performed in the upcoming calendar month and any potential interferences such Work may have on the OWNER'S operations and the planned mitigation measures, as well as (a) during the period where there are construction activities that are visible from the exterior of the Facility, three (3) varying color photographs from directions selected by NORESCO and (b) color photographs of equipment installation and other major construction and Work progress events that occurred on Site during the previous calendar month. This report will be incorporated into the required monthly report that NORESCO provides to the owner. The information from the CONTRACTOR shall be tailored to fit into the format of the NORESCO generated report. The current Monthly report can be reviewed by the Contractor at NORESCO's office.

Within five to ten (5-10) calendar days of the delivery of such written report, as noted in the current Meeting Schedule, representatives of NORESCO, the OWNER, and CONTRACTOR shall meet to review progress made to date, schedule status, and any potential problems foreseen by CONTRACTOR. If

requested by NORESCO, CONTRACTOR shall have subcontractors attend this meeting as well. CONTRACTOR shall generate written minutes of each meeting and deliver those minutes to NORESCO within five (5) calendar days of each meeting.

3.11. **Labor Relations.** The CONTRACTOR shall employ only such labor as can work in harmony with the other trades on the job and as will not cause dissension among any other workers or cause any work stoppage. If a work stoppage occurs on the job, whether by workers employed by the CONTRACTOR or by others because of matters relating to the CONTRACTOR's work, NORESCO shall have the right to terminate this Subcontract in accordance with the procedures set forth in Section 10.

3.12. **Prevailing Wage Rate.** CONTRACTOR is required to comply with Prevailing Wage Rates as established by the State of Rhode Island. When a CONTRACTOR is subject to Prevailing Wage Rates, no workers employed on this Project shall be paid less than the wage rate identified by the State. CONTRACTOR shall also submit certified payroll reports to NORESCO with each Payment Application.

3.13. **Minority Participation.** CONTRACTOR will adopt a minority participation plan in accordance with the NORESCO Plan dated January 5, 2001, Attachment XVI(the "Plan") in such a manner as to permit NORESCO to satisfy the requirements of the Plan.

3.14. **Authorized Representative.** NORESCO shall designate one or more persons who shall be NORESCO's authorized representative(s) a) on-site and b) off-site. Such authorized representative(s) shall be the only person(s) the CONTRACTOR shall look to for instructions, orders and/or directions, except in an emergency or safety concern raised by the OWNER or any outside agency having jurisdiction.

3.15. **Storage Allocation.** NORESCO shall assist CONTRACTOR in securing adequate on-site storage areas to the extent available for the CONTRACTOR's materials and equipment during the course of the CONTRACTOR's Work.

3.16. **Timely Communications.** NORESCO shall transmit, with reasonable promptness, all submittals, transmittals, and written approvals

relating to the CONTRACTOR's Work. Testing reports and commissioning documentation shall be provided to NORESCO immediately if required.

3.17. [Reserved]

3.18. **Responsibilities.**

3.18.1. The CONTRACTOR shall furnish all of the labor, materials, equipment and services, including, but not limited to, competent supervision, shop drawings, samples, tools and scaffolding as are necessary for the proper performance of the CONTRACTOR's Work.

3.18.2. The CONTRACTOR shall provide a list of proposed sub-subcontractors and suppliers, be responsible for taking field dimensions, providing tests, ordering of materials and all other actions as required to meet the Schedule of Work.

3.18.3. The CONTRACTOR shall submit in time not to delay the work all shop drawings, samples, material lists, catalog cuts, color charts or other data applicable to its work required by NORESCO. NORESCO's failure to note errors, omissions or deviations from the requirements of the Contract Documents shall not relieve the CONTRACTOR from liability thereof.

3.18.4. The CONTRACTOR shall order the materials required under the Subcontract as soon as possible to avoid delays caused by late deliveries, and require same to be delivered to the site of the project or the CONTRACTOR's shop.

3.18.5. The CONTRACTOR shall at its own expense perform in a skillful and workmanlike manner all cutting, fitting and patching necessary for the completion of work in accordance with this Agreement and its Attachments. The time, manner and extent of such cutting, fitting and patching and the obligations of the respective trades in connection therewith shallbe as mutually determined and in accordance with project requirements and prudent industry practices.

3.19. **Temporary Services.** The CONTRACTOR shall provide and pay for all facilities and conveniences that it may require for the performance of its work including, but not limited to, hoists, scaffolding, ladders, light, power

and heat. If NORESCO shall furnish any such services or facilities, the CONTRACTOR shall pay his pro-rata share of the cost thereof.

3.20. **Coordination.** The CONTRACTOR shall:

3.20.1. Coordinate its work with the work of other trades so as to allow the entire project to progress without delay;

3.20.2. Cooperate with NORESCO and all others whose work may interfere with the CONTRACTOR's Work;

3.20.3. Specifically note and immediately advise NORESCO of any such interference with the CONTRACTOR's Work;

3.20.4. Participate in the preparation of the coordination drawings and work schedules in areas of congestion; and

3.20.5. Immediately notify NORESCO of the existence or continuation of any delay or disruption caused as a result of any deficiency in cooperation or coordination.

3.21. **Quality Assurance/Quality Control.** CONTRACTOR shall, prior to commencement of its work, submit for NORESCO's approval a detailed written quality assurance/quality control ("QA/QC") program to be implemented for its portion of the work.

3.22. **Provision for Inspection.** The CONTRACTOR shall notify NORESCO when portions of the CONTRACTOR's Work are ready for inspection. The CONTRCTOR shall at all times furnish NORESCO and its representatives adequate facilities for inspecting materials at the site or any place where materials under this Agreement may be in the course of preparation, process, manufacture or treatment. The CONTRACTOR shall furnish to NORESCO in such detail and as often as required, full reports of the progress of the CONTRACTOR's Work irrespective of the location of such work.

3.23. **Cleanup.** In addition to its own cleaning obligations, the CONTRACTOR shall follow NORESCO's cleanup directions, and

3.23.1. At all times keep the building and premises free from debris and unsafe conditions resulting from the CONTRACTOR's Work; and

3.23.2. Broom clean each work area prior to discontinuing work in the same. If the CONTRACTOR fails to immediately commence cleanup duties within twenty-four (24) hours after receipt of written notice of noncompliance, NORESCO may implement such safety or cleanup measures without further notice and deduct the cost thereof from any amounts due or to become due the CONTRACTOR.

3.24. **Protection of the Work.** The CONTRACTOR shall take necessary precautions to properly protect the CONTRACTOR's Work, the NORESCO Provided Equipment while in CONTRACTOR's custody, and the work of others from damage caused by the CONTRACTOR's operations. Should the CONTRACTOR cause damage to the Work or property of the Owner, NORESCO, or others, the CONTRACTOR shall promptly remedy such damage to the satisfaction of NORESCO, or NORESCO may so remedy and deduct the costs thereof from any amounts due or to become due the CONTRACTOR. **Responsibility for insurance deductibles shall be as set forth in Section 8.3.**

3.25. **Permits, Fees and Licenses.** The CONTRACTOR shall give adequate notices to authorities pertaining to the CONTRACTOR's Work and secure and pay for all permits, fees, licenses, assessments, inspections and taxes necessary to complete the Contractor's Work in accordance with this Agreement and Attachments.

3.26. **Assignment.** The CONTRACTOR shall not assign this Agreement nor its proceeds nor subcontract the whole nor any part of the CONTRACTOR's Work without prior written approval of NORESCO, and NORESCO may in its sole discretion withhold consent.

3.27. **Non-Contracted Services.** The CONTRACTOR agrees, except as otherwise provided in this Agreement, that no claim for additional construction services rendered or materials furnished shall be valid unless the CONTRACTOR provides NORESCO notice:

3.27.1 Prior to furnishing of the services or materials, except in an emergency affecting the safety of persons or property;

3.27.2 In writing of such claim within three (3) Days of first furnishing such services or materials; and

3.27.3 The written charge for such services or materials shall be provided to NORESCO no later than the tenth Day after rendering such services or supplying such materials.

3.28. **Storage of NORESCO Provided Equipment.** The CONTRACTOR will receive NORESCO Provided Equipment. In the event that the equipment is required to be put into storage the CONTRACTOR will work together with NORESCO to limit the costs of the storage. Equipment being put into storage will be stored in accordance with the manufacturers recommendations. For example, there is equipment that requires space heaters energized as the equipment is put into storage. The following equipment will be placed into heated storage:

a. **Solar Gas Turbines**

NORESCO shall be responsible for storage and delivery to the Site of the Solar gas turbines. Upon delivery to the Site, CONTRACTOR shall have care and custody of the units, and shall be responsible for rigging and unloading.

b. **Electrical Substations and Motor Control Centers**

The Equipment will remain in heated storage until such time as the building is enclosed or as otherwise authorized by NORESCO. Other equipment not identified above will be put into indoor covered storage and shall be protected from damage. The only equipment that is not to be stored indoors are the boilers, which may be stored on the pad in the building footprint with proper tarps and watertight coverings.

3.29. **Storage and protection of CONTRACTOR Provided Equipment.** CONTRACTOR shall protect all stored equipment from weather. Equipment shall be stored on bolsters above high water and covered. Small or delicate machines shall be placed in a warehouse. Machined surfaces shall be protected with grease or suitable coating. All equipment subject to damage from falling objects shall be so protected during and after erection with covers suitable to prevent damage.

Ventilation inlets on motors and critical equipment in dusty or dirty work areas shall be covered to minimize internal contamination.

3.30. **Controls Integration.** NORESCO shall prequalify controls integrator subcontractors and prepare the scope of such work. CONTRACTOR shall contract only with controls integration subcontractors so prequalified. The CONTRACTOR shall be responsible for the Work of the controls integration subcontractor and the coordination and supervision of its Work in the manner of CONTRACTOR's other Subcontractors.

3.31. **Shop and Erection Drawings:** The CONTRACTOR shall submit to NORESCO for approval eight (8) copies of all shop and erection drawings, data sheets, etc., required for the Work. This shall be done with such promptness as to cause no delay in either CONTRACTOR's Work or that of any of his Subcontractors. These drawings shall be checked and certified, prior to submission, and shall contain all required information. The CONTRACTOR shall make any corrections required by NORESCO and resubmit eight copies of the corrected drawings. NORESCO shall review such drawings and respond to CONTRACTOR with any comments within ten Days of receipt of drawings.

Approved shop drawings will be so stamped and dated and shall form a part of this Agreement. One set of the approved shop drawings will be returned to the CONTRACTOR. Approval of such drawings shall not relieve the CONTRACTOR of the responsibility for deviations from the contract documents, not from responsibilities for error in shop or erection drawings.

The cost of shop and erection drawings furnished by the CONTRACTOR and revisions thereof shall be included in the contract price.

3.32. **Record Drawings** The CONTRACTOR shall prepare and be responsible for record drawings. These drawings shall be maintained on a weekly basis. They shall completely and accurately portray the work done to that time. Any changes from the Design drawings shall be clearly called out on these documents. At the end of the project the CONTRACTOR shall provide reproducible drawings to NORESCO.

3.33. **Operational and Maintenance Manuals** The CONTRACTOR shall develop 12 sets of operational and maintenance manuals which incorporates all of the equipment information into a notebook series which is alphabetically indexed for each piece of equipment, including the NORESCO Provided Equipment. NORESCO shall timely provide to CONTRACTOR vendor operation and maintenance materials for such equipment.. For large pieces of equipment the equipment manufactures operation and maintenance manual shall be used, but it shall be included in the main index for the manuals.

Manuals shall be delivered to NORESCO 30 days prior to issuance of "Certificate of Readiness for Startup."

ARTICLE 4. RESPONSIBILITIES OF NORESCO

NORESCO shall provide or perform in connection with the Work, at no cost to CONTRACTOR, those obligations set forth below.

4.1. **Engineering Data.** NORESCO has provided the CONTRACTOR with drawings and specifications that are representative of the scope of work for this project. The basic descriptions of Work are established with the Attachment I and the P&ID's. The other referenced drawings show the minor deviations from those documents. The equipment and systems vendor drawings show the particulars with regard to their installation and operation. NORESCO shall make reasonable efforts to make available to CONTRACTOR all drawings, specifications, technical descriptions and other pertinent information in its possession regarding the Existing Facility, the Site and the electrical, city water, steam and condensate systems to which the Facility will interconnect.

4.2. **Access and Cooperation.** NORESCO shall (i) provide CONTRACTOR rights of ingress and egress to the Site for CONTRACTOR and its Subcontractors, as may be necessary for the performance of the Work, (ii) provide such information, cooperation and access as may be reasonably requested by CONTRACTOR for the performance of the Work, including interconnection of the Facility to OWNER'S existing systems; (iii) maintain or cause to be maintained in reasonable working order all utility lines and other facilities on the property of OWNER interconnecting to the Facility and not within the scope of CONTRACTOR'S responsibility; and (iv) make reasonable efforts to cause OWNER to provide laydown and storage areas as reasonably requested by CONTRACTOR, provided such laydown and storage shall not unreasonably impair or interfere with OWNER's normal operations or activities.

4.3. **NORESCO Representative.** NORESCO shall designate a person or persons available on a daily basis and authorized to transmit and receive direct communications to and from CONTRACTOR.

4.4. **Utilities.** OWNER has agreed to maintain existing electric, gas, sewer and water capacity, up to the point of interconnection with the Facility.

4.5. [Reserved]

4.6. [Reserved]

4.7. [Reserved]

4.8. **Tax Exemption.** NORESCO shall provide to CONTRACTOR all tax exemption numbers, certificates, correspondence, and other documents in its possession as CONTRACTOR may reasonably request to permit CONTRACTOR to perform the Work on a tax-exempt basis.

## ARTICLE 5. COMPLIANCE WITH LAWS, PERMITS AND CODES

5.1. **Lawful Compliance.** CONTRACTOR shall perform the Work in compliance with all Federal, State, and local Laws, ordinances, permitting requirements, administrative directives, requirements of insurance policies and regulations of any kind pertaining thereto.

5.2. **Employment Laws.** CONTRACTOR shall comply with all Federal, State, and local Laws regarding employment, wages, workers compensation, discrimination and similar laws.

5.3. **Codes.** CONTRACTOR shall perform the Work in conformance with all applicable national, state and local engineering, environmental, construction, safety, and electrical codes and standards, and, in any event, in accordance with the standards and requirements described on Attachment I attached hereto.

5.4. **Existing Facility.** Notwithstanding any provision of Section 5.1 or 5.3 to the contrary, CONTRACTOR shall bear no responsibility for causing the Existing Facility or any of its pre-existing components or systems to comply with any such laws, codes or standards, except for the Work and as specifically set forth in Attachment 1.

5.5. **Safety.** The CONTRACTOR shall be responsible for the prevention of accidents and injury in the vicinity of or connected with CONTRACTOR's Work. The CONTRACTOR agrees to comply with all federal, state, municipal and local laws, ordinances, rules, regulations, codes and other requirements concerning safety, including but not limited to the Federal Occupational Safety and Health Act of 1970 (OSHA), and with all safety standards established by NORESCO and Owner.

CONTRACTOR shall, in writing, notify NORESCO of the occurrence of any accident or injury or the existence of any unsafe condition on or about the jobsite, immediately upon discovery of such accident, injury or condition. When so ordered, CONTRACTOR shall stop any part of the work which NORESCO or

Owner deems unsafe until corrective measures satisfactory to NORESCO and Owner have been taken.

## ARTICLE 6. PRICE AND PAYMENT

6.1. **Fixed Price.** CONTRACTOR's Fixed Price for full payment for the performance and completion of the Work as defined herein shall be Twelve Million Three Hundred Sixty Five Thousand One Hundred Five Dollars ($12,365,105) as full consideration. Notwithstanding any other provisions of this Agreement, no adjustments to the Fixed Price shall be permitted except as provided in Section 6.1.1, Section 6.2 or Article 7 below. The Fixed Price shall include all applicable Federal, State and local payroll , excise and other taxes, provided however, all sales, use and similar taxes are excluded. If any such sales, use or similar tax is imposed on the Work or any component of the Work at any level, CONTRACTOR shall be entitled to reimbursement of such amounts through NORESCO's issuance of a Change Order adjusting the Fixed Price accordingly.

6.1.1 Allowances. It has been agreed by NORESCO and the CONTRACTOR that there will be allowances carried for the following items. CONTRACTOR shall accurately account for the actual and necessary costs of performing the Work described in the following Allowances, and shall provide to NORESCO such accurate and detailed records thereof as may be reasonably requested. The Fixed Price shall be adjusted for any sums by which such costs for allowance items exceed or are less than the corresponding allowance amounts.

a. Items with allowances include the following:

| | |
|---|---|
| Permit allowance | $ 71,400 |
| Winter conditions allowance | $ 20,000 |
| R&R existing ductbank and new ductbank | $ 30,000 |
| Landscape | $ 15,000 |
| Condenser receiver pit | $ 10,000 |
| Remove/dispose existing floor grating | $ 880 |
| 1.5" Grating | $ 4,840 |
| Upgrade existing platforms to OSHA reqmt. | $ 10,000 |
| Cut below & cap penet. @ abandoned areas | $ 21,000 |
| Repair to existing exterior wall allowance | $ 45,000 |
| Signage | $ 2,000 |
| Miscellaneous platforms | $ 10,000 |
| Painting/coating of non active stack | $ 36,000 |

| | |
|---|---|
| Modify equip. @ 2.4kV infrastructure | $ 50,000 |
| Load shed syst. w/dist. equip. (interconnect only) | $ 50,000 |
| Tie into existing generator (1200A) | $ 6,750 |
| Relocate NECO incoming to SWBD No. 4 | $100,000 |
| Controls integrator | $330,000 |
| Startup Support Labor | $100,000 |
| Oil Tank Removal | $130,000 |
| Remove/replace roof deck over #7 boiler | $ 10,000 |

b. Use of allowances: The CONTRACTOR shall maintain a running account of the costs associated with each allowance and shall provide a monthly accounting to NORESCO on the costs to date. Before starting any allowance work there shall be a discussion with NORESCO on how it is expected such work will proceed and be accomplished in order that there be a general agreement between the CONTRACTOR and NORESCO on the expenditure of the allowances. CONTRACTOR shall also notify NORESCO as soon as practical upon discovery of an allowance exceedance for any individual scope of work covered by that allowance.

6.2. **Method of Payment.**

(a) The CONTRACTOR shall submit applications for payment ("Application(s) for Payment") for Work performed and shall be paid by NORESCO for such in accordance with this Article 6 on and after the Commencement Date.

Based upon Applications for Payment submitted by the CONTRACTOR to NORESCO on or before the fifth (5th) Business Day following the first (1st) Business Day of each calendar month, (or such other times as the parties may agree in writing), NORESCO shall, subject to the conditions set forth herein, and subject to the provisions of Section 6.3, make payments to the CONTRACTOR on account of the Fixed Price payments to the CONTRACTOR in accordance with, and limited by, the Not-to-Exceed Drawdown Schedule and the Milestone Schedule.

(b) The Not-to-Exceed Drawdown Schedule and the Milestone Schedule shall be used as the basis for the CONTRACTOR's Applications for Payment and NORESCO's review thereof. The completion of the Work, the occurrences or other events described in the Milestone Schedule as the milestone events shall, subject to the provisions of this Section 6.2(b) and Sections 6.3 and 6.4, entitle the CONTRACTOR to payments in the aggregate amount incurred, inclusive of contractor's overhead and profit for each completed milestone event to the date of the Application for Payment, which sums include an allowance for the CONTRACTOR's overhead and profit proportionate to the milestone event.

As part of the CONTRACTOR's Application for Payment pursuant to this Section 6.2, the CONTRACTOR shall prepare and submit for each milestone claimed for payment, such data substantiating completion of the milestone and the CONTRACTOR's right to payment as NORESCO may reasonably require. Each application for payment shall be certified and accompanied by a certificate from the CONTRACTOR which shall provide as follows:

"The amount included in this Application for Payment, when added to the amounts previously paid to the CONTRACTOR, does not exceed the total amount due for the Work, materials, overhead, profit and other expenses in the performance of this Agreement by the CONTRACTOR on behalf of NORESCO to the date of this Application for Payment, including payments by the CONTRACTOR for services or products to any corporation, partnership, joint venture or other entity controlled directly or indirectly by the CONTRACTOR."

NORESCO shall not be required to make payments until and unless the Application for Payment meets all the requirements contained in this Article 6.

(c) NORESCO shall, within ten (10) Business Days after the receipt of the CONTRACTOR's Application for Payment, either approve such Application for Payment, or disapprove all or any portion of such Application for Payment, in writing to CONTRACTOR, including NORESCO's reasons for withholding its approval of all or a portion of such

Application for Payment, if applicable. In the latter case, the CONTRACTOR shall make the necessary corrections and resubmit its Application for Payment subject to the same procedures applicable to its original application for payment in accordance with this paragraph (c).

NORESCO may decline to approve all or a portion of the CONTRACTOR's Application for Payment and shall withhold its approval, in whole or in part, to the extent reasonably necessary to protect NORESCO if: (i) the Work has not progressed to the point indicated in the Application for Payment, or (ii) the quality of the Work is not in accordance with the specifications as set forth in Attachment I or the detailed design specifications and drawings; or (iii) the CONTRACTOR is, for specified reasons, not entitled hereunder to all or any portion of the payment sought. Only such portion of any Application for Payment which NORESCO specifically disapproves shall be withheld by NORESCO.

If NORESCO, in any inspection subsequent to any payment approval of any Work, discovers that any Work, the payment for which was approved, is, in fact, defective or otherwise not in accordance with the specifications contained in Attachment I, then NORESCO may also decline to approve all or a portion of a current Application for Payment because of such subsequently discovered defective or non-conforming Work, and may nullify the whole or any part of any current approval for payment to such extent as may be necessary to complete or correct such defective or non-conforming Work in order to protect NORESCO from loss because of such defective or non-conforming Work or due to the CONTRACTOR's failure to carry out the Work in accordance with this Agreement, all as shall be specified in NORESCO's written notice to CONTRACTOR. If the CONTRACTOR and NORESCO cannot agree within ten (10) Business Days of the date of NORESCO's written notice to CONTRACTOR of any such disapproval of an Application for Payment, in whole or in part, then, NORESCO shall issue its approval for payment of the amount, if any, it believes properly payable to the CONTRACTOR, and the parties shall settle the dispute as to any remaining amounts owed pursuant to the provisions of Article 16.

When the grounds for withholding or nullifying approval for payment are removed, an Application for Payment of the amounts withheld because of such dispute may be resubmitted by the CONTRACTOR as part of the CONTRACTOR's next monthly Application for Payment, and shall be reviewed by NORESCO and paid in accordance with this Section 6.2.

Subject to approval of all or any portion of an Application for Payment by NORESCO as set forth herein, such payment shall be made as set forth in Section 6.10.

6.3. **Title.** The CONTRACTOR warrants and guarantees that title to all Work, materials and equipment covered by an Application for Payment will have passed to the OWNER either by incorporation in the Facility or upon receipt by the CONTRACTOR of payment, whichever occurs first, free and clear of all liens, claims, security interests and encumbrances. The CONTRACTOR further warrants and guarantees that , except as provided in the previous sentence, no Work, materials and equipment covered by an Application for Payment will have been acquired by the CONTRACTOR or by any other person performing the Work or furnishing materials and equipment for the Facility which is subject to an agreement under which an interest therein or encumbrances thereon is retained by the seller or otherwise imposed by the CONTRACTOR or such other person. In the event of any claim affecting such titles, the CONTRACTOR shall, at no cost to NORESCO, defend title to all Work, equipment and materials and shall obtain good and marketable title to the same on behalf of the OWNER.

6.4. **Retainage.** NORESCO shall withhold a retainage amount of five percent (5%) of each monthly payment otherwise due and payable to the CONTRACTOR pursuant to this Article 6 and the Not-to-Exceed Drawdown Schedule. The retainage described in this Section 6.4 may be applied by NORESCO, after written notice to CONTRACTOR and CONTRACTOR's failure to commence remedial action and effect a cure within a reasonable time, to complete the performance of the CONTRACTOR's obligations pursuant to this Agreement if the CONTRACTOR defaults in the performance of its obligations hereunder.

Upon (i) achievement of Readiness for Startup and (ii) agreement between NORESCO and CONTRACTOR regarding Punch List items and value pursuant to Section 12.6, CONTRACTOR may submit an Application for Payment for an amount equal to the retainage being held by NORESCO less an amount equal to two times the value of the outstanding Punch List items. CONTRACTOR may thereafter invoice NORESCO monthly for Punch List items completed. The review, approval and payment process for these Applications for Payment shall be the same as set forth in Section 6.2, with the exception of retaining the retainage.

6.5. **Final Payment.** After both NORESCO and the CONTRACTOR have executed the Certificate of Final Acceptance, the CONTRACTOR shall be entitled to submit an Application for Payment which includes the application for payment of the remaining retainage and any unpaid balances. The review, approval and payment process for this Application for Payment shall be the same as set forth in Section 6.2, with the exception of retaining the retainage.

The CONTRACTOR's acceptance of final payment shall constitute a full waiver of any and all claims by the CONTRACTOR against NORESCO with respect to the Work. Neither acceptance of the Work nor any payment by NORESCO shall be deemed to be a waiver of NORESCO's right to enforce any obligations of the CONTRACTOR under this Agreement or the recovery of damages for defective Work not discovered by NORESCO, the OWNER, or Consulting Engineer at the time of final payment.

6.6. [Reserved]

6.7. **Payment of Liquidated Damages.** All liquidated damages payable by CONTRACTOR in accordance with Article 10 shall be paid to NORESCO monthly in arrears within thirty (30) days following the date NORESCO submits to CONTRACTOR an invoice therefor, provided, however, no liquidated damages may be charged to the extent, but only to the extent, NORESCO is in default of its payment obligations to CONTRACTOR under this Agreement.

6.8. [Reserved]

6.9. **Payment Disputes; Partial Payment.** In case of a dispute with respect to a portion but not all of any payment amount, NORESCO or CONTRACTOR (in case of Liquidated Damages) shall pay the undisputed portion promptly in accordance with the provisions of this Agreement. CONTRACTOR'S or NORESCO's acceptance of partial payment shall not be deemed to constitute a waiver of the right to receive amounts which are then in dispute and CONTRACTOR and OWNER shall use all reasonable efforts to resolve all disputed amounts as soon as practicable.

6.10. **Form and Manner of Payments.** All payments to CONTRACTOR under this Agreement shall be made by corporate check. Payments shall be made net 30 days from approval of invoices by NORESCO.

6.11. **No Mechanics' Liens.** CONTRACTOR shall pay all labor, Subcontractors, Equipment vendors, and providers of services of any kind promptly, and in any event, in compliance with any supply or service contract. CONTRACTOR shall keep the Site and the Facility free from any liens in the performance of this Agreement. As a condition precedent to the making of any payment required by Section 6.2 of this Agreement, NORESCO shall have the right to require CONTRACTOR and each major Subcontractor to execute a Certificate and/or a waiver of liens and security interests to the extent of such payment in a form reasonably acceptable to NORESCO stating that all amounts that were due and payable to the certifying party in connection with the Work as of the date specified in the certificate have been paid in full, or require CONTRACTOR to post adequate security for any outstanding amounts. CONTRACTOR agrees to remove or substitute a bond for any mechanic's liens or similar security interests placed on the Facility, or the Site by any Subcontractor, except to the extent, and only to the extent, that NORESCO may be in default of its payment obligations to CONTRACTOR under this Agreement.. Such removal or bonding shall be accomplished within thirty (30) days of any filing evidencing such lien or security interest. If CONTRACTOR fails to remove such lien or security interest within such thirty (30) day period, NORESCO may effect such removal or substitute a bond at CONTRACTOR's expense, which CONTRACTOR will pay on demand of NORESCO.

## ARTICLE 7. CHANGES IN THE WORK

7.1. **NORESCO Requested Changes.** NORESCO, either on its own initiative or based upon a suggestion from CONTRACTOR, may issue an order for the performance of extra work, or alter the scope of Work or to change the cost or scope of the Work, and may make additions to or deletions from the Work as needed. Such order shall be valid only if issued in writing by NORESCO. CONTRACTOR shall respond in writing within ten (10) Days in the form required by Section 7.5 of this Agreement with a proposed price for the work requested (or any cost reduction resulting), impact of the change on the other applicable provisions of this Agreement and any modifications to NORESCO's proposed change. Extra work or changes in the Work shall only be valid if agreed upon in writing by NORESCO and CONTRACTOR.

7.2. **Adjustment for Change in Law.** In the event of a Change in Law,

compliance with which would either (1) require the CONTRACTOR to incur cost increases in order to meet its obligations hereunder or cost increases due to any required change in the Facility design, or (2) result in corresponding costs savings to the CONTRACTOR, the Fixed Price shall be increased or decreased, as the case may be, to offset the actual, demonstrable effect of such Change in Law on the CONTRACTOR, the Milestone Payment Schedule shall be adjusted accordingly, and, if affected, the other applicable provisions of this Agreement shall be equitably adjusted. The foregoing provision is intended to apply to increases in CONTRACTOR's costs to perform the Work, and shall not apply to any Change in Law to the extent it affects CONTRACTOR's general cost of doing business, including but not limited to changes in income tax or employment laws and the like. Within ten Days after becoming aware of such Change in Law, the CONTRACTOR shall advise NORESCO of the change and consequent savings or increased expenditure. The CONTRACTOR shall use reasonable efforts to mitigate the financial impact on NORESCO of any such Change in Law; any costs incurred by the CONTRACTOR in connection with mitigating the impact of the Change in Law shall be included in the CONTRACTOR's cost of compliance hereunder. The CONTRACTOR shall also submit to NORESCO calculation of the savings resulting from, or evidence of the expenses actually incurred in complying with, and mitigating the impact of, such Change in Law. The provisions of Section 7.5 shall apply to any such Change in Law.

7.3. Other Changes. In the event (i) NORESCO fails to timely perform any of its obligations hereunder, which failure demonstrably causes any increase in cost or delay, (ii) CONTRACTOR encounters a condition set forth in Attachment X or an Existing Facility condition (including without limitation a hazardous material condition) which it could not in the exercise of reasonable diligence have foreseen or (iii) compliance with any Facility environmental permit requires a change in the Facility design, specifications or scope of work as set forth in Attachment I hereof which change demonstrably causes any material increase in cost, or delay, (it being agreed that the design, specifications and Scope of Work are premised on the completed Facility being considered a minor change to a major emission source for purposes of environmental permitting) (iv) conditions of Force Majeure demonstrably and proximately cause any ~~material~~ increase in cost, or delay, (v) the cost of fuel tank removal and remediation in accordance with Part E of Attachment 1 exceeds One Hundred Thirty Thousand Dollars ($130,000), or (vi) an addition to, modification to, or deletion from the Work, NORESCO shall issue a Change Order and the Fixed Price shall be adjusted to offset the actual, demonstrable effect of such change, the Milestone Payment Schedule shall be adjusted accordingly, and if affected, the other applicable provisions of this Agreement shall be equitably adjusted; provided, however, in the event of changes as described in (i), above for which OWNER is not liable to NORESCO, CONTRACTOR's sole remedy shall be an appropriate

STB

adjustment of the Readiness for Testing Milestone, except in the event such delay exceeds sixty days in the aggregate. The provisions of Section 7.5 shall apply to any such change. CONTRACTOR shall provide notice to NORESCO as soon as practical, but in no case later than six(6) days after becoming aware of any such impact or condition, and shall use reasonable efforts to mitigate the financial impact on NORESCO of any such change; any costs incurred by CONTRACTOR in connection with mitigating the impact of any such Change shall be included in the CONTRACTOR'S costs. In the event of a change pursuant to clause v, above, CONTRACTOR shall, in addition to the documentation required pursuant to this Article 7, provide adequate documentation to reasonably establish that the CONTRACTOR incurred such $130,000 for the purposes stated in such clause v. Notwithstanding the foregoing, in the event CONTRACTOR encounters a subsurface condition as described in (ii) above, CONTRACTOR shall not further disturb such condition prior to providing to NORESCO notice of such condition and receiving authorization from NORESCO to proceed.

7.4. [Reserved]

7.5. **Effect of Changes.** CONTRACTOR shall prepare in writing a detailed explanation of any change required or requested pursuant to this Article 7, including underlying Subcontractor's bids or written estimates with their respective substantiation, and the effect, if any, such change is expected to have on (i) any other aspect of the Facility including without limitation the Performance Guarantees, (ii) the operation or maintenance of the Facility, and (iii) the Milestone Payment Schedule. CONTRACTOR's cost proposal for the change shall include all actual costs, plus a profit margin of ten (10%) percent of the sum of the above costs. NORESCO shall within fifteen (15) days after receipt thereof provide a notice of acceptance or rejection of any proposed Change Order. In the event NORESCO and CONTRACTOR are unable to agree upon any Change Order required pursuant to Sections 7.2, or 7.3 hereof, either party may submit such matter to dispute resolution pursuant to Article 16 hereof. For any Change Order valued at less than Fifty Thousand Dollars ($50,000.00), NORESCO shall have the right to approve a Change Order to expedite implementation while expressly reserving its rights to dispute the Change Order as to price and effect on the schedule. In such event, CONTRACTOR shall proceed to complete the work contemplated by the Change Order and the parties shall forthwith endeavor to resolve the disputed aspects of the Change Order, including determining the disputed sums in accordance with Article 16 if necessary. If CONTRACTOR proceeds with Work which it considers a change prior to issuance of a Change Order by NORESCO, CONTRACTOR shall be entitled to a resulting change in the Fixed Price or the Project Schedule only upon determination that such Work constitutes a change in accordance with this Article 7. Upon determination of the applicable components of a change,

including scope, schedule, price and other components as applicable, a formal Change Order shall be reduced to writing and signed by the parties.

7.6. [Reserved]

7.7. **Work by Others; Subcontractors.** NORESCO may at its option contract with one or more third parties for the performance of Change Order work. CONTRACTOR shall have no warranty responsibility for such work performed by others. CONTRACTOR shall reasonably cooperate with such third parties, and NORESCO shall ensure that such third-party work will be performed so as to not unreasonably interfere with CONTRACTOR'S activities or achievement of Milestone Deadlines.

7.8. **NORESCO Designated Subcontractors.** CONTRACTOR shall, at the request of NORESCO, solicit proposals for the performance of Change Order Work from any qualified Subcontractor identified by NORESCO and approved by CONTRACTOR, such approval not to be unreasonably withheld.. Such proposals shall be provided to NORESCO, and NORESCO may, at its option, direct CONTRACTOR to engage such Subcontractor to perform the subject Work. In the event the cost of the subcontracted Work is greater than the quoted cost from any other qualified Subcontractor for such Work, the amount of the Change Order shall be adjusted accordingly.

7.9. **Change Order Approval.** Notwithstanding anything set forth herein to the contrary, no Change Order which increases the Fixed Price or extends the schedule shall be effective unless and until approved by NORESCO.

## ARTICLE 8. INSURANCE

8.1. **Coverages.** During the performance of the Work covered by this Agreement, CONTRACTOR shall obtain and maintain at its own expense the following insurances with insurance carriers licensed to do business in the State of Rhode Island having a Best's A or equivalent rating:

(a) Workers' Compensation Insurance as required by Laws and regulations of the State of Rhode Island covering employees of CONTRACTOR engaged in the performance of the Work.

(b) Employer's Liability Insurance (bodily injuries) with a limit of $1,000,000 per accident, and Employer's Liability Insurance (occupational diseases) with limits of $1,000,000 per person and $1,000,000 in the aggregate.

(c) Comprehensive General Liability Insurance at limits of $1,000,000 each occurrence for Bodily Injuries and Property Damage combined, subject to an annual aggregate of $2,000,000, and $2,000,000 in the aggregate for Personal Injury. This insurance includes CONTRACTOR's Protective and Contractual Liability, Completed Operations Insurance for two (2) years after Final Acceptance, and coverage for Collapse, Explosion and Underground Hazards. This policy shall contain a waiver of subrogation in favor of OWNER. Any losses within the deductible amounts provided for under this policy or the policy described in (d), below, shall be borne by CONTRACTOR.

(d) Excess Liability Insurance providing coverage limits for Employer's Liability and Commercial General Liability with a combined single limit of not less than $20,000,000 per occurrence and aggregate for bodily injury and property damage subject, however, to an aggregate limit for all insureds equal to the per occurrence limit.

(e) Subcontractor's Insurance. Before permitting any of its Subcontractors to perform any Work at the Site, CONTRACTOR shall obtain a certificate of insurance from each such Subcontractor evidencing that such Subcontractor has obtained insurance in such amounts and against such risks as is customarily carried by persons engaged in similar businesses in the same geographic area.

8.2. **Certificates and Cancellations.** Each party shall, on or prior to the Commencement Date, furnish the other party with certificates or other documentary evidence showing that the insurance to be carried by it in accordance with Article 8 hereof has been arranged. All insurance carried hereunder shall be endorsed to require the insurer to furnish CONTRACTOR, NORESCO and OWNER within thirty (30) days written notice prior to the effective date of any cancellation of insurance.

8.3. **Builder's Risk.** CONTRACTOR shall maintain in full force and effect, and at its own cost and expense, Builders All Risk Insurance in an amount equal to or greater than the Fixed Price, including transportation and covering all equipment, materials and construction tools and equipment to be used in and incidental to the Work while in transit to the Site, awaiting and during installation and erection, from March ~~22,~~ 28 2002 until Substantial Completion. Such policy shall include coverage for sixty days of Facility hot testing. NORESCO shall notify CONTRACTOR in the event an extension of such sixty day period is required. Any such extension shall be at NORESCO's sole option and expense. Subject to the provisions of Section 13.3, any losses, including losses to the Work or the NORESCO Provided Equipment or

provided, however losses within the deductible amount arising from events outside of the control of ~~both~~ the parties shall be borne equally by ~~both~~ the parties.

SJB [initials]

~~NORESCO Supplied Systems, within the deductible amount provided for under this policy shall be borne by the negligent party.~~ The policy shall include the interests of NORESCO, Owner, Owner's representatives, CONTRACTOR, Subcontractors and sub-tier Subcontractors by naming them as insureds or additional insureds as appropriate. Such policy shall be primary to any insurance carried or provided by NORESCO. NORESCO shall be be provided thirty days prior notice of cancellation, non-renewal or any endorsement restructuring or reducing coverage, and ten days prior notice of cancellation for non-payment of premium.

8.4. **Non-Waiver.** Failure of either party to comply with the foregoing insurance requirements shall in no way waive its obligations or liabilities under this Agreement or the rights of NORESCO hereunder against CONTRACTOR, or the rights of CONTRACTOR hereunder against NORESCO.

8.5. **Right to Insure.** Should either party fail to provide or maintain any of the insurance coverages referred to in this Article, the other party shall have the right to provide or maintain such coverage at the expense of the party so failing, either by direct charge or setoff.

8.6. [Reserved]

## ARTICLE 9. PERFORMANCE BOND

9.1. **Bond.** Within fourteen (14) days after execution of this Agreement, CONTRACTOR shall provide a performance and labor and payment bond in the amount of the Fixed Price and in the form and amount set forth in Attachment VII. Such bond shall remain in effect from commencement of the Work until Final Acceptance.

Failure of CONTRACTOR to timely provide such a bond pursuant to this Section 9.1 shall enable NORESCO to terminate this Agreement upon written notice to CONTRACTOR given any time after such thirty (30) day period and shall enable NORESCO to recover its damages for breach of Agreement from CONTRACTOR.

## ARTICLE 10. EVENTS OF DEFAULT AND REMEDIES; LIMITATION OF LIABILITY

10.1. **Events of Default.** The occurrence of any one or more of the following shall constitute an Event of Default under this Agreement:

(a) Failure of NORESCO to make any payments required under

this Agreement within sixty (60) days of the date upon which such payment becomes due and payable.

(b) Failure of either party to comply with any material covenant, obligation or condition of this Agreement other than covenants, obligations or conditions which result in a default under subsections (a) above or (h) below, which failure is not cured within twenty-five (25) days of receipt of notice of such failure from the non-defaulting party provided if such breach is one that cannot be cured in twenty-five (25) days with the exercise of reasonable diligence, such failure shall not result in an Event of Default if the party is diligently proceeding to cure such failure; provided that such extended cure period shall not exceed an additional forty-five(45) days without the written consent of the non-defaulting party, which consent shall not be unreasonably withheld.

(c) The levy of any attachment or execution or the appointment of any receiver, or the execution of any other process or any court of competent jurisdiction which is not vacated, dismissed or set aside within a period of ninety (90) days and which materially interferes with CONTRACTOR's ability to perform under this Agreement.

(d) A writ of attachment or execution is levied on this Agreement, and is not vacated, dismissed or set aside within a period of ninety (90) days.

(e) Any representation or warranty by either party is false or misleading in any material respect when made unless cured without damage to the other party, which is not cured within thirty (30) days of receipt of notice of such default from the non-defaulting party provided if such breach is one that cannot be cured in thirty (30) days with the exercise of reasonable diligence, such failure shall not result in an Event of Default if the party is diligently proceeding to cure such breach; provided that such extended cure period shall not exceed an additional sixty (60) days without the written consent of the non-defaulting party, which consent shall not be unreasonably withheld.

(f) CONTRACTOR abandons performance of the Work, or persistently fails to provide sufficient materials or qualified

workers to adequately prosecute the Work.

(g) Failure of CONTRACTOR to pay, or otherwise secure to the reasonable satisfaction of NORESCO, applicable liquidated damages within forty-five(45) days after becoming due and payable.

(h) CONTRACTOR (1) fails to achieve Readiness for Startup within sixty days after the Readiness for Startup Deadline or, (2) NORESCO at any time reasonably determines that CONTRACTOR is likely to fail to achieve Readiness for Startup within sixty days after the Readiness for Startup Deadline and, after written notice to that effect, CONTRACTOR fails to provide adequate written assurances of its ability to achieve Readiness for Startup within such sixty days.

(i) Any proceeding is instituted against a party seeking to adjudicate it as a bankrupt or insolvent, or a party makes a general assignment for the benefit of creditors, or a receiver is appointed on account of the insolvency of a party, or a party files a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or reorganization of debts and, in the case of any such proceeding instituted against a party, such proceeding is not dismissed within sixty (60) days after such filing.

10.2. **Remedies.** Upon the happening of any of the aforesaid Events of Default and the expiration of the applicable cure period, the non-defaulting party shall, at its option, have the following remedies:

The non-defaulting party shall have the ability to exercise all rights and remedies available to it under the Agreement, or terminate the Agreement by written notice to the defaulting party.

10.3. **Failure to Meet Milestone Deadlines.**

(a) If CONTRACTOR fails to meet a Milestone Deadline or determines that it will fail to meet a Milestone Deadline, CONTRACTOR shall promptly provide notice to NORESCO stating (a) the reason for failure to timely complete the

applicable Milestone, (b) the CONTRACTOR's proposed method for correcting such failure, (c) the CONTRACTOR's schedule for completing the Milestone, (d) the method or methods by which the CONTRACTOR proposes to achieve subsequent Milestones by the relevant Milestone Deadlines, and (e) the additional cost (which shall be payable solely by the CONTRACTOR except to the extent otherwise provided pursuant to Article 7) of achieving such Milestone as proposed by the CONTRACTOR. CONTRACTOR shall thereupon implement such schedule recovery plan as is reasonably acceptable to NORESCO and prosecute such plan so as to achieve future milestones in a timely manner. Unless agreed to in writing, NORESCO shall not be deemed to have waived or consented to any failure to meet any Milestone Deadline or any Event of Default arising therefrom.

(b) In the event CONTRACTOR fails to achieve Readiness for Startup on or before the Readiness for Startup Milestone Deadline (as same may be amended from time to time), CONTRACTOR shall be liable to NORESCO as liquidated damages and not a penalty, the sum of Three Thousand Dollars ($3,000.00) for each day after the Readiness for Startup Milestone that Readiness for Startup is not achieved.

10.4. **Liquidated Damages.** Upon acknowledgment by OWNER of achievement of Readiness for Startup pursuant to Section 12.6, the parties shall in good faith endeavor to agree on the amount, if any, of liquidated damages assessable pursuant to Articles 10 and 11. If the parties are unable to so agree within ten (10) days after issuance of such notice, upon submission by either party the matter shall be determined in accordance with the expedited procedures set forth in the Construction Industry Arbitration Rules of the American Arbitration Association.

10.5. **Payment in the Event of Termination.** In the event of termination of this Agreement pursuant to Section 15.2 or this Article 10, NORESCO shall pay CONTRACTOR the value of Work provided (the "Adjusted Value"). In the event of termination pursuant to this Article 10, such payment shall be net of such direct damages as are due NORESCO hereunder, and the sum of such payment and NORESCO's damages and cost to complete the Work shall not exceed the Fixed Price. In either case, such payment shall be made to CONTRACTOR in the manner set forth in Article 6 hereof, except that the Adjusted Value shall be substituted in place of the Fixed Price.

In the event of such termination, each party shall designate a qualified appraiser. Each appraiser shall independently determine the percentage of the Work completed and materials procured by CONTRACTOR and each shall calculate and communicate to the parties a proposed Adjusted Value as the corresponding percentage of the Fixed Price. The appraisers shall thereafter make all reasonable efforts to agree upon an Adjusted Value, which agreed upon amount shall be binding upon the parties. If the appraisers are unable to so agree, the matter shall be determined pursuant to Article 16 hereof.

10.6. [Reserved]

10.7. **Limitation of Liquidated Damages.** CONTRACTOR'S aggregate cumulative liability for liquidated damages pursuant to Sections 10.3 hereof shall not exceed 10% (ten percent) of the Fixed Price.

10.8. [Reserved]

10.9. **Consequential Damages.** Except to the extent of liquidated damages payable by CONTRACTOR hereunder, in no event shall either party be liable to the other party, whether under breach of contract, tort, negligence, strict liability or any other theory of liability, whether arising before or after Final Acceptance, for special, indirect, consequential, punitive or exemplary damages of any nature.

## ARTICLE 11. GUARANTEES AND WARRANTY

11.1. **Warranty.** CONTRACTOR warrants that the Work will be performed in accordance with the requirements of this Agreement, the Technical Specifications, all Facility permits and approvals and applicable laws, and the Work furnished hereunder will be new and free of defects in materials and workmanship and will conform to the standards of care and diligence normally practiced by construction firms performing work of a similar nature.

11.2. **Warranty Period.** The warranty set forth in Section 11.1, above, shall apply for a period of twelve (12) months commencing on successful completion of Facility performance testing by NORESCO, however not to exceed a period of eighteen (18) months commencing on achievement of Readiness for Startup. Notwithstanding the foregoing, the warranty period for any item repaired, replaced corrected and/or reperformed during the above stated period ~~shall extend~~ for a period of one year from the date of such repair, replacement, correction and/or reperformance. ADPM shall make all reasonable efforts to extend

SJB SJB

11.3. **Remedy.** In the event of a breach of the warranty set forth in

Section 11.1, above, and upon receipt of notice from NORESCO promptly upon NORESCO's discovery within the warranty period of such breach, CONTRACTOR shall repair, replace, correct and/or reperform the applicable Work, within the original scope of Work, at CONTRACTOR'S sole cost. NORESCO shall provide CONTRACTOR access to the Facility to perform such services, and CONTRACTOR in the performance thereof shall not unreasonably interfere with the operation of the Facility. Contractor shall be responsible for removal, replacement and reinstallation of materials and equipment necessary to gain access to defective Work, provided however, NORESCO shall endeavor to the extent practicable make Facility operating personnel available during their regular working hours to assist CONTRACTOR in such removal, replacement and reinstallation.

11.4. **Conditions of Warranty.** The warranty set forth in Section 11.1 above shall be exclusive of (i) normal wear and tear, (ii) normal degradation of the Work, (iii) misuse of the Work or negligence in its operation or maintenance and (iv) operation or maintenance of the Work not in accordance with the written requirements and recommendations the Equipment suppliers.

11.5. [Reserved]

11.6. **Warranty Administration.** CONTRACTOR shall obtain all customary warranties available from Subcontractors and Equipment vendors selected by CONTRACTOR or any Subcontractor under this Agreement. Such warranties shall be obtained for the benefit of NORESCO and the OWNER as well as for CONTRACTOR. CONTRACTOR shall administer and enforce all such warranties for the benefit of NORESCO and the OWNER for the term of such warranties.

11.7. **Sole Remedy.** The remedies set forth in this Article 11 shall be NORESCO's sole remedy for breach by CONTRACTOR of the warranty set forth herein.

11.8. [Reserved]

## ARTICLE 12. TESTING AND ACCEPTANCE OF THE FACILITY

12.1 **Acceptance Testing.** The Facility is subject to extensive commissioning, startup and performance testing subsequent to Readiness for Startup as a condition of acceptance by NORESCO. CONTRACTOR agrees to provide assistance and support to NORESCO for the duration of such activities, in the form of trade personnel and supervisors as necessary, and such additional support as NORESCO may reasonably require.

12.2. [Reserved]

12.3. **Readiness for Startup.** When in CONTRACTOR's opinion the Facility is mechanically complete (with the exception of punch list items) and ready for startup, CONTRACTOR shall deliver to NORESCO Certificate of Readiness for Startup in the form of Attachment VIII. (CONTRACTOR shall employ inspection checklists for each system and piece of equipment indicating that piece of equipment is ready for startup. Sample checklists are in Attachment XVII.) Thereupon, NORESCO shall, within five (5) days, inspect the Facility and acknowledge in writing its agreement therewith or alternatively, furnish CONTRACTOR with a written statement setting forth in which respects NORESCO considers that the Facility has not achieved Readiness for Startup. Such procedure shall be repeated as necessary until NORESCO acknowledges the CONTRACTOR's Certificate of Readiness for Startup, which acknowledgment shall not be unreasonably withheld or delayed. Readiness for Startup shall be deemed to have been achieved as of the date upon which the CONTRACTOR submits a Certificate of Readiness for Startup to which NORESCO affixes its signature acknowledging such Certificate.

12.4 [Reserved]

12.5. [Reserved]

12.6 **Punch List.** Within ten (10) days after issuance of a Certificate of Readiness for Startup, NORESCO shall inspect all Work, and NORESCO and CONTRACTOR shall endeavor in good faith to agree upon a final Punch List and the actual value of the Punch List items.

12.7. **Release and Waivers.** CONTRACTOR shall deliver as a condition of Final Acceptance an affidavit of CONTRACTOR providing that releases or waivers of all liens and claims arising through CONTRACTOR in connection with the Work (including releases or waivers for all labor, services, material and equipment for which a lien or claim could be filed) have been obtained and that all payrolls, material and equipment bills and other indebtedness connected with the Work for which NORESCO, OWNER or its property may be responsible have been paid or otherwise satisfied.

12.8. **Completion of Work.** CONTRACTOR shall fully and finally complete the Work (including but not limited to any Punch List items) as soon after the date of Readiness for Startup as practicable, but in no event later than sixty (60) days after such date, unless extended in accordance with Article 7 hereof. If CONTRACTOR fails to complete the Punch List items within such

time, NORESCO may complete any incomplete items and use the Retainage to pay the costs incurred in so completing.

12.9 **Certificate of Final Acceptance.** Within ten (10) days after receipt of a Certificate of Final Acceptance from CONTRACTOR, NORESCO shall inspect the Work and within twenty (20) days thereafter either: (a) deliver to CONTRACTOR a written acknowledgment to the CONTRACTOR's Certificate of Final Acceptance; or (b) notify CONTRACTOR in writing that Final Acceptance has not been achieved, stating in detail its reasons therefore, which may include, without limitation, outstanding Punch List items. In the event NORESCO determines that Final Acceptance has not occurred, CONTRACTOR shall promptly take such corrective action, if any, as will cause Final Acceptance to occur and shall issue to NORESCO another written Certificate of Final Acceptance. Such procedure shall be repeated as necessary until NORESCO acknowledges the CONTRACTOR's Certificate of Final Acceptance, which acknowledgement shall not be unreasonably withheld or delayed. Final Acceptance shall be deemed to have been achieved as of the date upon which the CONTRACTOR submits a Certificate of Final Acceptance to which NORESCO affixes its signature acknowledging such Certificate.

12.10. **Extensions.** Milestone Deadlines shall be extended only: (a) upon the issuance of and agreement by CONTRACTOR and NORESCO to a Change Order executed in accordance with Article 7 of this Agreement which requires extended time for performance; (b) for delays due to Force Majeure, or (c) otherwise as specifically set forth in this Agreement. In the event that an extension of the date of Readiness for Startup or Final Completion is required by the provisions of this Section 12.10, the parties hereto shall immediately negotiate in good faith to determine the appropriate length of the extension. If the parties hereto are unable to agree during such good faith negotiations, the matter shall be submitted to dispute resolution pursuant to Article 16 hereof.

12.11. [Reserved]

## ARTICLE 13. TITLE AND RISK OF LOSS

13.1. **Care, Custody and Control.** The care, custody and control of the Work, including materials, equipment and supplies whether stored on or off the Site, and including the NORESCO Provided Equipment, shall remain with CONTRACTOR until Readiness for Startup, at which time care, custody and control shall transfer to OWNER.

13.2. **Title.** Title to all Work shall pass to NORESCO at the earlier of time of delivery to the Site or incorporation into the Work.

13.3. **Risk of Loss.** To the extent of the scope and exclusions of the Builder's Risk Policy provided by CONTRACTOR, CONTRACTOR shall assume the risk of loss or damage to the Work, including materials, equipment and supplies whether stored on or off the Site, and including the NORESCO Provided Equipment. Additionally, CONTRACTOR shall assume the risk of loss or damage to the Work, including materials, equipment and supplies whether stored on or off the Site, and including the NORESCO Provided Equipment, to the extent that the loss or damage is caused by the negligence, willful misconduct, gross negligence, or fraud of CONTRACTOR or its agents, employees or subcontractors. NORESCO shall assume the risk of loss or damage to the Work, including materials, equipment and supplies whether stored on or off the Site, and including NORESCO Provided Equipment, for loss or damage excluded from the Builder's Risk Policy and not caused by the negligence, willful misconduct, gross negligence or fraud or CONTRACTOR or its agents, employees or subcontractors.

## ARTICLE 14. INDEMNIFICATION

14.1. **Indemnification.** CONTRACTOR hereby agrees and covenants to indemnify, defend, and hold harmless NORESCO and OWNER, to the extent of CONTRACTOR's responsibility, from and against any liability of whatsoever kind or character, including, but not limited to, attorneys' fees and expenses, arising from any claim by a third party arising out of all accidents, injuries, or damages of any kind to the extent caused, or claimed to be caused, in whole or in part by the negligence, or willful misconduct of CONTRACTOR, its agents, employees, vendors or subcontractors. NORESCO shall provide timely notice to CONTRACTOR of any such claims. CONTRACTOR's obligations under this Section 14.1 shall continue without limitation for a period through the applicable statute of limitations period notwithstanding the extinguishment of other rights and duties under this Contract by completion, termination of the Agreement, or in any other manner.

14.2. **Compliance with Laws.** CONTRACTOR hereby agrees and covenants to indemnify, defend and hold harmless NORESCO from and against all costs, fines and/or penalties levied by governmental entities to the extent arising from or relating to any failure by CONTRACTOR to perform the Work or otherwise conform to all Federal, State and local Laws, ordinances, regulations, permitting requirement, administrative directives, and requirements of insurance policies as to which CONTRACTOR has actual notice. NORESCO shall provide timely notice to CONTRACTOR of any such claims.

14.3. **Patent Indemnity.** For items actually designed or specified by

CONTRACTOR, CONTRACTOR shall defend, indemnify and hold harmless NORESCO from and against any and all claims whatsoever arising from any infringement of patents or the improper use of other proprietary rights which may occur in connection with CONTRACTOR'S performance of the Work or the ownership or use of any portion of the Work, unless such infringement or improper use is at the direction of NORESCO. NORESCO's acceptance of CONTRACTOR'S engineering design (if any) and/or proposed or supplied materials or equipment shall not be construed to relieve CONTRACTOR of any obligation hereunder. CONTRACTOR shall have the sole authority for the control of the defense of any and all such claims or suits brought thereon, and NORESCO shall render such assistance as CONTRACTOR shall reasonably require in connection therewith; provided that in any suit brought on such claim, NORESCO shall have the right to be represented by counsel of its own choice at its own expense. Should any such claim materially impair CONTRACTOR'S performance of the Work or NORESCO's or OWNER'S continued use of the Work, then CONTRACTOR shall, at its own expense, timely procure the right to continue its performance of the Work so as not to materially impair the schedule for completion of the Work, or timely procure for NORESCO and OWNER the right to continue use of the Work.

## ARTICLE 15. FORCE MAJEURE

15.1. **Definition and Effect.** A delay in or failure of performance hereunder by either party shall not constitute a default under this Agreement, to the extent that such delay or failure of performance results from any cause the proximate cause of which is any "Force Majeure". "Force Majeure" shall mean events beyond the reasonable control of such party which events such party could not have foreseen, prevented or limited the effects thereof utilizing all reasonable efforts under the circumstances, including but not limited to an act of God or the public enemy; expropriation or confiscation of facilities; compliance with any order of request of any governmental authority; action or inaction of governmental authorities; labor disputes; Changes in Law; acts of declared or undeclared war; public disorder, rebellion or sabotage; revolution; epidemic; landslide; lightning; fire; hurricane; storm; earthquake; flood; riot; explosion; shutdown required by any utility or governmental agency; partial or entire failure of utilities; and injunction or quarantine. Failure or delay of any subcontractor shall be Force Majeure as to CONTRACTOR only to the extent such failure or delay is caused by an event of Force Majeure as to such subcontractor, provided, however, if CONTRACTOR has timely arranged for the purchase and delivery of natural gas or fuel oil from a reputable fuel supplier in accordance with the fuel specifications set forth in Attachment II, and a fuel supplier fails to timely deliver adequate quantities of such fuel in conformance with such specifications, such failure by a fuel supplier shall be deemed to be

Force Majeure

- 15.2. **Obligations Upon Force Majeure.** In the event either party is prevented by a condition of Force Majeure from performing its obligations under this Agreement (other than any obligation to make payment pursuant to this Agreement, which obligations shall not be excused by reason of Force Majeure), it shall have the right upon prompt written notification to the other party to suspend performance to the extent made necessary by and during continuance of the Force Majeure. Such written notice shall describe the specific nature, extent and expected duration of the Force Majeure condition and the corresponding duties and obligations suspended thereby. The non-performing party shall use all reasonable efforts to eliminate the Force Majeure condition as quickly as possible. In the event that a Force Majeure condition persists longer than a total period of Twelve (12) consecutive months, the party whose performance is not prevented by the Force Majeure shall have the right to terminate this Agreement in accordance with the applicable provisions hereof.

## ARTICLE 16. DISPUTES RESOLUTION

16.1. **Disputes.** In case of a controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof, the parties, represented at the project manager level, shall meet and exert their best efforts to reach an amicable settlement. If, despite the parties' diligent, good faith attempt to resolve such dispute at the project management level the parties do not resolve the dispute, then at the written request of either party, the executive officers of each party (or such other person that a party's executive officer designates in writing) shall meet at any mutually agreed location within thirty (30) days of receipt of such request to resolve the dispute. In the event the executive officers fail to so resolve such dispute, the Parties shall in good faith endeavor to agree upon mediation of such dispute before a neutral, third-party mediator.

16.2. **Litigation.** If despite such meeting and/or mediation the parties do not resolve the dispute or if no such meeting takes place within such thirty (30) day period, either party may commence a legal proceeding in Federal Court in Rhode Island. Contractor specifically consents to venue herein. If such court lacks jurisdiction, then a proceeding may be commenced in any Rhode Island state court of competent jurisdiction.

16.3. **Work and Payment.** Unless otherwise agreed in writing, CONTRACTOR shall carry on the Work and maintain its progress during any dispute resolution proceedings including litigation, and NORESCO shall continue to make payments to CONTRACTOR in accordance with the Agreement.