In the event of such termination, each party shall designate a qualified appraiser. Each appraiser shall independently determine the percentage of the Work completed and materials procured by CONTRACTOR and each shall calculate and communicate to the parties a proposed Adjusted Value as the corresponding percentage of the Fixed Price. The appraisers shall thereafter make all reasonable efforts to agree upon an Adjusted Value, which agreed upon amount shall be binding upon the parties. If the appraisers are unable to so agree, the matter shall be determined pursuant to Article 16 hereof.

10.6. [Reserved]

10.7. **Limitation of Liquidated Damages.** CONTRACTOR'S aggregate cumulative liability for liquidated damages pursuant to Sections 10.3 hereof shall not exceed 10% (ten percent) of the Fixed Price.

10.8. [Reserved]

10.9. **Consequential Damages.** Except to the extent of liquidated damages payable by CONTRACTOR hereunder, in no event shall either party be liable to the other party, whether under breach of contract, tort, negligence, strict liability or any other theory of liability, whether arising before or after Final Acceptance, for special, indirect, consequential, punitive or exemplary damages of any nature.

ARTICLE 11. GUARANTEES AND WARRANTY

11.1. **Warranty.** CONTRACTOR warrants that the Work will be performed in accordance with the requirements of this Agreement, the Technical Specifications, all Facility permits and approvals and applicable laws, and the Work furnished hereunder will be new and free of defects in materials and workmanship and will conform to the standards of care and diligence normally practiced by construction firms performing work of a similar nature.

11.2. **Warranty Period.** The warranty set forth in Section 11.1, above, shall apply for a period of twelve (12) months commencing on successful completion of Facility performance testing by NORESCO, however not to exceed a period of eighteen (18) months commencing on achievement of Readiness for Startup. Notwithstanding the foregoing, the warranty period for any item repaired, replaced corrected and/or reperformed during the above stated period ~~shall extend~~ for a period of one year from the date of such repair, replacement, correction and/or reperformance. ADPM shall make all reasonable efforts to extend

SJB
AMO

SJB
AMO

11.3. **Remedy.** In the event of a breach of the warranty set forth in

Section 11.1, above, and upon receipt of notice from NORESCO promptly upon NORESCO's discovery within the warranty period of such breach, CONTRACTOR shall repair, replace, correct and/or reperform the applicable Work, within the original scope of Work, at CONTRACTOR'S sole cost. NORESCO shall provide CONTRACTOR access to the Facility to perform such services, and CONTRACTOR in the performance thereof shall not unreasonably interfere with the operation of the Facility. Contractor shall be responsible for removal, replacement and reinstallation of materials and equipment necessary to gain access to defective Work, provided however, NORESCO shall endeavor to the extent practicable make Facility operating personnel available during their regular working hours to assist CONTRACTOR in such removal, replacement and reinstallation.

11.4. **Conditions of Warranty.** The warranty set forth in Section 11.1 above shall be exclusive of (i) normal wear and tear, (ii) normal degradation of the Work, (iii) misuse of the Work or negligence in its operation or maintenance and (iv) operation or maintenance of the Work not in accordance with the written requirements and recommendations the Equipment suppliers.

11.5. [Reserved]

11.6. **Warranty Administration.** CONTRACTOR shall obtain all customary warranties available from Subcontractors and Equipment vendors selected by CONTRACTOR or any Subcontractor under this Agreement. Such warranties shall be obtained for the benefit of NORESCO and the OWNER as well as for CONTRACTOR. CONTRACTOR shall administer and enforce all such warranties for the benefit of NORESCO and the OWNER for the term of such warranties.

11.7. **Sole Remedy.** The remedies set forth in this Article 11 shall be NORESCO's sole remedy for breach by CONTRACTOR of the warranty set forth herein.

11.8. [Reserved]

## ARTICLE 12. TESTING AND ACCEPTANCE OF THE FACILITY

12.1 **Acceptance Testing.** The Facility is subject to extensive commissioning, startup and performance testing subsequent to Readiness for Startup as a condition of acceptance by NORESCO. CONTRACTOR agrees to provide assistance and support to NORESCO for the duration of such activities, in the form of trade personnel and supervisors as necessary, and such additional support as NORESCO may reasonably require.

12.2. [Reserved]

12.3. **Readiness for Startup.** When in CONTRACTOR's opinion the Facility is mechanically complete (with the exception of punch list items) and ready for startup, CONTRACTOR shall deliver to NORESCO Certificate of Readiness for Startup in the form of Attachment VIII. (CONTRACTOR shall employ inspection checklists for each system and piece of equipment indicating that piece of equipment is ready for startup. Sample checklists are in Attachment XVII.) Thereupon, NORESCO shall, within five (5) days, inspect the Facility and acknowledge in writing its agreement therewith or alternatively, furnish CONTRACTOR with a written statement setting forth in which respects NORESCO considers that the Facility has not achieved Readiness for Startup. Such procedure shall be repeated as necessary until NORESCO acknowledges the CONTRACTOR's Certificate of Readiness for Startup, which acknowledgment shall not be unreasonably withheld or delayed. Readiness for Startup shall be deemed to have been achieved as of the date upon which the CONTRACTOR submits a Certificate of Readiness for Startup to which NORESCO affixes its signature acknowledging such Certificate.

12.4 [Reserved]

12.5. [Reserved]

12.6 **Punch List.** Within ten (10) days after issuance of a Certificate of Readiness for Startup, NORESCO shall inspect all Work, and NORESCO and CONTRACTOR shall endeavor in good faith to agree upon a final Punch List and the actual value of the Punch List items.

12.7. **Release and Waivers.** CONTRACTOR shall deliver as a condition of Final Acceptance an affidavit of CONTRACTOR providing that releases or waivers of all liens and claims arising through CONTRACTOR in connection with the Work (including releases or waivers for all labor, services, material and equipment for which a lien or claim could be filed) have been obtained and that all payrolls, material and equipment bills and other indebtedness connected with the Work for which NORESCO, OWNER or its property may be responsible have been paid or otherwise satisfied.

12.8. **Completion of Work.** CONTRACTOR shall fully and finally complete the Work (including but not limited to any Punch List items) as soon after the date of Readiness for Startup as practicable, but in no event later than sixty (60) days after such date, unless extended in accordance with Article 7 hereof. If CONTRACTOR fails to complete the Punch List items within such

time, NORESCO may complete any incomplete items and use the Retainage to pay the costs incurred in so completing.

12.9 **Certificate of Final Acceptance.** Within ten (10) days after receipt of a Certificate of Final Acceptance from CONTRACTOR, NORESCO shall inspect the Work and within twenty (20) days thereafter either: (a) deliver to CONTRACTOR a written acknowledgment to the CONTRACTOR's Certificate of Final Acceptance; or (b) notify CONTRACTOR in writing that Final Acceptance has not been achieved, stating in detail its reasons therefore, which may include, without limitation, outstanding Punch List items. In the event NORESCO determines that Final Acceptance has not occurred, CONTRACTOR shall promptly take such corrective action, if any, as will cause Final Acceptance to occur and shall issue to NORESCO another written Certificate of Final Acceptance. Such procedure shall be repeated as necessary until NORESCO acknowledges the CONTRACTOR's Certificate of Final Acceptance, which acknowledgement shall not be unreasonably withheld or delayed. Final Acceptance shall be deemed to have been achieved as of the date upon which the CONTRACTOR submits a Certificate of Final Acceptance to which NORESCO affixes its signature acknowledging such Certificate.

12.10. **Extensions.** Milestone Deadlines shall be extended only: (a) upon the issuance of and agreement by CONTRACTOR and NORESCO to a Change Order executed in accordance with Article 7 of this Agreement which requires extended time for performance; (b) for delays due to Force Majeure, or (c) otherwise as specifically set forth in this Agreement. In the event that an extension of the date of Readiness for Startup or Final Completion is required by the provisions of this Section 12.10, the parties hereto shall immediately negotiate in good faith to determine the appropriate length of the extension. If the parties hereto are unable to agree during such good faith negotiations, the matter shall be submitted to dispute resolution pursuant to Article 16 hereof.

12.11. [Reserved]

## ARTICLE 13. TITLE AND RISK OF LOSS

13.1. **Care, Custody and Control.** The care, custody and control of the Work, including materials, equipment and supplies whether stored on or off the Site, and including the NORESCO Provided Equipment, shall remain with CONTRACTOR until Readiness for Startup, at which time care, custody and control shall transfer to OWNER.

13.2. **Title.** Title to all Work shall pass to NORESCO at the earlier of time of delivery to the Site or incorporation into the Work.

13.3. **Risk of Loss.** To the extent of the scope and exclusions of the Builder's Risk Policy provided by CONTRACTOR, CONTRACTOR shall assume the risk of loss or damage to the Work, including materials, equipment and supplies whether stored on or off the Site, and including the NORESCO Provided Equipment. Additionally, CONTRACTOR shall assume the risk of loss or damage to the Work, including materials, equipment and supplies whether stored on or off the Site, and including the NORESCO Provided Equipment, to the extent that the loss or damage is caused by the negligence, willful misconduct, gross negligence, or fraud of CONTRACTOR or its agents, employees or subcontractors. NORESCO shall assume the risk of loss or damage to the Work, including materials, equipment and supplies whether stored on or off the Site, and including NORESCO Provided Equipment, for loss or damage excluded from the Builder's Risk Policy and not caused by the negligence, willful misconduct, gross negligence or fraud or CONTRACTOR or its agents, employees or subcontractors.

## ARTICLE 14. INDEMNIFICATION

14.1. **Indemnification.** CONTRACTOR hereby agrees and covenants to indemnify, defend, and hold harmless NORESCO and OWNER, to the extent of CONTRACTOR's responsibility, from and against any liability of whatsoever kind or character, including, but not limited to, attorneys' fees and expenses, arising from any claim by a third party arising out of all accidents, injuries, or damages of any kind to the extent caused, or claimed to be caused, in whole or in part by the negligence, or willful misconduct of CONTRACTOR, its agents, employees, vendors or subcontractors. NORESCO shall provide timely notice to CONTRACTOR of any such claims. CONTRACTOR's obligations under this Section 14.1 shall continue without limitation for a period through the applicable statute of limitations period notwithstanding the extinguishment of other rights and duties under this Contract by completion, termination of the Agreement, or in any other manner.

14.2 **Compliance with Laws.** CONTRACTOR hereby agrees and covenants to indemnify, defend and hold harmless NORESCO from and against all costs, fines and/or penalties levied by governmental entities to the extent arising from or relating to any failure by CONTRACTOR to perform the Work or otherwise conform to all Federal, State and local Laws, ordinances, regulations, permitting requirement, administrative directives, and requirements of insurance policies as to which CONTRACTOR has actual notice. NORESCO shall provide timely notice to CONTRACTOR of any such claims.

14.3. **Patent Indemnity.** For items actually designed or specified by

CONTRACTOR, CONTRACTOR shall defend, indemnify and hold harmless NORESCO from and against any and all claims whatsoever arising from any infringement of patents or the improper use of other proprietary rights which may occur in connection with CONTRACTOR'S performance of the Work or the ownership or use of any portion of the Work, unless such infringement or improper use is at the direction of NORESCO. NORESCO's acceptance of CONTRACTOR'S engineering design (if any) and/or proposed or supplied materials or equipment shall not be construed to relieve CONTRACTOR of any obligation hereunder. CONTRACTOR shall have the sole authority for the control of the defense of any and all such claims or suits brought thereon, and NORESCO shall render such assistance as CONTRACTOR shall reasonably require in connection therewith; provided that in any suit brought on such claim, NORESCO shall have the right to be represented by counsel of its own choice at its own expense. Should any such claim materially impair CONTRACTOR'S performance of the Work or NORESCO's or OWNER'S continued use of the Work, then CONTRACTOR shall, at its own expense, timely procure the right to continue its performance of the Work so as not to materially impair the schedule for completion of the Work, or timely procure for NORESCO and OWNER the right to continue use of the Work.

## ARTICLE 15. FORCE MAJEURE

15.1. Definition and Effect. A delay in or failure of performance hereunder by either party shall not constitute a default under this Agreement, to the extent that such delay or failure of performance results from any cause the proximate cause of which is any "Force Majeure". "Force Majeure" shall mean events beyond the reasonable control of such party which events such party could not have foreseen, prevented or limited the effects thereof utilizing all reasonable efforts under the circumstances, including but not limited to an act of God or the public enemy; expropriation or confiscation of facilities; compliance with any order of request of any governmental authority; action or inaction of governmental authorities; labor disputes; Changes in Law; acts of declared or undeclared war; public disorder, rebellion or sabotage; revolution; epidemic; landslide; lightning; fire; hurricane; storm; earthquake; flood; riot; explosion; shutdown required by any utility or governmental agency; partial or entire failure of utilities; and injunction or quarantine. Failure or delay of any subcontractor shall be Force Majeure as to CONTRACTOR only to the extent such failure or delay is caused by an event of Force Majeure as to such subcontractor, provided, however, if CONTRACTOR has timely arranged for the purchase and delivery of natural gas or fuel oil from a reputable fuel supplier in accordance with the fuel specifications set forth in Attachment II, and a fuel supplier fails to timely deliver adequate quantities of such fuel in conformance with such specifications, such failure by a fuel supplier shall be deemed to be

Force Majeure

- 15.2. **Obligations Upon Force Majeure.** In the event either party is prevented by a condition of Force Majeure from performing its obligations under this Agreement (other than any obligation to make payment pursuant to this Agreement, which obligations shall not be excused by reason of Force Majeure), it shall have the right upon prompt written notification to the other party to suspend performance to the extent made necessary by and during continuance of the Force Majeure. Such written notice shall describe the specific nature, extent and expected duration of the Force Majeure condition and the corresponding duties and obligations suspended thereby. The non-performing party shall use all reasonable efforts to eliminate the Force Majeure condition as quickly as possible. In the event that a Force Majeure condition persists longer than a total period of Twelve (12) consecutive months, the party whose performance is not prevented by the Force Majeure shall have the right to terminate this Agreement in accordance with the applicable provisions hereof.

## ARTICLE 16. DISPUTES RESOLUTION

16.1. **Disputes.** In case of a controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof, the parties, represented at the project manager level, shall meet and exert their best efforts to reach an amicable settlement. If, despite the parties' diligent, good faith attempt to resolve such dispute at the project management level the parties do not resolve the dispute, then at the written request of either party, the executive officers of each party (or such other person that a party's executive officer designates in writing) shall meet at any mutually agreed location within thirty (30) days of receipt of such request to resolve the dispute. In the event the executive officers fail to so resolve such dispute, the Parties shall in good faith endeavor to agree upon mediation of such dispute before a neutral, third-party mediator.

16.2. **Litigation.** If despite such meeting and/or mediation the parties do not resolve the dispute or if no such meeting takes place within such thirty (30) day period, either party may commence a legal proceeding in Federal Court in Rhode Island. Contractor specifically consents to venue herein. If such court lacks jurisdiction, then a proceeding may be commenced in any Rhode Island state court of competent jurisdiction.

16.3. **Work and Payment.** Unless otherwise agreed in writing, CONTRACTOR shall carry on the Work and maintain its progress during any dispute resolution proceedings including litigation, and NORESCO shall continue to make payments to CONTRACTOR in accordance with the Agreement.

ARTICLE 17. REPRESENTATIONS

17.1. **Representation of CONTRACTOR.** CONTRACTOR represents and warrants to NORESCO that as of the date of this Agreement:

(a) CONTRACTOR is duly organized, validly existing and in good standing under the laws of Arizona, is duly qualified to do business in the State of Rhode Island and has the power and authority to enter and perform its obligations under this Agreement.

(b) CONTRACTOR's entry into this Agreement and performance of its obligations hereunder does not conflict with the terms of any law, order, rule, regulation or judgment applicable to it and does not and will not contravene or result in any default under any agreement or instrument to which it is a party or by which any of its properties may be bound.

(c) There is no suit, action, proceeding or investigation pending or, to the CONTRACTOR's knowledge, threatened against or affecting the CONTRACTOR before any court, regulatory commission, arbitration tribunal, government department, administrative agency or instrumentality which are reasonably likely to result, either in any case or in the aggregate, in any material adverse change in the business prospects, condition (financial or otherwise) or operations of the CONTRACTOR or its ability to carry out the terms of this Agreement.

(d) CONTRACTOR is not insolvent, has not filed or had filed against it a petition in bankruptcy, has not made an assignment for the benefit of creditors or otherwise had a receiver or trustee appointed with respect to its properties or affairs and has not incurred any obligations or liabilities, contingent or otherwise, which would cause it to become insolvent, and that the information provided in its bid concerning this project remains complete and accurate in all material respects as of the date hereof.

(e) CONTRACTOR has duly executed and delivered this Agreement, and, assuming the due authorization, execution

and delivery thereof by the other parties thereto, such Agreement constitutes a valid and binding obligation of CONTRACTOR enforceable against it in accordance with its terms, except as (i) such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, liquidation, moratorium or similar laws affecting creditors', or lessors', rights generally and (ii) the application of general equitable principles may limit the availability of certain remedies.

17.2. **Representations of NORESCO.** NORESCO represents and warrants to CONTRACTOR that as of the date of this Agreement:

(a) NORESCO's entry into this Agreement and performance of its obligations hereunder does not conflict with the terms of any law, order, rule, regulations or judgment applicable to it and does not and will not contravene or result in any default under any agreement or instrument to which it is a party or by which any of its properties may be bound.

(b) NORESCO has duly executed and delivered this Agreement, and, assuming the due authorization, execution and delivery thereof by the other parties thereto, such Agreement constitutes a valid and binding obligation of NORESCO enforceable against it in accordance with its terms, except as (i) such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, liquidation, moratorium or similar laws affecting creditors', or lessors', rights generally and (ii) the application of general equitable principles may limit the availability of certain remedies.

## ARTICLE 18. MISCELLANEOUS PROVISIONS

18.1. **Governing Law.** This Agreement shall be governed by the laws of the State of Rhode Island and shall be construed accordingly.

18.2. **Assignment by CONTRACTOR.** This Agreement shall not be assigned by CONTRACTOR without the express written approval of NORESCO.

18.3. **Assignment by NORESCO.** This Agreement may be assigned by NORESCO provided such assignee is no less financially capable than NORESCO of satisfying NORESCO's payment obligation hereunder, and NORESCO provides evidence to that effect reasonably satisfactory to CONTRACTOR.

NORESCO may collaterally assign all its rights in this Agreement to a lender, trustee or bondholder as reasonably required in connection with obtaining financing for performance of the Work.

18.4. Notices. All notices, demands or requests required or permitted to be given hereunder shall be in writing and delivered personally or sent by electronic facsimile, or by registered or certified mail, return receipt requested, as follows:

| | |
|---|---|
| To NORESCO: | Steven C. Bosland<br>Project Manager<br>NORESCO<br>1 Research Drive, Suite 400C<br>Westborough, MA 01581 |
| With a copy to: | Wade M. Carleton<br>Vice President - Operations |
| To CONTRACTOR: | Edward McNaught<br>Project Manager<br>ADP Marshall<br>75 Newman Avenue<br>Rumford, RI 02916 |
| With a copy to: | Jim Maguire |

Change of address for notice shall be accomplished by written notice sent in compliance with this Section. Notices shall be effective when received by the other party.

18.5. Non-Waiver. Except as expressly provided otherwise in this Agreement, the forbearance or delay of either party in exercising any rights hereunder shall not be deemed to be a waiver or release of any other rights which may subsequently arise unless expressly set forth in writing by such party.

18.6. **No Personal Liability; Third Parties.** Nothing herein or in the Proposal Documents shall be construed to create any personal liability on the part of any officer, agent, employee, director, attorney or consultant of NORESCO or CONTRACTOR, nor shall the Proposal Documents or this Agreement be construed to give any rights or benefits hereunder to anyone other than NORESCO and the CONTRACTOR.

18.7. Merger; Precedence; Amendment. This Agreement, which includes the Attachments referred to herein, represents the entire understanding of

NORESCO and CONTRACTOR with respect to the subject matter hereof. In the event of a conflict between the Agreement and the Attachments, the Agreement shall govern. No prior oral or written understanding shall be of any force or effect with respect to any matter covered hereunder. This Agreement may not be modified or altered except in writing signed by both parties.

18.8. **Jurisdiction; Integration.** This Agreement shall be governed by and interpreted under the laws of the State of Rhode Island. Jurisdiction over any disputes arising from this Agreement shall be exclusively in the federal and state courts in the State of Rhode Island. If any part of this Agreement is found by a court of competent jurisdiction to be invalid, the remainder of this Agreement shall be in full force and effect. The parties hereby consent to subject matter and personal jurisdiction and venue in the State of Rhode Island.

18.9. **Binding Agreement.** This Agreement shall be binding upon the parties hereto and their respective heirs, executors, administrators, successors and assigns.

18.10. **Time of Performance.** Time is of the essence in the achievement of Readiness for Startup by the Readiness for Startup Milestone. The CONTRACTOR shall diligently proceed to completion of the Work, and shall, subject to the conditions set forth herein, strictly adhere to the project schedule and meet all Milestone Deadlines.

18.11 **Entire Agreement.** The following Attachments are attached to and made part of this Design and Construction Agreement.

| | |
|---|---|
| Attachment I | Technical Specifications |
| Attachment II | NORESCO Provided Equipment; NORESCO Supplied Systems |
| Attachment III | Acceptance Testing |
| Attachment IV | [Reserved] |
| Attachment V | [Reserved] |
| Attachment VI | Milestone Payment |
| Attachment VII | Performance and Payment Bond |
| Attachment VIII | Certificate of Readiness for Startup |
| Attachment IX | Certificate of Final Acceptance |
| Attachment X | Unforeseen Conditions |
| Attachment XI | Milestone Schedule |
| Attachment XII | Owner's WORK |
| Attachment XIII | Demonstration Program |
| Attachment XIV | Unknown Conditions |
| Attachment XV | General Conditions of Purchase |

| | |
|---|---|
| Attachment XVI | NORESCO Minority Participation Plan |
| Attachment XVII | Sample Equipment Checklists |
| Attachment XVIII | Design Documents |
| Attachment XIX | Prepurchased Equipment Shop Drawing List (partial list) |
| Attachment XX | Exclusions and Clarifications |

This Procurement and Construction Agreement, including the recitals thereto, and the foregoing Attachments, constitutes the entire Design and Construction Agreement. To the extent of a conflict between the Procurement and Construction Agreement and the Rhode Island General Conditions of Purchase, the provision imposing the higher standard, duty, cost, or obligation on the CONTRACTOR shall govern.

18.12 [Reserved]

18.13 **Term.** The Term of this Agreement shall commence upon execution and shall terminate upon completion of the performance of the obligations of the parties hereunder.

18.14 **Pre-Existing Contamination.** Anything herein to the contrary notwithstanding, except to the extent of CONTRACTOR's obligations set forth as within its scope of Work, title to, ownership of, and legal responsibility and liability for any and all pre-existing contamination shall at all times remain with NORESCO. "Pre-existing contamination" is any hazardous or toxic substance or condition present at the Facility which was not brought there (or as to conditions, exacerbated or made worse) by CONTRACTOR. NORESCO hereby releases and agrees to defend, indemnify and hold CONTRACTOR harmless from and against any and all costs, losses, damages, expenses (including attorney's fees), fines, penalties, claims and causes of action which arise out of or result in any way from such pre-existing contamination, except to the extent resulting from CONTRACTOR's negligence or willful misconduct, or the negligence or willful misconduct of any of its agents, employees or subcontractors.

to the extent negligent
SJB

18.15 **Exclusive Remedies.** To the extent remedies are provided in this Agreement, then such remedies would be the exclusive remedy with respect to the subject matter covered thereby, provided however, such remedy shall be in addition to all other remedies set forth in this Agreement. In the event a cause of action or claim arises for which a remedy is not provided in this Agreement, then the parties shall have rights and remedies available at law or in equity, subject to the waivers, releases and limitations of liability set forth in this Agreement. To the extent any waivers, releases and limitations of liability are expressed in this Agreement then such waivers, releases and limitations of liability shall apply

even in the event of default, negligence or strict liability of the parties to be released or whose liability is limited and shall extend to the officers, directors, employees, agents and related entities of such party.

IN WITNESS WHEREOF, OWNER and CONTRACTOR have agreed and executed this Agreement as of the date first above written.

| NORESCO, LLC | ADP MARSHALL, INC. |
|---|---|
| By: [signature] | By: S. James Busam [signature] |
| Name: J. E. O'Brien President | Name: S. James Busam |
| Title: | Title: Vice President |

# ATTACHMENTS

## ATTACHMENT I TECHNICAL SPECIFICATIONS

The technical specifications consist of:

1. Design and Construct Agreement (DCA) and Exhibits, Cogeneration Facility and Upgrade of Existing Power Plant, State of Rhode Island and Providence Plantations, Rhode Island Department of Mental Health, Retardation, and Hospitals, Howard Center, Cranston, RI - RFP No. 1619 and Exhibit I - Previously provided to ADP Marshall. This document sets the project scope of supply and the systems for the project.

2. The Noresco 75% design drawings and specifications issued on October 12, 2001 clarify areas of Exhibit I that were not fully developed. The list of drawings and specifications are listed in this Attachment and these documents are incorporated into this contract by reference.

3. It is intended that the drawings and specifications establish design and operating conditions and that it indicate general construction and special features of the desired equipment which is complete and operable when installed and operated in accordance with the manufacturer's recommendations. Incidental items which are essential for complete and operable units, but which may not be specifically described in the specifications or not shown in the drawings, shall be included and shall be of the best available quality at no additional cost to *NORESCO* or to the OWNER.

## 75% Drawing List
## Issued October 12, 2001

| Sheet Designation | Sheet Title |
|---|---|
| | |
| T-100 | Project Title Sheet |
| | |
| A-001 | Notes, Symbols & Abbreviations |
| A-010 | General Plan |
| | |
| A-101 | New Facility – Ground Floor Plan |
| A-102 | New Facility - Mezzanine Plan |
| A-103 | New Facility - Roof Plan |
| | |
| A-201 | Existing Plant / Active Area - Floor Plans |
| A-202 | Existing Plant / Roof Plan |
| A-211 | Existing Plant / East / West Elevations |
| A-221 | Existing Plant / Active Area –Interior Elevations |
| | |
| A-301 | New Facility - West / North Elevations |
| A-302 | New Facility East / South Elevations |
| A-311 | New Facility - Cross Sections |
| A-312 | New Facility – Longitudinal Section |
| | |
| A-401 | Administration – Floor Plan |
| A-402 | Administration Area – Mezzanine Floor Plan |
| A-411 | Administration Area Reflected Ceiling Plan |
| A-421 | Interior Elevations – Bathrooms / Lockers |
| A-422 | Interior Elevations – Offices / Control Room |
| | |
| A-501 | Exterior Wall Sections |
| A-511 | Wall Paneling – Plans, Sections, Details |
| A-512 | Wall Paneling – Plans, Sections, Details |
| | |
| A-711 | Partition Types, Schedule – Finish Schedule |
| | |
| C-102 | Excavation Outlines for Building FDNS |
| C-103 | Site Grading, Paving and Drainage |
| | |
| S-101 | Building Roof Framing Plan |

| Sheet Designation | Sheet Title |
|---|---|
| S-102 | Pipe Racks Framing Plan |
| S-103 | Mezzanine Framing Plan |
| S-104 | Building Wall Elevations, SH-1 |
| S-105 | Building Wall Elevations, SH-2 |
| S-106 | Column Schedule and Details |
| S-107 | Sections and Details, SH-1 |
| | |
| S-201 | Building Foundations and Ground Floor Plan |
| S-202 | Sections and Details, SH-1 |
| S-203 | Sections and Details, SH-2 |
| S-204 | Sections and Details, SH-3 |
| S-205 | Sections and Details, SH-4 |
| S-206 | Sections and Details, SH-5 |
| | |
| M-100 | Symbols, Abbreviations, General Notes |
| M-101 | P&ID Diagram Symbol Library |
| | |
| M-310 | Mechanical Piping Tie-in Locations |
| M-311 | Mechanical Piping Tie-in Schedule |
| | |
| M-400 | P&ID Steam System, Sheet 1 of 2 |
| M-401 | P&ID Steam System, Sheet 2 of 2 |
| M-402 | P&ID Steam Distribution System |
| M-403 | P&ID Feed Water System |
| M-404 | P&ID Blowdown/Condensate Returns |
| M-405 | P&ID Steam/Water Sampling System |
| M-406 | P&ID Domestic Steam Space Heater Supply |
| M-410 | P&ID No. 6 Fuel Oil System |
| M-411 | P&ID No. 2 Fuel Oil System |
| M-412 | P&ID Natural Gas System |
| M-420 | P&ID Air/Flue Gas System, Sheet 1 of 2 |
| M-421 | P&ID Air/Flue Gas System, Sheet 2 of 2 |
| M-430 | P&ID Cooling Water System |
| M-440 | P&ID Chemical Feed and Lube Oil Systems |
| M-450 | P&ID Instrument Air & Plant Air System |
| M-460 | P&ID Raw Water/Water Treatment System |
| M-461 | P&ID Waste Water System |
| M-470 | P&ID Combustion Turbine No. 1&2 Enclosure Connections |
| | |
| M-500 | General Arrangement Composite Building Floor Plan 0'-0" |

| Sheet Designation | Sheet Title |
|---|---|
| M-501 | General Arrangement 18'-0" |
| M-510 | Piping Part Plan: Equipment Room El. 0'-0" |
| M-511 | Piping Part Plan: Equipment Room El. 18'-0" |
| M-512 | Piping Part Plan: Existing Boiler Room No. 3 Upper Level |
| M-513 | Piping Part Plan: Existing Boiler Room No. 3 & TH -1,2 Main Level |
| M-514 | Piping Part Plan: Existing Boiler Room 3 & Turbine Halls No. 1 & 2 Lower Level |
| M-520 | Roof Plan: Part Plan Mechanical Equipment & Piping |
| M-521 | Roof Plan: Stack Region |
| M-530 | HVAC Work: Ground Floor Ductwork |
| M-531 | HVAC Work: Ground Floor Piping, Mezzanine Ductwork, Roof Part Plan |
| M-550 | Condensate Return and Fuel Oil Tank Farm Piping |
| M-551 | Site Steam and Condensate Piping |
| | |
| M-701 | Mechanical Sections Sheet 2 |
| M-702 | Mechanical Sections Sheet 3 |
| | |
| M-800 | Mechanical Details Sheet 1 |
| M-801 | Mechanical Details Sheet 2 |
| M-802 | Mechanical Details Sheet 3 |
| M-803 | Mechanical Details Sheet 4 |
| | |
| M-900 | Mechanical Schedules Sheet 1 |
| M-901 | Mechanical Schedules Sheet 2 |
| | |
| E-100 | Symbols and Abbreviations Sheet 1 of 2 |
| E-101 | Symbols and Abbreviations Sheet 2 of 2 |
| | |
| E-300 | Electrical Site Work - Details |
| E-310 | Electrical Grounding Grid |
| E-311 | Electrical Grounding Details |
| | |
| E-400 | Electrical One-Line Diagram Main |
| E-401 | Electrical Control System Architecture |
| E-402 | Electrical One-Line Diagram MCC-1 |
| E-403 | Electrical One-Line Diagram MCC-2 |
| E-404 | Auxuliary 125V DC Distribution Systems |
| E-410 | Electrical, Logic/Control Drawing (EL-1) |
| E-411 | Electrical, Logic/Control Turbine Failure (EL-2) |

| Sheet Designation | Sheet Title |
|---|---|
| E-412 | Electrical, Logic/Control Utility Failure/Restoration (EL-3) |
| | |
| E-500 | New Work: Electrical Lighting Plan Powerhouse and Offices |
| E-501 | New Work: Power and Fire Alarm Plan Powerhouse and Offices |
| E-502 | New Work: Lighting, Power and Fire Alarm Plan – Mezzanine |
| | |
| E-510 | New Work: Roof – Power Plan |
| E-513 | Existing Boiler Room 3 and Turbine Hall Basement -: Power & Fire Alarm Plan |
| E-521 | Existing Boiler Room 3 Basement - Lighting Plan |
| E-522 | Existing Boiler Room 3 Ground Level - Lighting and Fire Alarm Plan |
| E-530 | Fuel Tank Farm Power Plan |
| | |
| E-600 | Panel Schedule |
| E-610 | MCC Front Views |
| E-630 | Control Schematics Sheet 1 of 3 |
| E-631 | Control Schematics Sheet 2 of 3 |
| E-632 | Control Schematics Sheet 3 of 3 |
| E-634 | Fire Alarm Riser Diagram |
| | |
| P-100 | Symbols, Abbreviations, General Notes |
| | |
| P-200 | Site Piping Demolition Plan |
| P-210 | Existing Building Plumbing Demolition BR#3/TH#1 and 2 |
| | |
| P-300 | Site Piping Plan (New Work) |
| P-310 | Under-Slab Piping Plan – Powerhouse and Office Area |
| | |
| P-400 | Plumbing Plan – Powerhouse, Office Area and Mezzanine |
| P-410 | Plumbing Plan – Roof Work |
| P-420 | Plumbing Plan – New Work, BR #3/TH#1 and 2; Equipment Level |
| | |
| P-500 | Plumbing Riser Diagrams |
| | |
| P-600 | Plumbing Details, Sheet 1 |
| P-601 | Plumbing Details, Sheet 2 |
| | |
| FP-400 | Symbols, Abbreviations, General Notes and Details |
| | |

| Sheet Designation | Sheet Title |
|---|---|
| FP-400 | Fire Protection Plan: Powerhouse and Office Area |
| FP-410 | Fire Protection Plan: BR #3/TH #1 and 2 |
| | |
| FP-500 | Fire Protection Riser Diagram and Details |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

## ATTACHMENT II NORESCO PROVIDED EQUIPMENT

"*NORESCO* provided Equipment" means those equipment packages described below being provided to the CONTRACTOR for installation and startup including the following:

1. Two gas turbines and auxiliaries,
2. Two HRSGs,
3. Two duct burners,
4. Ductwork assemblies for the gas turbines and the boiler,
5. Silencers for the gas turbines,
6. Inlet air filters for the gas turbines,
7. One boiler with economizer,
8. Two gas compressors,
9. Four heat exchangers,
10. Two air compressors,
11. Three city water booster pumps,
12. One medium voltage switchgear,
13. Two MCC lineups,
14. Chemical treatment systems,
15. Three boiler feed pumps,
16. One condensate return tank and pumping system,
17. One deaerator,
18. One intermittent blowdown tank and one continuous blowdown tank.

The CONTRACTOR is responsible to install and startup this equipment including providing the fluids required for lubrication and transport such as oil, propylene glycol and disposing of used fluids until the systems are started up. See Attachment XIX for the shop drawings describing the *NORESCO* supplied equipment.

## ATTACHMENT III ACCEPTANCE TESTING

Acceptance Testing requirements are described in Exhibit III, printed on 9/5/00 and incorporated into this section. *NORESCO* is in the process of developing the Test Plan identified in this document. The CONTRACTOR shall provide *NORESCO* with trade support during the acceptance test period to assist in the acceptance testing and equipment readiness. Daily work slips shall be handed in describing the work done that day.

# EXHIBIT III

## ACCEPTANCE TEST PROCEDURES

PART A GENERAL

1. Purpose

The purpose of this Exhibit III is to provide an outline of the procedures for Acceptance Testing to be incorporated in the test plan to be developed by the CONTRACTOR pursuant to Section 12.1 of the Agreement.

2. Commencement of Acceptance Tests

The CONTRACTOR may commence Acceptance Testing pursuant to Section 12.4 of the Agreement at the Contractor's discretion so long as: (i) the test plan developed in accordance with Section 12.1 of the Agreement has been approved by the OWNER or any dispute with regard to such test plan has be resolved in accordance with Article 16 of the Agreement; (ii) the OWNER has acknowledged the CONTRACTOR's Certificate of Readiness for Testing pursuant to Section 12.3 of the Agreement as evidence by the OWNER affixing its signature to such certificate; and (iii) the CONTRACTOR has provided the OWNER with the prior notice required pursuant to Section 12.4 of the Agreement.

3. Test Plan

The test plan developed pursuant to Section 12.1 of the Agreement and this Exhibit III shall, for each test required in Part B of this Exhibit III, include at a minimum: the detailed test protocols to be used; a listing of the parameters to be measures; the method of measurement and recording of the data; the frequency with which each datum will be recorded; the meters and other instrumentation to be used and the physical location of such meters and instruments; sample data sheets and/or computer outputs as applicable; the details of corrections to be performed; copies of any manufacturers correction curves that will be used to perform such corrections; sample calculations; and a detailed test schedule.

4. Operation During Acceptance Tests

During Acceptance Testing, normal operating personnel shall operate the Facility in accordance with normal operating and maintenance procedures and staffing levels (except that special staffing required to conduct the tests and record measurements will be acceptable), and shall perform all routine functions of operation and maintenance.

Shutdown of all or a part of the Facility to make necessary repairs to equipment or to correct normal operational problems will be permitted, provided that the duration of some tests may need to be extended or the tests repeated as the case may be.

5. Instrumentation and Calibration

Instrumentation employed during Acceptance Testing shall consist primarily of the permanent plant instrumentation supplied by the CONTRACTOR in accordance with the Work, supplemented, if necessary, by temporary, portable, or laboratory devices. All Primary, and Secondary instrumentation (as those terms are defined by ASME PTC 46) to be relied upon

during Acceptance Testing shall be calibrated, in accordance with applicable ASME, RIDEM or EPA procedures, by an independent party. Primary instrumentation that is sent to outside laboratories for certification shall be calibrated within 60 days of the commencement of the Acceptance Tests. Primary instrumentation that is calibrated in situ, shall be calibrated within 30 days of the commencement of the Acceptance Tests. As part of the Certificate of Readiness for Testing, the CONTRACTOR shall furnish documentation confirming the calibration of such instruments. Secondary instrumentation shall be calibrated upon initial installation, and shall not be required to meet the above time limits for re-certification.

6. Sampling and Laboratory Analysis
All sampling and laboratory analysis required by applicable permits shall be performed by an independent firm (under subcontract to the CONTRACTOR) who is qualified in such matters and acceptable to the permitting agency and the OWNER.

7. Data
Copies of all data recorded during each Acceptance Test shall be delivered by the CONTRACTOR to the OWNER or the OWNER's representative as soon as practical.

8. Electrical and Thermal Loads
It shall be the CONTRACTOR's responsibility to ensure that sufficient steam and electrical loads are available during the time of the tests.

9. Test Codes
The test procedures described in this Exhibit III are based on the following American Society of Mechanical Engineers (ASME) Performance Test Codes (PTC):

ASME PTC 4.1 – 1974 Steam Generating Units – Reaffirmed 1991

ASME PTC 4.4 – 1981 Gas Turbine Heat Recovery Steam Generators – Reaffirmed 1992 ✓

ASME PTC 22 – 1997 Gas Turbines ✓

ASME PTC 46 – 1996 Performance Test Code on Overall Plant Performance ✓

Acceptance Testing shall be conducted in accordance with the edition of the respective test codes in effect at the time the testing is conducted.

PART B ACCEPTANCE TESTS
1. Gas Turbine-Generator Capability Guarantee Tests
Each Gas Turbine-Generator shall be tested in accordance with the latest edition of ASME PTC 22. The electrical power output shall be determined using the methods specified in PTC 22. Corrections shall be made using the methods set forth in PTC 22. Each Gas Turbine-Generator shall be tested as follows: (i) for four thirty minute test periods, with the beginning of the first test period not more than 4 hours from the end of the last test period (unless a test was required

to be repeated due to the variation in the test conditions being greater than those permitted in Section 3.3.3 of PTC 22), while firing natural gas; and (ii) for four thirty minute test periods, with the beginning of the first test period not more than 4 hours from the end of the last test period (unless a test was required to be repeated due to the variation in the test conditions being greater than those permitted in Section 3.3.3 of PTC 22), while firing No. 2 fuel oil. During one or more of the test runs for each fuel type, the air emissions for such turbine shall be tested for the pollutants regulated by the RIDEM air quality permit in accordance with the test procedures contained in the permit and applicable RIDEM and EPA documents. The test runs of the Gas Turbine-Generators may, at the discretion of the CONTRACTOR, be conducted concurrently with the HRSG Capability Guarantee Test specified in Section 2 of Part B of this Exhibit III.

Before commencing any test run, the Gas Turbine-Generator shall be operating under stable conditions. Stable conditions shall be considered achieved when the unit has been operating at the manufacturer's specified "T5" temperature limit for a minimum of one (1) hour. Once a test run has been started, variation of the test conditions that is greater than the "Maximum Permissible Variation In Test Conditions" specified in Section 3.3.3 and Table 3.3.3 of PTC 22 shall be grounds for repeating the particular test run.

The electrical power output of the Gas Turbine-Generator in MW shall be determined in accordance with Sections 4.4 and 5.2 of PTC 22.

Shutdown of all or part of the Gas Turbine-Generator being tested to make necessary repairs to equipment or to correct normal operational problems will be permitted, provided that the specific test run that was being conducted at the time of the shutdown shall be repeated after the repairs or corrections have been made.

All measurements not related to the air emissions shall be read and recorded at a maximum of 10 minute intervals except for quantity measurements which shall be integrating instruments.

The measured and recorded parameters shall include, without limitation, the following:

a) ambient air temperature, relative humidity and barometric pressure,

b) when combusting natural gas — the gas density, volume flow, temperature and pressure,

c) when combusting No. 2 fuel oil — kinematic viscosity, density, volumetric flow,

d) measured power output of the electric generator and the power factor,

f) frequency output of the electric generator,

g) absolute exhaust back pressure at engine,

h) absolute inlet air pressure at engine,

i) water or steam injection pressure, temperature and flow, if applicable,

j) the pollutants regulated by the RIDEM air quality permit.

All computations shall be prepared in accordance with Section 5 of PTC 22. The measured power output in MW (as defined in Section 2.3.1 of PTC 22), as appropriately corrected, shall be compared to the Gas Turbine-Generator Capability Guarantee to determine the extent to which each Gas Turbine-Generator meets the Gas Turbine-Generator Capability Guarantee.

<u>2. HRSG Capability Guarantee Tests</u>

The steam production capacity of each HRSG shall be tested in accordance with the latest edition of ASME PTC 4.4. Corrections shall be made using the methods set forth in PTC 4.4. Each HRSG shall be tested for a minimum continuous period of 4 hours while firing natural gas and for 4 hours while firing No. 2 fuel oil. The two 4 hour tests shall be continuous. Each HRSG test may be conducted concurrently with the Gas Turbine-Generator Capability Test for the respective Gas Turbine-Generator. During each 4 hour test, the air emissions for such HRSG shall be tested for the pollutants regulated by the RIDEM air quality permit in accordance with the test procedures contained in the permit and applicable RIDEM and EPA documents.

Before commencing any test run, the Gas Turbine-Generator and HRSG shall be operating under stable conditions. With respect to the HRSG, stable conditions shall be considered achieved when the unit (or train) has been operating at following conditions for a minimum of one (1) hour:

| Variable | Variation |
|---|---|
| Feedwater Flow To Economizer | +/- 2% |
| Fuel Flow to Gas Turbine | +/- 2% |
| Supplemental Fuel Flow | +/- 2% |
| Gas Turbine Power Output | +/- 2% |
| Gas Temperature To HRSG | +/- 10 °F |
| Stack Gas Temperature | +/- 10 °F |
| Water Temperature To Economizer | +/- 10 °F |
| Steam Temperature Leaving Superheater | +/- 10 °F |
| Ambient Temperature | +/- 5 °F |
| Barometric Pressure | +/- 3% |
| Steam Pressure | +/- 20 PSIG |

Once a test run has been started, variation of the test conditions that is greater than the "Maximum Permissible Variation In Test Conditions" specified in Section 3.3.3 and Table 3.3.3 of PTC 22 shall be grounds for repeating the particular test run.

The steam generating capacity of the HRSG shall be determined from the actual output steam in lbs/hr (as determined by the measured feedwater flow minus the measured blowdown flow) and the actual steam temperature and pressure of the output steam.

During the tests, samples of the fuels shall be taken and analyzed to determine the fuel heating

value and any other parameters required by PTC 4.4.

To the extent practical, boiler blowdown shall not be performed during the test (or if not practical, boiler blowdown shall be minimized during the test) in order to either eliminate this variable or at least minimize it. The heat in the output steam shall be determined in accordance with Section 5.4.2.2 of PTC 4.4.

Shutdown of all or a part of the HRSG being tested to make necessary repairs to equipment or to correct normal operational problems will be permitted, provided that the specific 4 hour test that was being conducted at the time of the shutdown shall be repeated after the repairs or corrections have been made.

All measurements not related to the air emissions shall be read and recorded at a maximum of 10 minute intervals except for quantity measurements which shall be integrating instruments.

The measured and recorded parameters shall include, without limitation, the following

a) turbine exhaust gas temperature and flow,

b) HRSG exhaust gas temperature,

c) ambient air temperature, relative humidity and barometric pressure,

d) when combusting natural gas — the gas density, volume flow, temperature and pressure,

e) when combusting No. 2 fuel oil — kinematic viscosity, density, volumetric flow,

f) combustion air temperature and flow,

g) steam temperature, pressure and flow,

h) condensate temperature, pressure and flow,

i) feedwater temperature, pressure and flow,

j) boiler blowdown temperature and flow,

k) gross electric power output,

l) the pollutants regulated by the RIDEM air quality permit.

The steam output in pounds per hour (as measured by the feedwater flow minus the blowdown flow), temperature and pressure shall be compared to the HRSG Capability Guarantee to determine the extent to which each HRSG meets the HRSG Capability Guarantee.

3. Auxiliary Boiler Capability Guarantee Test

The capacity of the Auxiliary Boiler No. 8 shall be tested in accordance with the latest edition of ASME PTC 4. 1. The capacity shall be determined by the evaporation of steam in pounds per hour (as measured by the feedwater flow minus the blowdown flow) and the actual steam temperature and pressure of the output steam. Corrections shall be made using the methods set forth in PTC 4. 1. The Auxiliary Boiler No. 8 shall be tested for a minimum continuous period of 4 hours while firing natural gas and for 4 hours while firing No. 2 fuel oil. The two 4 hour tests shall be continuous. During each 4 hour test, the air emissions shall be tested for the pollutants regulated by the RIDEM air quality permit in accordance with the test procedures contained in the permit and applicable RIDEM and EPA documents.

Before commencing any test run, Auxiliary Boiler No. 8 shall be operating under stable conditions. Stable conditions shall be considered achieved when the boiler has been operating at following conditions for a minimum of one (1) hour:

| Variable | Variation |
|---|---|
| Feedwater Flow To Economizer | +/- 2% |
| Fuel Flow To Burner | +/- 2% |
| Stack Gas Temperature | +/- 10 °F |
| Water Temperature To Economizer | +/- 10 °F |
| Steam Temperature Leaving Superheater | +/- 10 °F |
| Reference Temperature | +/- 5 °F |
| Barometric Pressure | +/- 3% |
| Steam Pressure | +/- 20 PSIG |

During the tests, samples of the fuels shall be taken and analyzed to determine the fuel heating value and any other parameters required by PTC 4. 1.

Heat output shall be the sum of the output steam plus boiler blowdown. The output steam quantity shall be determined by the measured feedwater flow minus the measured blowdown flow. To the extent practical, boiler blowdown shall not be performed during the test (or if not practical, boiler blowdown shall be minimized during the test) in order to either eliminate this variable or at least minimize it. The heat in the output steam shall be determined in accordance with Sections 4.17, 4.19 and 4.21 of PTC 4. 1.

All computations shall be prepared in accordance with Section 7.2 of PTC 4. 1.

Shutdown of all or a part of the Auxiliary Boiler No. 8 while being tested to make necessary repairs to equipment or to correct normal operational problems will be permitted, provided that the specific 4 hour test that was being conducted at the time of the shutdown shall be repeated after the repairs or corrections have been made.

All measurements not related to the air emissions shall be read and recorded at a maximum of 10 minute intervals except for quantity measurements which shall be integrating instruments.

The measured and recorded parameters shall include, without limitation, the following

a) ambient air temperature, relative humidity and barometric pressure,

b) combustion air temperature,

c) when combusting natural gas — the gas density, volume flow, temperature and pressure,

d) when combusting No. 2 fuel oil — kinematic viscosity, density, volumetric flow,

e) steam temperature, pressure and flow,

f) feedwater temperature, pressure and flow,

g) boiler blowdown temperature, pressure and flow,

h) flue gas recirculation temperature and flow,

i) flue gas temperature, and

j) the pollutants regulated by the RIDEM air quality permit.

The steam output in pounds per hour (as measured by the feedwater flow minus the blowdown flow), temperature and pressure shall be compared to the Auxiliary Boiler Capability Guarantee to determine the extent to which the Auxiliary Boiler No. 8 meets the Auxiliary Boiler Capability Guarantee.

## PART C ACCEPTANCE TEST REPORT AND FACILITY INSPECTION

1. Acceptance Test Report

Upon completion of Acceptance Testing, and prior to or concurrent with the CONTRACTOR's delivery to OWNER of the Notice of Substantial Completion, the CONTRACTOR shall submit to the OWNER a written Acceptance Test report. The test plan shall specify the contents of such report, which shall include, without limitation, the following:

a) a certification from the CONTRACTOR that all Acceptance Tests were conducted in accordance with the approved test plan;

b) a certification from the CONTRACTOR of the results of the Acceptance Tests including a determination by the CONTRACTOR of the extent to which the Facility complies with the Performance Guarantees;

c) all data measured and recorded during the Acceptance Tests;

d) all calculations and computations;

e) the results of all laboratory analyses;

THE AMERICAN INSTITUTE OF ARCHITECTS

*AIA Document A312*

# Performance Bond

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

CONTRACTOR (Name and Address):

SURETY (Name and Principal Place of Business):

OWNER (Name and Address):

CONSTRUCTION CONTRACT
Date:
Amount:
Description (Name and Location):

BOND
Date (Not earlier than Construction Contract Date):
Amount:
Modifications to this Bond: ☐ None ☐ See Page 3

CONTRACTOR AS PRINCIPAL
Company: (Corporate Seal)

Signature: ______________________
Name and Title:

SURETY
Company: (Corporate Seal)

Signature: ______________________
Name and Title:

(Any additional signatures appear on page 3)

*(FOR INFORMATION ONLY—Name, Address and Telephone)*
AGENT or BROKER:

OWNER'S REPRESENTATIVE (Architect, Engineer or other party):

1 The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

2 If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1.

3 If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

3.1 The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

4 When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

4.1 Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

4.2 Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

4.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1 After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

.2 Deny liability in whole or in part and notify the Owner citing reasons therefor.

5 If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

6 After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

6.1 The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

6.2 Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

6.3 Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

7 The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators or successors.

8 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

9 Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation avail-

able to sureties as a defense in the jurisdiction of the suit shall be applicable.

10 Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

11 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

12 DEFINITIONS

12.1 Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

12.2 Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

12.3 Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

12.4 Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:

(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | (Corporate Seal) | Company: | (Corporate Seal) |
| Signature: | | Signature: | |
| Name and Title: | | Name and Title: | |
| Address: | | Address: | |

THE AMERICAN INSTITUTE OF ARCHITECTS

*AIA Document A312*

# Payment Bond

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

CONTRACTOR (Name and Address):

SURETY (Name and Principal Place of Business):

OWNER (Name and Address):

CONSTRUCTION CONTRACT
Date:
Amount:
Description (Name and Location):

BOND
Date (Not earlier than Construction Contract Date):
Amount:
Modifications to this Bond: ☐ None ☐ See Page 6

CONTRACTOR AS PRINCIPAL
Company: (Corporate Seal)

Signature: ______________________
Name and Title:

SURETY
Company: (Corporate Seal)

Signature: ______________________
Name and Title:

(Any additional signatures appear on page 6)

*(FOR INFORMATION ONLY—Name, Address and Telephone)*
AGENT or BROKER:

OWNER'S REPRESENTATIVE (Architect, Engineer or other party):

1 The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference.

2 With respect to the Owner, this obligation shall be null and void if the Contractor:

2.1 Promptly makes payment, directly or indirectly, for all sums due Claimants, and

2.2 Defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity whose claim, demand, lien or suit is for the payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, provided the Owner has promptly notified the Contractor and the Surety (at the address described in Paragraph 12) of any claims, demands, liens or suits and tendered defense of such claims, demands, liens, or suits to the Contractor and the Surety, and provided there is no Owner Default.

3 With respect to Claimants, this obligation shall be null and void if the Contractor promptly makes payment, directly or indirectly, for all sums due.

4 The Surety shall have no obligation to Claimants under this Bond until:

4.1 Claimants who are employed by or have a direct contract with the Contractor have given notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and, with substantial accuracy, the amount of the claim.

4.2 Claimants who do not have a direct contract with the Contractor:

.1 Have furnished written notice to the Contractor and sent a copy, or notice thereof, to the Owner, within 90 days after having last performed labor or last furnished materials or equipment included in the claim stating, with substantial accuracy, the amount of the claim and the name of the party to whom the materials were furnished or supplied or for whom the labor was done or performed; and

.2 Have either received a rejection in whole or in part from the Contractor, or not received within 30 days of furnishing the above notice any communication from the Contractor by which the Contractor has indicated the claim will be paid directly or indirectly; and

.3 Not having been paid within the above 30 days, have sent a written notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and enclosing a copy of the previous written notice furnished to the Contractor.

5 If a notice required by Paragraph 4 is given by the Owner to the Contractor or to the Surety, that is sufficient compliance.

6 When the Claimant has satisfied the conditions of Paragraph 4, the Surety shall promptly and at the Surety's expense take the following actions:

6.1 Send an answer to the Claimant, with a copy to the Owner, within 45 days after receipt of the claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed.

6.2 Pay or arrange for payment of any undisputed amounts.

7 The Surety's total obligation shall not exceed the amount of this Bond, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

8 Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any Construction Performance Bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and the Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

9 The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligations to make payments to, give notices on behalf of, or otherwise have obligations to Claimants under this Bond.

10 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

11 No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the location in which the work or part of the work is located or after the expiration of one year from the date (1) on which the Claimant gave the notice required by Subparagraph 4.1 or Clause 4.2.3, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

12 Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page. Actual receipt of notice by Surety, the Owner or the Contractor, however accomplished, shall be sufficient compliance as of the date received at the address shown on the signature page.

13 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this

Bond shall be construed as a statutory bond and not as a common law bond.

14 Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor shall promptly furnish a copy of this Bond or shall permit a copy to be made.

15 DEFINITIONS

15.1 Claimant: An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Contract. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

15.2 Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

15.3 Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:

(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | (Corporate Seal) | Company: | (Corporate Seal) |
| Signature: ______________ | | Signature: ______________ | |
| Name and Title: | | Name and Title: | |
| Address: | | Address: | |

ATTACHMENT VIII

CERTIFICATE OF READINESS FOR STARTUP

CONTRACTOR hereby certifies that the Facility is mechanically complete except for remaining Punch List items and the Facility, including all equipment and subsystems are ready for energized and operated (Startup) as set forth in Section 12.3 of the Agreement.

Dated this _____ day of ______, ______.

ADP MARSHALL, INC.

By: ____________________

Name: ____________________

Title: ____________________

## ATTACHMENT IX

## CERTIFICATE OF FINAL ACCEPTANCE

CONTRACTOR hereby certifies that all of the Work has been completed and CONTRACTOR has achieved final completion of the Facility in accordance with the Agreement as of [date].

Dated this _____ day of ______, _____.

ADP MARSHALL, INC.

By: ____________________

Name: ____________________

Title: ____________________

ATTACHMENT X UNFORSEEN CONDITIONS

Exhibit XII Owners Work is dated 09/05/00 attached and is incorporated into this section.

# ATTACHMENT XI

## MILESTONE SCHEDULE

| Milestone | Milestone Deadline |
|---|---|
| Mechanical Completion | April 2003 |
| Readiness for Testing | April 2003 |

***ATTACHMENT XII OWNERS WORK***

Owners Work is taken directly from NORESCO's contract with MHRH. . It entitled Exhibit XII Owners Work is dated 09/05/00 and is incorporated into this section.

# EXHIBIT XII

## OWNER'S WORK

The following items are required under the Owner's Work section of the contract:

**A. Owner's Equipment & Systems:**

1. Refurbish Steam Turbine-Generators (STGs) #3 and #4 in general accordance with OEM specifications and good engineering practices, normal wear and tear excepted. Demonstrate all safety devices, controls, lube oil systems, and auxiliaries function properly. Demonstrate STG isolation valves on 100 PSIG extraction and 15 PSIG exhaust hold pressure and do not leak. Demonstrate STG non-return valves (100 PSIG system) function properly.
2. Refurbish Boiler No.7 in general accordance with OEM specifications and good engineering practice, normal wear and tear excepted. Demonstrate all on-board safety devices, controls, and auxiliaries function properly, including without limitation all fuel burners, combustion controls, feedwater systems, blowdown systems, flue gas system, steam tubing, insulation, chemical feed system, fans, drives, ductwork, and exhaust stack. OWNER shall be responsible for bringing Boiler No. 7 into compliance with all applicable environmental permits.
3. Demonstrate that existing isolation valves to all 400 PSIG steam loads on 400 PSIG interconnect header hold pressure and do not leak. Refurbish these valves if necessary for safe and effective operation of the Rehabilitated Facility.
4. Demonstrate function of trip and re-close capability on all existing, unaltered switchgear, including switchboards 1, 2 and 3. Refurbish existing switchgear if necessary for safe and effective operation of the Rehabilitated Facility.

**B. Other Conditions:**

1. Any piping, utilities, hazardous waste or other subsurface impediments (including ledge or rock that requires blasting) that are not identified in the Work, and that, subject to the reasonable agreement of the parties hereto, must be relocated or removed to allow for the performance of the Work, shall be performed by the Contractor pursuant to a Change Order executed between Owner and Contractor.
2. The OWNER shall hold CONTRACTOR harmless with respect to piping code violations, if any, on steam and other existing piping that will not be upgraded as part of CONTRACTOR's Scope of Work.

## ATTACHMENT XV GENERAL CONDITIONS OF PURCHASE

The State of Rhode Island Office of Purchases General Conditions of Purchase are attached as a part of this section.

STATE OF RHODE ISLAND OFFICE OF PURCHASES

# GENERAL CONDITIONS OF PURCHASE

All State Purchase Orders, Contracts, Solicitations, Delivery Orders and Service Requests shall incorporate and be subject to the provisions of Title 37 Chapter 2 of the General Laws of the State of Rhode Island, the Regulations adopted pursuant thereto, all other applicable provisions of the Rhode Island General Laws, specific requirements described in the Request or Contract, and the following General Conditions of Purchase:

1. GENERAL - All purchase orders, contracts, solicitations, delivery orders, and service requests are for specified goods and services, in accordance with express terms and conditions of purchase, as defined herein. For the purposes of this document, the terms "bidder" and "contractor" refer to any individual, firm, corporation, or other entity presenting a proposal indicating a desire to enter into contracts with the State, or with whom a contract is executed by the State's Purchasing Agent, and the term "contractor" shall have the same meaning as "vendor".

2. ENTIRE AGREEMENT - The State's Purchase Order, or other State contract endorsed by the State Office of Purchases, shall constitute the entire and exclusive agreement between the State and any contractor receiving an award. In the eve any conflict between the bidder's standard terms of sale, these conditions or more specific provisions contained in the solicitation shall govern. All communication between the State and any contractor pertaining to any award or contract shall be accomplished in writing.

- a. Each proposal will be received with the understanding that the acceptance, in writing, by contract or Purchase Order by the Purchasing Agent of the offer to do work or to furnish any or all the materials, equipment, supplies or services described therein shall constitute a contract between the bidder and the State. This shall bind the bidder on his part to furnish and deliver at the prices and in accordance with the conditions of said accepted proposal and detailed specifications and the State on its part to order from such contractor (except in case of emergency) and to pay for at the agreed prices, all materials, equipment, supplies or services specified and delivered. A contract shall be deemed executory only to the extent of funds available for payment of the amounts shown on Purchase Orders issued by the State to the contractors.

  b. No alterations or variations of the terms of the contract shall be valid or binding upon the State unless submitted in writing and accepted by the Purchasing Agent. All orders and changes thereof must emanate from the

Office of Purchases: no oral agreement or arrangement made by a contractor with an agency or employee will be considered to be binding on the Purchasing Agent, and may be disregarded.
c. Contracts will remain in force for the contract period specified or until all articles or services ordered before date of termination shall have been satisfactorily delivered or rendered and accepted and thereafter until all terms and conditions have been met, unless

1. terminated prior to expiration date by satisfactory delivery against orders of entire quantities, or
2. extended upon written authorization of the Purchasing Agent and accepted by the contractor, to permit ordering of the unordered balances or additional quantities at the contract price and in accordance with the contract terms, or
3. canceled by the State in accordance with other provisions stated herein.

d. It is mutually understood and agreed that the contractor shall not assign, transfer, convey, sublet or otherwise dispose of this contract or his right, title or interest therein; or his power to execute such contract, to any other person, company or corporation, without the previous consent, in writing, of the Purchasing Agent.
e. If, subsequent to the submission of an offer or issuance of a purchase order or execution of a contract, the bidder or contractor shall merge with or be acquired by another entity, the contract may be terminated, except as a corporate resolution prepared by the contractor and the new entity ratifying acceptance of the original bid or contract terms, condition, and pricing is submitted to the Office of Purchases, and expressly accepted.
f. The contractor or bidder further warrants by submission of an offer or acceptance of a purchase order or other contract that he has no knowledge at the time of such action of any outstanding and delinquent or otherwise unsettled debt owed by him to the State, and agrees that later discovery by the Purchasing Agent that this warranty was given in spite of such knowledge, except where the matter is pending in hearing or from any appeal therefrom, shall form reasonable grounds for termination of the contract.

3. SUBCONTRACTS - No subcontracts or collateral agreements shall be permitted, except with the State's express consent. Upon request, contractors must submit to the Office of Purchases a list of all subcontractors to be employed in the performance of any Purchase Order or other contract arising from this Request.

4. RELATIONSHIP OF PARTIES - The contractor or bidder warrants, by submission of an offer or acceptance of a purchase order or other contract, that he is not an employee, agent, or servant of the State, and that he is fully qualified and capable in all material regards to provide the specified goods and services.

Nothing herein shall be construed as creating any contractual relationship or obligation between the State and any sub-bidder, subcontractor, supplier, or employee of the contractor or offeror.

5. COSTS OF PREPARATION - All costs associated with the preparation, development, or submission of bids or other offers will be borne by the offeror. The State will not reimburse any offeror for such costs.

6. SPECIFIED QUANTITY REQUIREMENT - Except where expressly specified to the contrary, all solicitations and contracts are predicated on a specified quantity of goods or services, or for a specified level of funding.

- a. The State reserves the right to modify the quantity, scope of service, or funding of any contract, with no penalty or charge, by written notice to the contractor, except where alternate terms have been expressly made a part o contract.
  b. The State shall not accept quantities in excess of the specified quantity except where the item is normally sold by weight (where sold by weight, the State will not accept quantities greater than ten per cent [10%] of the specified quantity), or where the Request or Contract provides for awards for other than exact quantities.
  c. Purchase Orders or other contracts may be increased in quantity or extended in term without subsequent solicit with the mutual consent of the contractor and the State, where determined by the Purchasing Agent to be in the State's best interest.

7. TERM AND RENEWAL - Where offers have been requested or contracts awarded for terms exceeding periods of twelve (12) months, it is mutually understood and agreed that the State's commitment is limited to a base term not to exceed twelve (12) months, subject to renewal annually at the State's sole option for successive terms as otherwise described, except where expressly specified to the contrary. Purchase orders appearing to commit to obligations of funding or terms of performance may be executed for administrative convenience, but are otherwise subject to this provision, and in such cases the State's renewal shall be deemed to be automatic, conditional on the continued availability of appropriated funds for the purpose, except as written notice of the State's intent not to renew is served.

8. DELIVERY - Delivery must be made as ordered and in accordance with the proposal. If delivery qualifications do not appear on the bidder's proposal, it will be interpreted to mean that goods are in stock and that shipment will be made within seven (7) calendar days. The decision of the Purchasing Agent, as to reasonable compliance with the delivery terms, shall be final. Burden of proof of delay in receipt of order shall rest with the contractor. No delivery charges shall be

added to invoices except when authorized on the Purchase Order.

9. FOREIGN CORPORATIONS - In accordance with Title 7 Chapter 1.1 of the General Laws of Rhode Island, no foreign corporation shall have the right to transact business in this state until it shall have procured a certificate of authority so to do from the Secretary of State.

10. PRICING - All pricing offered or extended to the State is considered to be firm and fixed unless expressly provided for to the contrary. All prices shall be quoted F.O.B. Destination with freight costs included in the unit cost to be paid by the State, except, where the Request or Contract permits, offers reflecting F.O.B. Shipping Point will be considered, and freight costs may then be prepaid and added to the invoice.

11. COLLUSION - Bidder or contractor warrants that he has not, directly or indirectly, entered into any agree participated in any collusion or otherwise taken any action in restraint of full competitive bidding. In special circumstances, an executed affidavit will be required as a part of the bid.

12. PROHIBITION AGAINST CONTINGENT FEES AND GRATUITIES - Bidder or contractor warrants that he has not paid, and agrees not to pay, any bonus, commission, fee, or gratuity to any employee or official of the State for the purpose of obtaining any contract or award issued by the State. Bidder or contractor further warrants that no commission or other payment has been or will be received from or paid to any third party contingent on the award of any contract by the State, except as shall have been expressly communicated to the State Purchasing Agent in writing prior to acceptance of the contract or award in question. Subsequent discovery by the State of non-compliance with these provisions shall constitute sufficient cause for immediate termination of all outstanding contracts and suspension or debarment of the bidder(s) or contractor (s) involved.

13. AWARDS - Awards will be made with reasonable promptness and by written notice to the successful bidder (only); bids are considered to be irrevocable for a period of sixty (60) days following the bid opening unless expressly provided for to the contrary in the Request, and may not be withdrawn during this period without the express permission of the Purchasing Agent.

- a. Awards shall be made to the bidder(s) whose offer(s) constitutes the lowest responsive price offer (or lowest responsive price offer on an evaluated basis) for the item(s) in question or for the Request as a whole, at the option of the State. The State reserves the right to determine those offers which are responsive to the Request, or which otherwise serve its best interests.

b. The State reserves the right, before making award, to initiate investigations as to whether or not the materials, equipment, supplies, qualifications or facilities offered by the bidder meet the requirements set forth in the proposal and specification, and are ample and sufficient to insure the proper performance of the contract in the event of award. If upon such examination it is found that the conditions of the proposal are not complied with or that articles or equipment proposed to be furnished do not meet the requirements called for, or that the qualifications or facilities are not satisfactory, the State may reject such a bid. It is distinctly understood, however, that nothing in the foregoing shall mean or imply that it is obligatory upon the State to make any examinations before awarding a contract; and it is further understood that if such examination is made, it in no way relieves the contractor from fulfilling all requirements and conditions of the contract.

c. Qualified or conditional offers which impose limitations of the bidder's liability or modify the requirements of the bid, offers for alternate specifications, or which are made subject to different terms and conditions than those specified by the State may, at the option of the State, be

1. rejected as being non-responsive, or
2. set aside in favor of the State's terms and conditions (with the consent of the bidder), or
3. accepted, where the State Purchasing Agent determines that such acceptance best serves the interests of the State.

- Acceptance or rejection of alternate or counter-offers by the State shall not constitute a precedent which shall be considered to be binding on successive solicitations or procurements.

d. Bids submitted in pencil, or which do not bear an original signature, in ink, by an owner or authorized agent thereof, will not be accepted.

e. Bids must be extended in the unit of measure specified in the Request. In the event of any discrepancy between unit prices and their extensions, the unit price will govern.

f. The Purchasing Agent reserves the right to determine the responsibility of any bidder for a particular procurement.

g. The Purchasing Agent reserves the right to reject any and all bids in whole or in part, to waive technical defects, irregularities, and omissions, and to give consideration to past performance of the offerors where, in his judgement the best interests of the State will be served by so doing.

h. The Purchasing Agent reserves the right to make awards by items, group of items or on the total low bid for all the items specified as indicated in the detailed specification, unless the bidder specifically indicates otherwise in his bid.

i. Preference may be given to bids on products raised or manufactured in the State, other things being equal.

j. The impact of discounted payment terms shall not be considered in

evaluating responses to any Request.
k. The Purchasing Agent reserves the right to act in the State's best interests regarding awards caused by clerical errors by the Office of Purchases.

14. SUSPENSION AND DEBARMENT - The Purchasing Agent may suspend or debar any vendor or potential bidder, for good cause shown:

- a. A debarment or suspension against a part of a corporate entity constitutes debarment or suspension of all of its divisions and all other organizational elements, except where the action has been specifically limited in scope and application, and may include all known corporate affiliates of a contractor, when such offense or act occurred in connection with the affiliate's performance of duties for or on behalf of the contractor, or with the knowledge, approval, or acquiescence of the contractor or one or more of its principals or directors (or where the contractor otherwise participated in, knew of, or had reason to know of the acts)

b. The fraudulent, criminal or other serious improper conduct of any officer, director, shareholder, partner, employee, or any other individual associated with a contractor may be imputed to the contractor when the conduct occurred in connection with the individual's performance of duties for or on behalf of the contractor, or with the contractor's knowledge, approval or acquiescence. The contracfor's acceptance of benefits derived from the conduct shall be evidence of such knowledge, approval, or acquiescence.

c. A vendor or contractor who knowingly engages as a subcontractor for a contract awarded by the State to a vendor or contractor then under a ruling of suspension or debarment by the State shall be subject to disallowance of cost, annulment or termination of award, issuance of a stop work order, or debarment or suspension, as may be judged to be appropriate by the State Purchasing Agent.

15. PUBLIC RECORDS - Contractors and bidders are advised that all documents, correspondence, and other submissions to the Office of Purchases may be accessible as public records, pursuant to Title 38, Chapter 2 of the General Laws, absent specific notice that portions of such submittals may contain confidential or proprietary information, such that public access to those items should be withheld.

16. PRODUCT EVALUATION - In all specifications, the words "or equal" are understood after each article when manufacturer's name or catalog are referenced. If bidding on items other than those specified, the bidder must, in every instance, give the trade designation of the article, manufacturer's name and detailed specifications of the item the bidder proposes to furnish; otherwise, the bid will be construed as submitted on the identical commodity described in the detailed

specifications. The Purchasing Agent reserves the right to determine whether or not the item submitted is the approved equal the detailed specifications.

- a. Any objections to specifications must be filed by a bidder, in writing, with the Purchasing Agent at least 96 hours before the time of bid opening to enable the Office of Purchases to properly investigate the objections.
  b. All standards are minimum standards except as otherwise provided for in the Request or Contract.
  c. Samples must be submitted to the Office of Purchases in accordance with the terms of the proposals and detailed specifications. Samples must be furnished free of charge and must be accompanied by descriptive memorandum invoices indicating whether or not the bidder desires their return and specifying the address to which they are to be returned (at the bidder's risk and expense), provided they have not been used or made useless by tests; and absent instructions, the samples shall be considered to be abandoned. Award samples may be held for comparison with deliveries.
  d. All samples submitted are subject to test by any laboratory the State Purchasing Agent may designate.

17. PRODUCT ACCEPTANCE - All merchandise offered or otherwise provided shall be new, of prime manufacture, and of first quality unless otherwise specified by the State. The State reserves the right to reject all non-conforming goods, and to cause their return for credit or replacement, at the State's option. Contract deliverables specified for procurements of services shall be construed to be work products, and subject to the provisions of this section.

- a. Failure by the State to discover latent defect(s) or concealed damage or non-conformance shall not foreclose the State's right to subsequently reject the goods in question.
  b. Formal or informal acceptance by the State of non-conforming goods shall not constitute a precedent for successive receipts or procurements.
  c. Where the contractor fails to promptly cure the defect or replace the goods, the State reserves the right to cancel the Purchase Order, contract with a different contractor, and to invoice the original contractor for any differential in price over the original contract price.
  d. When materials, equipment or supplies are rejected, the same must be removed by the contractor from the premises of the State Agency within forty-eight (48) hours of notification. Rejected items left longer than two days will be regarded as abandoned and the State shall have the right to dispose of them as its own property.

18. PRODUCT WARRANTIES - All product or service warranties normally offered by the contractor or bidder shall accrue to the State's benefit, in addition to any special requirements which may be imposed by the State. Every unit delivered

must be guaranteed against faulty material and workmanship for a period of one year unless otherwise specified, and the State may, in the event of failure, order its replacement, repair, or return for full credit, at its sole option.

19. PAYMENT - Unless otherwise provided for by the Request or Contract, payment shall not be made until delivery has been made, or services performed, in full, and accepted. Payment shall not be due prior to thirty (30) working days following the latest of completion, acceptance, or the rendering of a properly submitted invoice.

- a. Payment terms other than the foregoing may be rejected as being non-responsive.
  b. No partial shipments will be accepted, unless provided for by the Request or Contract.
  c. Where a question of quality is involved, payment in whole or part against which to charge back any adjustment required, shall be withheld at the direction of the Purchasing Agent. In the event a cash discount is stipulated, the withholding of payments, as herein described, will not deprive the State from taking such discount.
  d. Payments for used portion of inferior delivery will be made by the State on an adjusted price basis.
  e. Payments on contracts under architectural or engineering supervision must be accompanied by a Certificate of Payment and Statement of Account signed by the architect or engineer and submitted to the Agency involved for approval.

20. THIRD PARTY PAYMENTS - The State recognizes no assigned or collateral rights to any purchase agreement except as may be expressly provided for in the bid or contract documents, and will not accede to any request for third party or joint payment(s), except as provided for in specific orders by a court of competent jurisdiction, or by express written permission of the Purchasing Agent. Where an offer is contingent upon such payment(s), the offeror is obligated to serve affirmative notice in his bid submission.

21. SET-OFF AGAINST PAYMENTS - Payments due the contractor shall be subject to reduction by the State Controller equal to the amount of unpaid and delinquent state taxes (or other just debt owed to the State), except where notice of delinquency has not been served or while the matter is pending in hearing or from any appeal therefrom.

22. CLAIMS - Any claim against a contractor may be deducted by the State from any money due him in the same or other transactions. If no deduction is made in such fashion, the contractor shall pay the State the amount of such claim on demand. Submission of a voucher and payment, thereof, by the State shall not