preclude the Purchasing Agent from demanding a price adjustment in any case when the commodity delivered is later found to deviate from the specifications and proposal.

- a. The Purchasing Agent may assess dollar damages against a vendor or contractor determined to be non-performing or otherwise in default of their contractual obligations equal to the cost of remedy incurred by the State, and make payment of such damages a condition for consideration for any subsequent award. Failure by the vendor or contractor to pay such damages shall constitute just cause for disqualification and rejection, suspension, or debarment.

23. STATE CONTROLLER'S CERTIFICATION OF FUNDING - Certification as to the availability of funds to support the procurement for the current fiscal year ending June 30th only. Where delivery or service requirements extend beyond the end of the current fiscal year, such extensions are subject to both the availability of appropriated funds and a determination of continued need.

24. UNUSED BALANCES - Unless otherwise specified, all unused Blanket Order quantities and/or unexpended funds shall be automatically canceled on the expiration of the specified term. Similarly, for orders encompassing more than one State fiscal year, unexpended balances of funding allotted for an individual fiscal year may be liquidated at the close of that fiscal year, at the State's sole option.

25. MINORITY BUSINESS ENTERPRISES - Pursuant to the provisions of Title 37 Chapter 14.1 of the General Laws, the State reserves the right to apply additional consideration to offers, and to direct awards to bidders other than the responsive bid representing the lowest price where:

- a. the offer is fully responsive to the terms and conditions of the Request, and
  b. the price offer is determined to be within a competitive range (not to exceed 5% higher than the lowest responsive price offer) for the product or service, and
  c. the firm making the offer has been certified by the R.I. Department of Economic Development to be a small business concern meeting the criteria established to be considered a Minority Business Enterprise.

Ten per cent [10%] of the dollar value of the work performed against contracts for construction exceeding $5,000 shall be performed by Minority Business Enterprises where it has been determined that subcontract opportunities exist, and where certified Minority Business Enterprises are available. A contractor may count towards its MBE, DBE, or WBE goals 60% of its expenditures for materials and supplies required under a contract and obtained from an MBE, DBE, or WBE

regular dealer, and 100% of such expenditures when obtained from an MBE, DBE, or WBE manufacturer. Awards of this type shall be subject to approval, by the Director of Administration, of a Subcontracting Plan submitted by the bidder receiving the award.

26. PREVAILING WAGE REQUIREMENT - In accordance with Title 37 Chapter 13 of the General Laws of Rhode Island, payment of the general prevailing rate of per diem wages and the general prevailing rate for regular, overtime and other working conditions existing in the locality for each craft, mechanic, teamster, or type of workman needed to execute this work is a requirement for both contractors and subcontractors for all public works.

27. EQUAL OPPORTUNITY COMPLIANCE, HANDICAPPED ACCESS AND AFFIRMATIVE ACTION - Contractors of the State are required to demonstrate the same commitment to equal opportunity as prevails under federal contracts controlled by Federal Executive Orders 11246, 11625, 11375 and 11830, and Title 28 Chapter 5.1 of the General Laws of Rhode Island. Affirmative action plans shall be submitted by the contractor for review by the State Equal Opportunity Office. A contractor's failure to abide by the rules, regulations, contract terms and compliance reporting provisions as established shall be grounds for forfeiture and penalties as shall be established, including but not limited to suspension.

28. DRUG-FREE WORKPLACE REQUIREMENT - In accordance with Executive Order No. 91-14, Contractors who do business with the State and their employees shall abide by the State's drug-free workplace policy and the contractor shall so attest by signing a certificate of compliance.

29. GOODS PRODUCED IN THE REPUBLIC OF SOUTH AFRICA - In accordance with Chapters 35-10-12 and 37-2-57 of the General Laws, goods which are known to be wholly produced in the Republic of South Africa may not be accepted for any procurement the State of Rhode Island; the offeror attests by his submission of a bid or offer, or acceptance of a purchase order or other contract, that these prohibitions do not apply to material or goods which form the basis for his offer or contract.

30. TAXES - The State of Rhode Island is exempt from payment of excise, transportation and sales tax imposed by the Federal or State Government. These taxes should not be included in the proposal price. Exemption Certificates will be furnished upon request.

31. INSURANCE - All construction contractors, independent tradesmen, or firms providing any type of maintenance, repair, or other type of service to be performed on state premises, buildings, or grounds are required to purchase and

maintain coverage with a company or companies licensed to do business in the state as follows:

- a. Comprehensive General Liability Insurance -
  - 1) Bodily Injury $1,000,000 each occurrence
    - $1,000,000 annual aggregate

  - 2) Property Damage $500,000 each occurrence

- $500,000 annual aggregate.
  - Independent Contractors
  - Contractual - including construction hold harmless and other types of contracts or agreements in effect for insured operations.
  - Completed Operations
  - Personal Injury (with employee exclusion deleted)

- b. Automobile Liability Insurance -

- Combined Single Limit $1,000,000 each occurrence
  - Bodily Injury
  - Property Damage, and in addition non-owned and/or hired vehicles and equipment

- c. Workers' Compensation Insurance -

- Coverage B $100,000

The Purchasing Agent reserves the right to consider and accept alternate forms and plans of insurance or to require additional or more extensive coverage for any individual requirement. Successful bidders shall provide certificates of coverage, reflecting the State of Rhode Island as an additional insured, to the Office of Purchases, forty-eight (48) hours prior to the commencement of work, as a condition of award. Failure to comply with this provision shall result in rejection of the offeror's bid.

32. BID SURETY - When requested, a bidder must furnish a Bid Bond or Certified Check for 5% of his bid, or for the stated amount shown in the solicitation. Bid Bonds must be executed by a reliable Surety Company authorized to do business in the State of Rhode Island. Failure to provide Bid Surety with bid may be cause for rejection of bid. The Bid Surety of any three bidders in contention will be held until an award has been made according to the specifications of each proposal. All others will be returned by mail within 48 hours following the bid opening. Upon award of a contract, the remaining sureties will be returned by mail unless instructed to do otherwise.

33. PERFORMANCE AND LABOR AND PAYMENT BONDS - A performance bond and labor and payment bond of up to 100% of an award may be required by the Purchasing Agent. Bonds must meet the following requirements:

- a. Corporation: The Bond must be signed by an official of the corporation above his official title and the corporate seal must be affixed over his signature.
  b. Firm or Partnership: The Bond must be signed by all of the partners and must indicate that they are "Doing Business As (name of firm)."
  c. Individual: The Bond must be signed by the individual owning the business and indicate "Owner."
  d. The Surety Company executing the Bond must be licensed to do business in the State of Rhode Island or Bond must be countersigned by a company so licensed.
  e. The Bond must be signed by an official of the Surety Company and the corporate seal must be affixed over his signature.
  f. Signatures of two witnesses for both the principal and the Surety must appear on the Bond.
  g. A Power of Attorney for the official signing of the Bond for the Surety Company must be submitted with the Bond.

34. DEFAULT AND CANCELLATION - A contract may be canceled or annulled at the contractor's expense upon non-performance of contract, or breach, by the contractor, of any of his obligations. Failure of contractor to cure such non-performance or breach within ten working days after the receipt of notice, shall be sufficient cause for the cancellation of the contract in question, the cancellation of all outstanding contracts or sub-contracts held by the contractor, and the suspension or debarment of the contractor from future procurements.

- a. Failure of a contractor to deliver or perform within the time specified, or within reasonable time as interpreted by the Purchasing Agent or failure to make replacement of rejected articles, when so requested, immediately or as directed by the Purchasing Agent, will cause the Purchasing Agent to purchase in the open market to replace those rejected or not delivered. The Purchasing Agent reserves the right to authorize immediate purchase in the open market against rejections on any contract when necessary. On all such purchases, the contractor, or his surety, agrees to promptly reimburse the State for excess costs occasioned by such default. Should the cost be less, the contractor shall have no claim to the difference.
  b. A contractor who fails to commence within the time specified or complete an award made for repairs, alterations, construction, or any other service will be considered in default of contract. The Purchasing Agent may contract for completion of the work with another contractor and seek recourse from the defaulting contractor or his surety.

c. If contractor consistently fails to deliver quantities or otherwise perform as specified, the Purchasing Agent reserves the right to cancel the contract and purchase the balance in the open market at the contractor's expense.

35. INDEMNITY - The contractor guarantees:

- a. To save the State, its agents and employees, harmless from any liability imposed upon the State arising from the negligence, either active or passive, of the contractor, as well as for the use of any copyrighted or uncopyrighted composition, secret process, patented or unpatented invention, article or appliance furnished or used in the performance of the contract of which the contractor is not the patentee, assignee or licensee.
  b. To pay for all permits, licenses and fees and give all notices and comply with all laws, ordinances, rules and regulations of the city or town in which the installation is to be made and of the State of Rhode Island.
  c. That the equipment offered is standard new equipment, latest model of regular stock product with all parts regularly used with the type of equipment offered; also, that no attachment or part has been substituted or applied contrary to manufacturer's recommendations and standard practice.

36. CONTRACTOR'S OBLIGATIONS - In addition to the specific requirements of the contract, construction and building repair contractors bear the following standard responsibilities:

- a. To furnish adequate protection from damage for all work and to repair damages of any kind, for which he or his workmen are responsible, to the building or equipment, to his own work, or to the work of other contractors;
  b. To clear and remove all debris and rubbish resulting from his work from time to time, as directed or required, a completion of the work leave the premises in a neat unobstructed condition, broom clean, and in satisfactory order and repair;
  c. To store equipment, supplies, and material at the site only upon approval by the State, and at his own risk;
  d. To perform all work so as to cause the least inconvenience to the State, and with proper consideration for the rights of other contractors and workmen;
  e. To acquaint themselves with conditions to be found at the site, and to assume responsibility for the appropriate dispatching of equipment and supervision of his employees during the conduct of the work; and
  f. To ensure that his employees are instructed with respect to special regulations, policies, and procedures in effect for any State facility or site, and that they comply with such rules.

37. FORCE MAJEURE - All orders shall be filled by the contractor with

reasonable promptness, but the contractor shall not be held responsible for any losses resulting if the fulfillment of the terms of the contract shall be delayed or prevented by wars, acts of public enemies, strikes, fires, floods, acts of God, or for any other acts not within the control of the contractor and which by the exercise of reasonable diligence, the contractor is unable to prevent.

## ATTACHMENT XVI NORESCO MINORITY PARTICIPATION PLAN

The *NORESCO* Minority Participation Plan was issued on January 5, 2001 in a letter to Dorinda Keene from Valerie A. Moran. That plan is attached in this section. CONTRACTOR shall comply with this plan in accordance with Section 3.13 of this Agreement.

NORESCO
*Your energy solutions partner*

January 5, 2001

Ms. Dorinda Keene
State of Rhode Island
Department of Administration
Minority Business Enterprise Compliance Office
C/O Economic Development Corporation
One West Exchange Street, 5th Floor
Providence, RI 02903

Re: MBE/WBE Compliance Plan – MHRH cogeneration facility RFP #1619

Dear Ms. Keene:

Enclosed is a copy of our MBE Subcontracting Plan for the above referenced project. At this time, we request approval of this Plan.. Noresco will submit amendments containing specific contractors, service providers and contract amounts to demonstrate a good faith effort at compliance with General Law 37-14.1.

Coordination of all Noresco activity will be handled by:

Valerie A. Moran
Contracts Administrator
c/o Noresco
One Research Drive, Suite 400C
Westborough, MA 01581
Phone: 508-898-8665 ext. 1028
Fax: 508-836-9988
Email: vmoran@noresco.com

We trust this meets with the needs of your agency and we look forward to a productive working relationship over the course of the project. If there are any questions please do not hesitate to contact me.

Respectfully submitted,

Valerie A Moran

Valerie A. Moran

cc: Frank Wolak

An EQUITABLE RESOURCES Company
One Research Drive
Suite 400 C • Westborough, MA 01581
Phone: 508-614-1000 • Fax: 508-836-9988

f) any other data or analysis reasonably requested by the OWNER to be included in such report; and

g) a statement as to whether the CONTRACTOR intends to conduct additional Acceptance Tests and an estimated schedule of such testing.

2. Inspection
Upon completion of the Acceptance Tests, the OWNER and the OWNER's representatives shall have the right, but not the obligation, to inspect any portions of the Facility that the OWNER chooses, including without limitation, internal equipment and components.

ATTACHMENT VI

DRAWDOWN SCHEDULE
AND
MILESTONE SCHEDULE

## PART A. DRAWDOWN SCHEDULE

Monthly Payments:

All Applications for Payment by the CONTRACTOR to NORESCO shall be based upon the accomplishment of milestones and events, each of which represents a specific percentage of the Guaranteed Maximum Price and the costs associated with the allowances. The value of each milestone and allowance and determination of attainment of each shall be as specified in Part B of this Attachment VI.

Retainage:

Any amounts permitted to be paid pursuant to this Attachment VI shall be reduced by the amount of retainage required pursuant to Section 6.4 of the Agreement.

## PART B. MILESTONE SCHEDULE

1. Milestones for Preset Price = $11,312,235

| | Elements of Work | Percentage of Preset Price | | Description of Milestone and Description of Verification for Payment Method |
|---|---|---|---|---|
| B.3 | Combustion Equipment | | | |
| B.3.a | Heat Recovery Steam Generators (HRSG) | 1.46% | 4. | HRSGs set in permanent position, verified by visual inspection. |
| B.3.b | Auxiliary Boiler No. 8 | 0.88% | 4. | Boiler No. 8 set in permanent position verified by visual inspection. |
| B.4 | Stacks | 0.35% | 7. | Installation of ductwork/breaching from gas turbines and HRSGs, verified by visual inspection. |
| | | 0.33% | 8. | Commencement of treatment of existing stack, verified by visual inspection. |

| | Elements of Work | Percentage of Preset Price | Description of Milestone and Description of Verification for Payment Method |
|---|---|---|---|
| B.5 | Gas Turbine Generator | 0.99% | 5. Installation of gas turbine generators on pedestals completed, verified by visual inspection. |
| B.6 | Balance of Equipment | 0.18% | 3. Mechanical installation of boiler feedwater pumps, verified by visual inspection. |
| | | 0.47% | 6. Mechanical installation of deaerator and condensate tank system, verified by visual inspection. |
| | | 0.23% | 9. Mechanical installation of unit substation, verified by visual inspection. |
| | | 0.23% | 12. Mechanical installation of MCCs, verified by visual inspection. |
| | | 0.12% | 15. Mechanical installation of air compressors, verified by visual inspection. |
| | | 0.29% | 21. Mechanical installation of Gas Compressor system, verified by visual inspection. |
| | | 0.35% | 24. Mechanical installation of City Water Booster Pump, verified by visual inspection. |
| | | 0.06% | 27. Mechanical installation of Water Treatment system, verified by visual inspection. |
| | | 0.23% | 30. Mechanical installation of Switchboard #4, verified by visual inspection. |
| B.7 | Construction | 0.00 | |
| B.7.a | Mobilization | 4.28% | 1. The Civil/Site Work Subcontractor mobilizes on site, verified by visual inspection. |
| B.7.b | Site Work | 0.60% | 1. Site clearing initiated. |
| | | 1.21% | 2. Rough grading of site complete. |
| | | 3.32% | 3. Foundation and underground utilities excavation complete. |
| | | 0.91% | 4. Roads and parking complete. |
| | | 0.24% | 5. Landscaping complete. |
| | | | Verification of Site Work milestones will be by visual inspection. |

| Elements of Work | | Percentage of Preset Price | | Description of Milestone and Description of Verification for Payment Method |
|---|---|---|---|---|
| B.7.c | Foundation Work | 0.90% | 1. | Building foundation forms in place. |
| | | 1.58% | 2. | Building floor slab poured. |
| | | 1.35% | 3. | Stack foundation poured. |
| | | 2.25% | 4. | All equipment pads poured. |
| B.7.d | Structural Steel | 0.24% | 1. | Award of structural steel order, verified by unpriced signed purchase order. |
| | | 0.55% | 2. | Structural steel delivered to site, verified by signed delivery receipt, calculated at each payment application as a percentage of the total weight of structural steel forecasted to be delivered to the site. |
| | | 0.79% | 3. | Structural steel erected, verified by visual inspection, calculated at each payment application as a percentage of the total weight of structural steel forecasted to be delivered to the site. |
| B.7.e | Mechanical and Piping | 1.95% | 1. | Award of Mechanical/Piping subcontract, verified by signed unpriced purchase order. |
| | | 3.90% | 2. | Start on-site installation of High Pressure Header, verified by visual inspection. |
| | | 3.90% | 3. | Mechanical completion of High to Intermediate Pressure Reducing Station, verified by visual inspection. |
| | | 3.12% | 4. | Start on-site installation of Intermediate Pressure Header, verified by visual inspection. |
| | | 3.12% | 5. | Mechanical completion of Intermediate to Low Pressure Reducing Station, verified by visual inspection. |
| | | 3.12% | 6. | Start on-site installation of Low Pressure piping, verified by visual inspection. |
| | | 3.12% | 7. | Mechanical completion of Potable water piping, verified by visual inspection. |

| Elements of Work | Percentage of Preset Price | Description of Milestone and Description of Verification for Payment Method |
|---|---|---|
| | 1.56% | 8. Mechanical completion of process water treatment system, verified by visual inspection. |
| | 0.32% | 9. Mechanical completion of Fire Sprinkler piping, verified by visual inspection. |
| | 1.56% | 12. Mechanical completion of natural gas supply piping, verified by visual inspection. |
| | 1.17% | 13. Mechanical completion of compressed air piping, verified by visual inspection. |
| B.7.f Buildings | 0.92% | 1. Award of Building subcontract. |
| | 0.92% | 2. Completion of siding on new building. |
| | 0.92% | 3. Completion of roofing on new building. |
| | 0.92% | 4. Completion of interior finishing in new building. |
| | 9.00% | 5.a Mechanical completion in new building. |
| | 3.48% | 5.b Mechanical completion of HVAC and plumbing in new building. |
| | 1.00% | 6.a Commencement of asbestos removal from existing building. |
| | 3.13% | 6.b Completion of asbestos removal in the Boiler No. 7 area. |
| | 1.00% | 6.c Completion of asbestos removal in the turbine hall area. |
| | 0.92% | 7. Building subcontractor demobilizes. |
| | 2.75% | 8. Completion of renovations to existing building. |
| | 0.92% | 9. Active/Non-Active dividing wall complete. |
| | 0.92% | 10. Offices complete. |
| | | Verification will be visual inspection and comparison with approved design. |

| | Elements of Work | Percentage of Preset Price | Description of Milestone and Description of Verification for Payment Method |
|---|---|---|---|
| B.7.g | Control System/Electrical | 3.05% | 2. Control System installed and calibrated as evidenced by calibration logs. |
| | | 2.47% | 3. Award of Electrical subcontract, verified by signed unpriced purchase order. |
| | | 1.64% | 4. Feeders from Substation to Switchboard #4 installed, verified by visual inspection. |
| | | 1.64% | 5. Power available to Switchboard #4 verified by visual inspection. |
| | | 3.29% | 6. Power available to Motor Control Center verified by visual inspection. |
| | | 3.29% | 7. Switchgear relay testing and calibration completed as evidenced by signed test certificates. |
| | | 4.11% | 8. Electrical systems operational, as evidenced by electric utility approval to operate in parallel. |
| B.7.h | Painting/Insulation | 0.10% | 1. Award of painting subcontract, verified by signed unpriced purchase order. |
| | | 0.10% | 2. Award of insulation subcontract, verified by signed unpriced purchase order. |
| | | 0.25% | 3. Completion of painting, verified by visual inspection. |
| | | 0.19% | 4. Completion of installation of insulation, verified by visual inspection. |
| B.8 | Startup & Commissioning | 0.18% | 1. Submittal of Test protocols by CONTRACTOR to NORESCO. |
| | | 0.92% | 2. Facility passes Acceptance Tests, verified by NORESCO's acknowledgement of Certificate of Substantial Completion. |

| Elements of Work | Percentage of Preset Price | Description of Milestone and Description of Verification for Payment Method |
|---|---|---|
| | 0.28% | 4. Delivery by CONTRACTOR to NORESCO of Operation and Maintenance Manuals. |
| | 0.46% | 5. Delivery by CONTRACTOR to NORESCO of the complete set of "As Built" drawings and conformed specifications. |
| Total | 100% | |

2. Allowances = $ 1,052,870

The allowances, of a value of $1,052,870, are shown in the contract section 6.1.1.a. The allowances will be paid out based on section 6.1.1b of the contract.

3. Fixed Price = $12,365,105

The Fixed Price as described in contract section 6.1 is the combination of the Preset Price of $11,312,235 and the Allowances of $1,052,870 which equals $12,365,105

## ATTACHMENT VII PERFORMANCE AND PAYMENT BOND

The AIA performance and payment bond is attached to this section.

# *NORESCO* Subcontracting Plan

It is *NORESCO*'s policy, consistent with Chapter 37-14.1 of the General Laws of Rhode Island, that Minority Business Enterprise (MBE), Disadvantaged Business Enterprise (DBE), and Women-Owned Business Enterprise (WBE), shall mean a small business concern (SBC), owned and controlled by one or more minorities or women certified by the Rhode Island Department of Economic Development. Qualified MBE's, DBE's, and WBE's shall be provided with the maximum practicable opportunity to participate as *NORESCO*'s subcontractors, particularly in regards to contracts let by Federal, State or local agencies. As a component of this policy, *NORESCO* incorporates procedures to ensure the timely payment of amounts due its subcontractors, consistent with the terms of the specific subcontract agreement. The intent of this policy is to award appropriate subcontracts to qualified MBE's, DBE's and WBE's consistent with efficient contract performance.

*NORESCO* and its management have developed this subcontracting plan in accordance with the requirements of Chapter 37-14.1 of the General Laws of Rhode Island to guide its efforts in meeting the intent of this policy.

J. E. O'Brien
President

Subcontracting Plan

Article 1 - Percentage Goals
The following goals (expressed as percentages of total planned subcontracting dollars) will be applied to the total award as may be revised as a result of contract changes. These goals include subcontracted direct costs only, and do not include subcontracted indirect costs.

1.1 Minority Business Enterprise (MBE), Disadvantaged Business Enterprise (DBE), Women-Owned Business Enterprise (WBE): Target minimum of 10% of the total contract value under this solicitation will be awarded to subcontractors that qualify as MBE's, DBE's, and/or WBE's, according to Rhode Island Department of Economic Development.

1.2 Percentage of categories to be applied to the goals shall be:

100% Contract price of qualified MBE, DBE and/or WBE subcontractors and sub-tier contractors.

60% Materials and supplies required under this contract and obtained from MBE, DBE, and/or WBE vendor.

100% Expenditures of materials and supplies required under this contract and obtained from WBE, DBE and/or WBE manufacturers.

1.3 All percentages shall be monitored and adjusted as necessary throughout the contract to reflect any changes in scope, quantity or cost of any qualified MBE, DBE and/or WBE purchases, subcontracts, or sub-tier contracts.

**Article 2 - Principal Types of Supplies and Services to be Subcontracted**

2.1 *NORESCO* plans to subcontract a variety of supplies and/or services to facilitate the execution of this contract. Areas of subcontract responsibility shall include, but not be limited to, the following:

2.1.1 Geotechnical Services
2.1.2 Civil/Structural Equipment & Supplies
2.1.3 Civil/Structural Construction Services
2.1.4 Electrical Equipment and Supplies
2.1.5 Electrical Construction Services
2.1.6 Mechanical Equipment and Supplies
2.1.7 Mechanical Construction
2.1.8 Control System Components
2.1.9 Control System Installation Services
2.1.10 Professional Engineering and Architectural Services, specifically specialty services not covered in-house.
2.1.11 Waste Handling, Remediation, and Disposal Services
2.1.12 Material Handling and Rigging Services
2.1.13 Testing and Commissioning Services

2.2 Subcontracted Supplies and Services to MBE's, DBE's and/or WBE's.

2.2.1 All supplies and services described in Article 3.1 above are possible areas for subcontracting to MBE's, DBE's and/or WBE's. In the past, *NORESCO* has conducted significant portions of it's total subcontracting dollars with MBE's, DBE's and or WBE's.

**Article 3 - Methods to Identify Potential Subcontractors**

3.1 Historically, *NORESCO* has used a variety of methods to identify and solicit participation for suitable potential subcontractors. In any geographic region where *NORESCO* has existing qualified subcontractors, we anticipate continuing successful subcontracting relationships. In addition, we continually attempt to include other qualified potential subcontractors. Methods that will be employed to identify potential subcontractors include:

3.1.1 Use of source lists maintained by government agencies including the Procurement Automated Source System ("PASS") of the Small Business Administration ("SBA"), the National Minority Purchasing Council Vendor Information Service, the Minority Business Development Agency of the Department of Commerce.

3.1.2 Use of source lists maintained by state agencies including those which *NORESCO* is already familiar with and utilizes on an on-going basis (i.e. *NORESCO* specifically uses the State Office of Minority and Women

Business Assistance ("SOMWBA") in the Commonwealth of Massachusetts).

3.1.3 Recommendations or lists obtained from cognizant personnel at the facility.

3.1.4 Lists available from Rhode Island Chamber of Commerce, R.I. Vendor Information Program, and local Trade Associations.

3.1.5 Firms identified through attendance at conferences and trade fairs.

3.1.6 Contact with organizations which may be familiar with suitable subcontractors such as Economic Development organizations, etc.

3.1.7 Contact with equipment vendors who may be familiar with qualified installation subcontractors.

**Article 4 - Subcontracting Plan Administration**

4.1 The subcontracting plan will be administered by the following individual:
Valerie Moran
Contract Administrator
*NORESCO*
1 Research Drive
Westborough, MA 01581
(508) 898-8665

4.2 The administrator's responsibilities include, but are not limited to:

4.2.1 Searching, obtaining and maintaining source lists from all appropriate agencies such as the SBA, Department of Commerce, local Chamber of Commerce, etc.

4.2.2 Participating in vendor surveys to determine capabilities.

4.2.3 Providing guidance and assistance to MBE's, DBE's and WBE's to clarify *NORESCO*'s requirements and encourage participation.

4.2.4 Assuring inclusion of MBE's, DBE's, and/or WBE's in all solicitations where appropriate.

4.2.5 Providing guidance and training to internal personnel regarding timely development and expansion of MBE's, DBE's, and/or WBE's subcontracting.

4.2.6 Monitoring attainment of proposed goals and preparing periodic reports for management review.

4.2.7 Reviewing solicitations to remove statements, clauses, etc., which may be obstacles to participation by otherwise qualified MBE's, DBE's and/or WBE's.

4.2.8 Including the applicable MBE's DBE's, and/or WBE's clauses/provisions in subcontracts where required.

4.2.9 Providing assistance, guidance and review of first tier subcontract programs to include appropriate MBE, DBE, and WBE subcontracting goals and programs to lower tier subcontractors.

4.2.10 Maintaining records of solicitations and awards to MBE's, DBE's, and/or WBE's including reasons for non-awards as appropriate.

4.2.11 Participating in and providing necessary information for participation in periodic studies and surveys regarding MBE, DBE, and WBE subcontracting.

4.2.12 Obtaining the assistance of others as necessary to perform the above duties.

**Article 5 - Assuring Equitable Opportunity to Compete for Subcontracts**

5.1 Outreach efforts will be made as follows:

5.1.1 Contacts with SBA (PASS)

5.1.2 Contacts with Minority and Small Business Trade Associations

5.1.3 Contacts with business development organizations

5.1.4 Attendance at Small and Minority Business procurement conferences and trade fairs.

5.2 The following internal efforts will be made to guide and encourage internal personnel with decision making responsibility:

5.2.1 Workshops, seminars and training will be conducted on a regular basis.

5.2.2 Activities will be monitored to evaluate compliance and progress towards goals.

5.2.3 Sources lists will be maintained, updated and distributed to responsible decision makers.

5.2.4 Potential obstacles to participation by MBE's, DBE's, and/or WBE's will be reviewed, discussed and removed where appropriate.

5.3 When requested, *NORESCO* will review unsuccessful responses from MBE's, DBE's, and/or WBE's with respondent for guidance on revisions to increase likelihood for future success.

**Article 6 - Compliance by Subcontractors**

6.1 *NORESCO* agrees that "Minority Business Enterprise Utilization" will be included in all subcontracts which offer further subcontracting opportunities, and that all subcontractors (except MBE's, DBE's and/or WBE's) that receive subcontracts in excess of $100,000 will be required to adopt a subcontracting plan similar to this one.

6.2 The following procedures will be followed in reviewing, approving, and monitoring such plans.

6.2.1 The subcontracting plan will be part of the agreement with the subcontractor.

6.2.2 The subcontractor will be monitored for performance.

6.2.3 *NORESCO* may terminate subcontractors that fail to perform its obligations under the subcontracting plan.

## Article 7 - Surveys and Reports

7.1 *NORESCO* agrees to:

7.1.1 Cooperate with any studies or surveys related to small business subcontracting as may be required.

7.1.2 Submit periodic reports which allow the State to determine the extent of *NORESCO*'s compliance with the subcontracting plan.

7.1.3 Submit Subcontracting Report for Individual Contracts, and/or Summary Subcontract Report in accordance with the Contract requirements.

7.1.4 Ensure that its subcontractors agree to submit Forms as required.

## Article 8 - Records and Documents

*NORESCO* agrees that it will maintain at least the following types of records to document compliance with this subcontracting plan.

8.1 MBE, DBE, and WBE source lists, guides and other data identifying possible MBE, DBE and WBE vendors.

8.2 Organizations contacted for sources.

8.3 Records of all subcontract solicitations indicating on each solicitation (1) whether MBE was solicited, and if not, why not; (2) whether DBE was solicited, and if not, why not, (3) whether WBE was solicited, and if not, why not, and (4) reasons for failure of solicited MBE, DBE or WBE to receive the subcontract award.

8.4 Records to support outreach efforts undertaken, including contacts with trade associations, business development organizations, and conference and trade fairs attended to help locate MBE's, DBE's and WBE's.

8.5 Records of efforts to support internal activities to guide and encourage buyers and monitoring of progress towards goals and compliance with the subcontracting plan.

8.6 Records to support award data submitted to the State to include name and address of subcontractors.

## ATTACHMENT XVII SAMPLE EQUIPMENT CHECK LISTS

The CONTRACTOR is expected to follow the startup check lists and procedures provided by the *NORESCO* pre-purchase equipment vendors. In lieu of these check lists and procedures the CONTRACTOR shall follow check lists similar to those provided in this section for:

1. Pumps
2. Fans
3. Piping

# Pastore Center Cogeneration Project

## PRE-COMMISSIONING CHECKLIST
## FANS

Fan No.:____________________

System:____________________

Location:____________________

Service:____________________

P: PASTORE REPRESENTATIVE
N: NORESCO REPRESENTATIVE
Q: CHIEF QUALITY CONTROL
M: MECHANICAL REPRESENTATIVE
E: ELECTRICAL REPRESENTATIVE
I/C: INSTRUMENT/CONTROL REP.

| INSTALLATION DETAILS | P | N | Q | M | E | I/C |
|---|---|---|---|---|---|---|
| (1) VIBRATION ISOLATION DEVICES INSTALLED | | | | | | |
| (2) INSPECTION AND ACCESS DOORS ARE OPERABLE | | | | | | |
| (3) CASING UNDAMAGED | | | | | | |
| (4) INSULATION UNDAMAGED | | | | | | |
| (5) CONDENSATE DRAINAGE IS UNOBSTRUCTED | | | | | | |
| (6) FAN BELT ADJUSTED | | | | | | |
| (7) MANUFACTURER'S REQ'D MAINT. CLEARANCE PROVIDED | | | | | | |
| (8) CONTRUCTION FILTERS REMOVED AND REPLACED IF APPLICABLE | | | | | | |
| ELECTRICAL | | | | | | |
| (1) POWER AVAILABLE TO UNIT DISCONNECT | | | | | | |
| (2) POWER AVAILABLE TO UNIT CONTROL PANEL | | | | | | |
| (3) PROPER MOTOR ROTATION VERIFIED | | | | | | |
| (4) VERIFY POWER DISCONNECT IS LOCATED WITHIN SIGHT OF THE UNIT | | | | | | |
| CONTROLS | | | | | | |
| (1) DAMPERS/ACTUATORS PROPERLY INSTALLED | | | | | | |
| (2) DAMPERS/ACTUATORS OPERABLE | | | | | | |
| (3) VERIFY PROPER LOCATION AND INSTALLATION OF THERMOSTAT | | | | | | |

| COMMENTS & NOTES |
| --- |
| |
| NOTE: REFER TO MANUFACTURER'S MANUALS AS REQUIRED |

# Pastore Center Cogeneration Project

## PRE-COMMISSIONING CHECKLIST
## PUMPS

System:____________________

Location:____________________

Service:____________________

P: PASTORE REPRESENTATIVE
N: NORESCO REPRESENTATIVE
Q: CHIEF QUALITY CONTROL
M: MECHANICAL REPRESENTATIVE
E: ELECTRICAL REPRESENTATIVE
I/C: INSTRUMENT/CONTROL REP.

| INSTALLATION DETAILS | P | N | Q | M | E | I/C |
|---|---|---|---|---|---|---|
| (1) PUMPS GROUTED IN PLACE | | | | | | |
| (2) PUMP VIBRATION ISOLATION DEVICES FUNCTIONAL | | | | | | |
| (3) PUMP/MOTOR COUPLING ALIGNMENT VERIFIED | | | | | | |
| (4) PIPING SYSTEM INSTALLED | | | | | | |
| (5) PIPING SYSTEM PRESSURE TESTED | | | | | | |
| (6) PUMP NOT LEAKING | | | | | | |
| (7) FIELD ASSEMBLED COUPLINGS ALIGNED TO MEET MANUF. PRESCRIBED TOLERANCES | | | | | | |
| (8) PRESSURE/TEMPERATURE GAUGES INSTALLED | | | | | | |
| (9) PIPING SYSTEM CLEANED | | | | | | |
| (10) CHEMICAL WATER TREATMENT COMPLETE | | | | | | |
| **ELECTRICAL** | | | | | | |
| (1) POWER AVAILABLE TO PUMP DISCONNECT | | | | | | |
| (2) PUMP ROTATION VERIFIED | | | | | | |
| (3) CONTROL SYSTEM INTERLOCKS FUNCTIONAL | | | | | | |
| (4) VERIFY POWER DISCONNECT IS LOCATED WITHIN SIGHT OF THE UNIT IT CONTROLS | | | | | | |

**COMMENTS & NOTES**

NOTE: REFER TO MANUFACTURER'S MANUALS AS REQUIRED

# Pastore Center Cogeneration Project

## PRE-COMMISSIONING CHECKLIST
## PIPING

System:______________________

Location:______________________

Service:______________________

P: PASTORE REPRESENTATIVE
N: NORESCO REPRESENTATIVE
Q: CHIEF QUALITY CONTROL
M: MECHANICAL REPRESENTATIVE
E: ELECTRICAL REPRESENTATIVE
I/C: INSTRUMENT/CONTROL REP.

| INSTALLATION CHECKS | P | N | Q | M | E | I/C |
|---|---|---|---|---|---|---|
| (1) PIPING COMPLETE | | | | | | |
| (2) AS-BUILT SHOP DRAWINGS SUBMITTED | | | | | | |
| (3) PIPING FLUSHED AND CLEANED | | | | | | |
| (4) STRAINERS CLEANED | | | | | | |
| (5) VALVES INSTALLED AS REQUIRED | | | | | | |
| (6) HYDROSTATIC TEST COMPLETE | | | | | | |
| (7) PIPING INSULATED AS REQUIRED | | | | | | |
| (8) THERMOMETERS AND GAUGES INSTALLED AS REQUIRED | | | | | | |
| (9) VALVE OPERATION VERIFICATION | | | | | | |
| (10) AIR VENTS INSTALLED AS SPECIFIED | | | | | | |
| (11) FLEXIBLE CONNECTORS INSTALLED AS SPECIFIED | | | | | | |
| (12) VERIFY THAT PIPING HAS BEEN LABELED AND VALVES IDENTIFIED AS SPECIFIED | | | | | | |

COMMENTS/NOTES

NOTE: REFER TO MANUFACTURER'S MANUALS AS REQUIRED

## ATTACHMENT XVIII DESIGN DOCUMENTS

Refer to Attachment I for details and references to Design Documents

ATTACHMENT XX EXCLUSIONS AND CLARIFICATIONS

Revision #7 dated 3/22/02 is attached and details all applicable exclusions and clarifications. Provided by ADP Marshall.

ADP MARSHALL - A Fluor Daniel Company

*** ** ****************************************************************************

PROJECT: RHODE ISLAND DEPARTMENT OF MENTAL HEALTH, RETARDATION AND HOSPITALS
PASTORE CENTER COGENERATION PROJECT
EXCLUSIONS AND CLARIFICATIONS

LOCATION: CRANSTON, R.I.

ARCH/ENG: N.K. ENGINEERS / J.R. LORING
BID DATE: MARCH 31, 1997 - MCI COST TO ERI MARCH 29, 1997. [redacted]
SUMMARY BY: SMK / ETM
CHECKED BY: JM APPROVED BY: JM

*** ** ****************************************************************************************************************

GENERAL REQUIREMENTS

WE HAVE NOT INCLUDED ARCHITECTURAL AND ENGINEERING SERVICES.
WE HAVE NOT INCLUDED ANY ENGINEERING SERVICES FOR THE PROCESS/SYSTEM WORK. [redacted]
WE HAVE INCLUDED PERFORMANCE & PAYMENT BOND
WE HAVE INCLUDED BUILDER'S RISK INSURANCE FOR ONE YEAR (STARTING MARCH 1, 2002)
WE HAVE INCLUDED AN ALLOWANCE FOR THE BUILDING PERMIT FEES
WE HAVE EXCLUDED INSPECTION & TESTING SERVICES / FEES.
[redacted]
WE HAVE EXCLUDED PROPERTY LINE SURVEY / SOIL BORING TESTING
WE HAVE EXCLUDED SALES TAX BOND
[redacted]
WE HAVE INCLUDED AN ALLOWANCE FOR TEMPORARY HEAT,ENCLOSURES & WINTER PROTECTION
WE HAVE EXCLUDED WATCHMEN & SECURITY SERVICES
WE HAVE INCLUDED A TEMPORARY CONSTRUCTION FENCE
WE HAVE INCLUDED A SIGNAGE ALLOWANCE
WE HAVE EXCLUDED OVERTIME PREMIUMS, EXCEPT AT UTILITY SHUT DOWN / TIE-IN
WE HAVE EXCLUDED SUBDIVISION APPROVALS OR ZONING VARIANCES
[redacted]
WE HAVE EXCLUDED REGULATORY APPROVALS REQUIRED BY EPA, DEM,
WETLANDS, FEDERAL, STATE OR LOCAL AUTHORITIES

SITEWORK

WE HAVE EXCLUDED ROCK EXCAVATION REQUIRING DRILLING OR BLASTING
WE HAVE NOT INCLUDED GROUNDWATER PUMPING, DEWATERING & WELL POINT SYSTEMS
WE HAVE EXCLUDED EXCAVATION OR REMOVAL OF HAZARDOUS MATERIALS
WE HAVE EXCLUDED SEWERAGE EJECTOR PUMP & PIT
WE HAVE EXCLUDED ANY IMPACT FEES IMPOSED BY LOCAL UTILITIES.
WE HAVE EXCLUDED ANY ENVIRONMENTAL CONSIDERATIONS IMPOSED BY
GOVERNING AUTH. - i.e. DETENTION PONDS, SWALES, ETC.
[redacted]
WE HAVE EXCLUDED ALL CURBING; CAPE CODE BERM IS INCLUDED
WE HAVE INCLUDED AN ALLOWANCE OF $15 K FOR ALL LANDSCAPING.
WE HAVE EXCLUDED PILINGS, CAISSONS OR UNDERPINNING
[redacted]
WE HAVE EXCLUDED SITE FIRE LOOP & HYDRANTS
WE HAVE EXCLUDED FOUNDATION / SUB DRAIN SYSTEMS
WE HAVE EXCLUDED SANITARY LIFT STATION
[redacted]
WE HAVE EXCLUDED GAS SERVICE BEFORE METER.
[redacted]

DEMOLITION / ABATEMENT

WE HAVE EXCLUDED ASBESTOS ABATEMENT OUTSIDE THE AREA TO REMAIN ACTIVE IN THE EXIST'G BLDG.
WE HAVE EXCLUDED ASBESTOS ABATEMENT ON U.G. PIPING; SPOT ABATEMENTS ARE INCLUDED FOR TIE-INS
WE HAVE INCLUDED A 2 HR/ FIRE WALL SEPARATING RENOVATED / ABANDONED AREAS
WE HAVE EXCLUDED ALL DEMOLITION OF ITEMS WITHIN THE ABANDONED AREAS NOT REFRENCED IN EXHIBIT I

CONCRETE

WE HAVE INCLUDED A 6 MIL VAPOR BARRIER UNDER SLAB ON GRADE
WE HAVE EXCLUDED FIBROUS REINFORCEMENT
[redacted]
WE HAVE EXCLUDED ANY COLORED CONCRETE.
WE HAVE EXCLUDED SLAB ON METAL DECK ON ROOF

MASONRY

WE HAVE EXCLUDED SPECIALTY MASONRY. etc. GLASS BLOCK, SPLIT FACED, SPLIT FACED RIBBED, COLORED
WE HAVE EXCLUDED ANY STRUCTURAL FACING TILE.
WE HAVE EXCLUDED ANY STONE, MARBLE, SLATE
WE HAVE INCLUDED A DIVIDER/LIMIT OF WORK WALL AT BOILER ROOM #3 AND TURBINE ROOM AS DEFINED ON THE GENERAL ARRANGEMENT PROVIDED BY J.R.LORING
WE HAVE EXCLUDED ANY REFURBISHING OF THE EXISTING BOILER No. 7 STACK.
WE HAVE INCLUDED AN ALLOWANCE TO COAT THE SOUTHERN STACK TO ENCASE ASBESTOS.

STRUCTURAL STEEL & MISCELLANEOUS IRON

WE HAVE EXCLUDED ANY STRUCTURAL UPGRADES TO THE EXISTING BUILDING.
WE HAVE EXCLUDED STRUCTURAL STEEL ANALYSIS OF EXISTING BUILDING
WE HAVE INCLUDED AN ALLOWANCE FOR REMOVAL & REPLACEMENT OF EXISTING METAL DECKING
WE HAVE EXCLUDED PAINTING STRUCTURAL STEEL TNEMEC-ZINC 90-97.
WE HAVE INCLUDED STANDARD RED OXIDE PAINT AS MANUFACTURED BY TNEMEC.
WE HAVE INCLUDED FIREPROOFING, AS SHOWN IN THE OFFICE AREA
WE HAVE EXCLUDED UNPINNING AND / OR SUPPLEMENTARY SUPPORT SYSTEMS
WE HAVE EXCLUDED SLAB ON METAL DECK AT THE ROOF LEVEL

EXTERIOR ENCLOSURE

WE HAVE EXCLUDED ANY ASBESTOS ABATEMENT OF THE EXISTING ROOFING SYSTEM.
WE HAVE EXCLUDED ANY HAZARDOUS MATERIALS AND/OR ASBESTOS ABATEMENT OF THE U.G. PIPING
[redacted]
WE HAVE EXCLUDED ANY ACOUSTICAL AND / OR SOUND CONTROLS
WE HAVE EXCLUDED BOXED IN / Canopies AT ALL DOORS EXCEPT CANOPY @ MAIN ENTRY DOOR
WE HAVE EXCLUDED 3" COMPOSITE WALL PANELS.

FINISHES

WE HAVE INCLUDED STANDARD ENAMEL PAINT ONLY
[redacted]
WE HAVE EXCLUDED PAINTING EXPOSED CEILINGS PER NORESCO REQUEST.
[redacted]
WE HAVE INCLUDED LEAD PAINT ABATEMENT AS PART OF THE ASBESTOS OPERATION

BUILDING SPECIALTIES

WE HAVE EXCLUDED FURNISHINGS & DRAPERIES
WE HAVE EXCLUDED TRASH COMPACTOR OR DUMPSTER
WE HAVE EXCLUDED ELEVATOR / VERTICAL TRANSPORT SYSTEM.
[redacted]
WE HAVE EXCLUDED MOVEABLE OR DEMOUNT. PTNS.
WE HAVE EXCLUDED LABORATORY EQUIPMENT
WE HAVE EXCLUDED PEDESTAL FLOOR
WE HAVE EXCLUDED MECHANICAL EQUIPT. ROOF SCREEN
[redacted]

PRE-ENGINEERED STRUCTURE

[redacted]
WE HAVE INCLUDED ROOF DESIGN BASED ON A DEFLECTION OF L/180
WE HAVE INCLUDED MEZZANINE FRAMING BASED ON A DEFLECTION OF L/180
WE HAVE INCLUDED COMPOSITE METAL WALL PANELS 2" THICK, 36" WIDE, 26 ga. INNER & OUTER PNLS.
WE HAVE INCLUDED GUTTER AND DOWNSPOUTS DRAINING TO PAVEMENT AREAS
WE HAVE INCLUDED THE STEEL FRAMING WITH A STANDARD RED OXIDE FINISH (1 MIL DFT)
[redacted]

EQUIPMENT

WE HAVE EXCLUDED OVERHEAD CRANES, HOISTS, RAILS, TRACTORS
WE HAVE EXCLUDED CONTINUOS EMISSIONS MONITORING
WE HAVE EXCLUDED CONVEYING SYSTEMS
MATERIAL HAND. EQUIPT. & STORAGE RACKS
SPECIAL PITS &/OR TRENCHES FOR OWNER'S
MAT'L HANDL'G EQUIPT.
RACK STORAGE SYSTEM
WE HAVE EXCLUDED REHAB OF EXISTING EQUIPMENT

SPRINKLERS

FIRE STORAGE TANK OR RESERVOIR IS EXCLUDED
WE HAVE INCLUDED SPRINKLERS IN OFFICE AREAS ONLY, ALL OTHER AREAS ARE EXCLUDED
[redacted]
PROCESS WASTE,FILTRATION &/OR RECLAIM. SYSTEM IS EXCLUDED
WASTE TREATMENT IS EXCLUDED
SEWERAGE EJECTOR PUMPS/PIT OR WET WELLS ARE EXCLUDED
GAS COMPANY CHARGES ARE EXCLUDED
OIL TANK SYSTEMS - FIRE PROTECTION EXTERNAL TO BUILDING ARE EXCLUDED

MECHANICAL

[redacted]
WE HAVE EXCLUDED REFURBISHING THE EXISTING PRV'S
WE HAVE EXCLUDED MISC. REPAIRS, CONNECTIONS, & REPLACEMENT OF BOILER No. 7 PIPING.
WE HAVE INCLUDED COMPLETELY RE-INSULATING THE BOILER No. 7 ROOM AFTER ABATEMENT.
WE HAVE INCLUDED A 4" STEAM LINE TO THE EXISTING WAREHOUSE, EXCLUDING EXCAVATION & BACKFILL.
WE HAVE INCLUDED ALL DRAINAGE & UNDERGROUND WORK AT THE FUEL OIL CONTAINMENT AREA.
[redacted]
WE HAVE INCLUDED PLUMBING ASSOCIATED WITH THE NEW ADDITION AND OFFICES.
WE HAVE INCLUDED FURNISHING (13) STEAM FLOW METERS and (2) STEAM PRV STATIONS.
WE HAVE INCLUDED SITE DISTRIBUTION STEAM & CONDENSATE BETWEEN THE GARAGE & LAUNDRY, PER NORESCO
WE HAVE INCLUDED CONDENSATE PUMPS and CONNECTIONS AT THE LAUNDRY & GARAGE PER NORESCO
WE HAVE INCLUDED INSTALLATION OF THE GAS TURBINE ALLOY METAL BY-PASS STACK, AS SUPPLIED BY NORESCO
[redacted]
WE HAVE INCLUDED WORK ASSOCIATED WITH THE #6 FUEL OIL SKID AND THE WORK AT THE CONTAINMENT.
WE HAVE INCLUDED WORK ASSOCIATED WITH THE CITY WATER BOOSTER PUMPS.

ELECTRICAL

WE HAVE INCLUDED ALL REQUIREMENTS PRESENTED ON THE LORING ONE-LINE DIAGRAM 58-05-E1.
ELECTRIC COMPANY CHARGES ARE EXCLUDED
[redacted]
WE HAVE EXCLUDED THE FURNISHING OF THE FOLLOWING ITEMS PROVIDED BY NORESCO:
2.4 kV SWITCHGEAR AND MODIFICATIONS TO EXISTING
MOTOR CONTROL CENTERS and TRANSFORMERS
REACTORS
DCS EQUIPMENT
LOAD SHED SYSTEM
POWER MONITORING SYSTEM
WE HAVE EXCLUDED THE 175 KVA EMERGENCY GENERATOR WHICH WAS DELETED.
WE HAVE INCLUDED WIRING FOR THE #6 FUEL OIL SKID, CITY WATER BOOSTER PUMPS, & THIRD REACTOR.
WE HAVE INCREASED THE 1000 KVA TRANSFORMER TO TWO (2) 2000 KVA TRANSFORMERS.
WE HAVE INCREASED THE MOTOR CONTROL CENTERS FROM ONE (1) 1200 AMP to TWO (2) AT 2500 AMP.
WE HAVE INCLUDED A 2500 AMP SECONDARY TIE AND THE WIRING FOR THE ADDITIONAL EQUIPMENT.
WE HAVE INCLUDED A 25 KVA UPS SYSTEM
WE HAVE INCLUDED THE 125V DC SYSTEM.
WE HAVE INCLUDED THE FIRE ALARM SYSTEM.
WE HAVE INCLUDED THE ALLOWANCE FOR AN INTERCOM SYSTEM.
[redacted]
WE HAVE INCLUDED THE COST ASSOCIATED WITH RELOCATING THE NECO INCOMING FEEDER.
WE HAVE INCLUDED COST FOR MISCELLANEOUS 120/208V AND 277/480V PANELS FOR GENERAL LIGHTING AND POWER.
WE HAVE INCLUDED THE COST ASSOCIATED WITH CONNECTING TO THE EXISTING GENERATOR.
WE HAVE EXCLUDED THE ELECTRICAL TIE BREAKER

# C

THE AMERICAN INSTITUTE OF ARCHITECTS

St. Paul Fire and Marine Insurance Company Bond No: 400SP8413-02
Fidelity and Deposit Company of Maryland Bond No: 8642263

Premium included in Performance Bond

*AIA Document A312*

# Payment Bond

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

CONTRACTOR (Name and Address):
ADP Marshall, Inc.
75 Newman Avenue
Rumford, RI 02916

SURETY (Name and Principal Place of Business):
St. Paul Fire and Marine Insurance Company
One Market, Spear Tower
10th Floor
San Francisco, CA 94105
and
Fidelity and Deposit Company of Maryland
225 South Lake Avenue, Suite 700
Pasadena, CA 91101

OBLIGEE (Name and Address):
Noresco, LLC, a Delaware limited liability company
1 Research Drive
Westborough, MA 01581

CONSTRUCTION CONTRACT
Date: March 22, 2002
Amount: $12,365,105.00
Description (Name and Location): Pastore Center Cogeneration Project - Cranston, RI

BOND
Date (Not earlier than Construction Contract Date): April 4, 2002
Amount: $12,365,105.00
Modifications to this Bond: ☒ None ☐ See Page 6

CONTRACTOR AS PRINCIPAL
Company: ADP Marshall, Inc. (Corporate Seal)
Signature: S. James Busam
Name and Title: S. James Busam, VP

(Any additional signatures appear on page 6)

SURETY
Company: St. Paul Fire and Marine Insurance Company (Corporate Seal)
Signature: [signature]
Name and Title: Irene Lau, Attorney-in-Fact

see page 3 for additional surety signature

*(FOR INFORMATION ONLY—Name, Address and Telephone)*

AGENT or BROKER:
Marsh Risk & Insurance Services
4695 MacArthur Court, Suite 700
Newport Beach, CA 92660
(949) 399-5800

OWNER'S REPRESENTATIVE (Architect, Engineer or other party):

1 The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference.

2 With respect to the Owner, this obligation shall be null and void if the Contractor:

2.1 Promptly makes payment, directly or indirectly, for all sums due Claimants, and

2.2 Defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity whose claim, demand, lien or suit is for the payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, provided the Owner has promptly notified the Contractor and the Surety (at the address described in Paragraph 12) of any claims, demands, liens or suits and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety, and provided there is no Owner Default.

3 With respect to Claimants, this obligation shall be null and void if the Contractor promptly makes payment, directly or indirectly, for all sums due.

4 The Surety shall have no obligation to Claimants under this Bond until:

4.1 Claimants who are employed by or have a direct contract with the Contractor have given notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and, with substantial accuracy, the amount of the claim.

4.2 Claimants who do not have a direct contract with the Contractor:

.1 Have furnished written notice to the Contractor and sent a copy, or notice thereof, to the Owner, within 90 days after having last performed labor or last furnished materials or equipment included in the claim stating, with substantial accuracy, the amount of the claim and the name of the party to whom the materials were furnished or supplied or for whom the labor was done or performed; and

.2 Have either received a rejection in whole or in part from the Contractor, or not received within 30 days of furnishing the above notice any communication from the Contractor by which the Contractor has indicated the claim will be paid directly or indirectly; and

.3 Not having been paid within the above 30 days, have sent a written notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and enclosing a copy of the previous written notice furnished to the Contractor.

5 If a notice required by Paragraph 4 is given by the Owner to the Contractor or to the Surety, that is sufficient compliance.

6 When the Claimant has satisfied the conditions of Paragraph 4, the Surety shall promptly and at the Surety's expense take the following actions:

6.1 Send an answer to the Claimant, with a copy to the Owner, within 45 days after receipt of the claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed.

6.2 Pay or arrange for payment of any undisputed amounts.

7 The Surety's total obligation shall not exceed the amount of this Bond, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

8 Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any Construction Performance Bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and the Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

9 The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligations to make payments to, give notices on behalf of, or otherwise have obligations to Claimants under this Bond.

10 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

11 No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the location in which the work or part of the work is located or after the expiration of one year from the date (1) on which the Claimant gave the notice required by Subparagraph 4.1 or Clause 4.2.3, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

12 Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page. Actual receipt of notice by Surety, the Owner or the Contractor, however accomplished, shall be sufficient compliance as of the date received at the address shown on the signature page.

13 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this

Bond shall be construed as a statutory bond and not as a common law bond.

14 Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor shall promptly furnish a copy of this Bond or shall permit a copy to be made.

15 DEFINITIONS

15.1 Claimant: An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Contract. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

15.2 Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

15.3 Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:

(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)

CONTRACTOR AS PRINCIPAL
Company: ADP Marshall, Inc. (Corporate Seal)

Signature: S. James Busam
Name and Title: S. James Busam, VP
Address:

SURETY
Company: Fidelity and Deposit Company of Maryland (Corporate Seal)

Signature: [signature]
Name and Title: Irene Lau, Attorney-in-Fact
Address: 225 S. Lake Ave., #700
Pasadena, CA 91101

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of Orange

On April 4, 2002 before me, Kathy R. Mair, Notary Public,
DATE — NAME, TITLE OF OFFICER - E.G., "JANE DOE, NOTARY PUBLIC

personally appeared Irene Lau,
NAME(S) OF SIGNER(S)

☒ personally know to me - OR - ☐ proved to me on the basic of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

KATHY R. MAIR
Commission # 1302377
Notary Public - California
Orange County
My Comm. Expires May 22, 2005

WITNESS my hand and official seal.

SIGNATURE OF NOTARY

## OPTIONAL

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

**CAPACITY CLAIMED BY SIGNER**

☐ INDIVIDUALS
☐ CORPORATE OFFICER

TITLE(S)

☐ PARTNER(S) ☐ LIMITED
☐ GENERAL
☒ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER:

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR ENTITY(IES)
St. Paul Fire and Marine Insurance Company
Fidelity and Deposit Company of Maryland

**DESCRIPTION OF ATTACHED DOCUMENT**

Payment Bond
TITLE OR TYPE OF DOCUMENT

NUMBER OF PAGES

DATE OF DOCUMENT

SIGNER(S) OTHER THAN NAMED ABOVE

kmm (5/2001)

The St Paul

# POWER OF ATTORNEY

Seaboard Surety Company
St. Paul Fire and Marine Insurance Company
St. Paul Guardian Insurance Company
St. Paul Mercury Insurance Company

United States Fidelity and Guaranty Company
Fidelity and Guaranty Insurance Company
Fidelity and Guaranty Insurance Underwriters, Inc.

Power of Attorney No. 21338

Certificate No. 1211611

KNOW ALL MEN BY THESE PRESENTS: That Seaboard Surety Company is a corporation duly organized under the laws of the State of New York, and that St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company and St. Paul Mercury Insurance Company are corporations duly organized under the laws of the State of Minnesota, and that United States Fidelity and Guaranty Company is a corporation duly organized under the laws of the State of Maryland, and that Fidelity and Guaranty Insurance Company is a corporation duly organized under the laws of the State of Iowa, and that Fidelity and Guaranty Insurance Underwriters, Inc. is a corporation duly organized under the laws of the State of Wisconsin *(herein collectively called the "Companies")*, and that the Companies do hereby make, constitute and appoint

Irene Lau, Kathy R. Mair and Mechelle Larkin

of the City of Newport Beach, State California, their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign its name as surety to, and to execute, seal and acknowledge any and all bonds, undertakings, contracts and other written instruments in the nature thereof on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

IN WITNESS WHEREOF, the Companies have caused this instrument to be signed and sealed this 1st day of December, 1999.

Seaboard Surety Company
St. Paul Fire and Marine Insurance Company
St. Paul Guardian Insurance Company
St. Paul Mercury Insurance Company

United States Fidelity and Guaranty Company
Fidelity and Guaranty Insurance Company
Fidelity and Guaranty Insurance Underwriters, Inc.

JOHN F. PHINNEY, Vice President

State of Maryland
City of Baltimore

THOMAS E. HUIBREGTSE, Assistant Secretary

On this 1st day of December, 1999, before me, the undersigned officer, personally appeared John F. Phinney and Thomas E. Huibregtse, who acknowledged themselves to be the Vice President and Assistant Secretary, respectively, of Seaboard Surety Company, St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company, St. Paul Mercury Insurance Company, United States Fidelity and Guaranty Company, Fidelity and Guaranty Insurance Company, and Fidelity and Guaranty Insurance Underwriters, Inc.; and that the seals affixed to the foregoing instrument are the corporate seals of said Companies; and that they, as such, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the names of the corporations by themselves as duly authorized officers.

In Witness Whereof, I hereunto set my hand and official seal.

My Commission expires the 13th day of July, 2002.

REBECCA EASLEY-ONOKALA, Notary Public

This Power of Attorney is granted under and by the authority of the following resolutions adopted by the Boards of Directors of Seaboard Surety Company, St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company, St. Paul Mercury Insurance Company, United States Fidelity and Guaranty Company, Fidelity and Guaranty Insurance Company, and Fidelity and Guaranty Insurance Underwriters, Inc. on September 2, 1998, which resolutions are now in full force and effect, reading as follows:

**RESOLVED**, that in connection with the fidelity and surety insurance business of the Company, all bonds, undertakings, contracts and other instruments relating to said business may be signed, executed, and acknowledged by persons or entities appointed as Attorney(s)-in-Fact pursuant to a Power of Attorney issued in accordance with these resolutions. Said Power(s) of Attorney for and on behalf of the Company may and shall be executed in the name and on behalf of the Company, either by the Chairman, or the President, or any Vice President, or an Assistant Vice President, jointly with the Secretary or an Assistant Secretary, under their respective designations. The signature of such officers may be engraved, printed or lithographed. The signature of each of the foregoing officers and the seal of the Company may be affixed by facsimile to any Power of Attorney or to any certificate relating thereto appointing Attorney(s)-in-Fact for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and subject to any limitations set forth therein, any such Power of Attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company, and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is validly attached; and

**RESOLVED FURTHER**, that Attorney(s)-in-Fact shall have the power and authority, and, in any case, subject to the terms and limitations of the Power of Attorney issued them, to execute and deliver on behalf of the Company and to attach the seal of the Company to any and all bonds and undertakings, and other writings obligatory in the nature thereof, and any such instrument executed by such Attorney(s)-in-Fact shall be as binding upon the Company as if signed by an Executive Officer and sealed and attested to by the Secretary of the Company.

I, Thomas E. Huibregtse, Assistant Secretary of Seaboard Surety Company, St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company, St. Paul Mercury Insurance Company, United States Fidelity and Guaranty Company, Fidelity and Guaranty Insurance Company, and Fidelity and Guaranty Insurance Underwriters, Inc. do hereby certify that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which is in full force and effect and has not been revoked.

**IN TESTIMONY WHEREOF**, I hereunto set my hand this ________ day of APR - 4 2002 , ________.

1927 SEAL SEAL 1896 1977 1951

Thomas E. Huibregtse, Assistant Secretary

*To verify the authenticity of this Power of Attorney, call 1-800-421-3880 and ask for the Power of Attorney clerk. Please refer to the Power of Attorney number, the above-named individuals and the details of the bond to which the power is attached.*

# Power of Attorney
# FIDELITY AND DEPOSIT COMPANY OF MARYLAND
### HOME OFFICE: P.O. BOX 1227, BALTIMORE, MD 21203-1227

Know ALL MEN BY THESE PRESENTS: That the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a corporation of the State of Maryland, by W. B. WALBRECHER, Vice-President, and T. E. SMITH, Assistant Secretary, in pursuance of authority granted by Article VI, Section 2, of the By-Laws of said Company, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, does hereby nominate, constitute and appoint Irene LAU, of Newport Beach, California, its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed: any and all bonds and undertakings and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Company, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the Company at its office in Baltimore, Md., in their own proper persons.

The said Assistant Secretary does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article VI, Section 2, of the By-Laws of said Company, and is now in force.

IN WITNESS WHEREOF, the said Vice-President and Assistant Secretary have hereunto subscribed their names and affixed the Corporate Seal of the said FIDELITY AND DEPOSIT COMPANY OF MARYLAND, this 29th day of July, A.D. 1999.

FOR YOUR PROTECTION: LOOK FOR THE F&D WATERMARK

ATTEST: **FIDELITY AND DEPOSIT COMPANY OF MARYLAND**

SEAL

*T. E. Smith* *Assistant Secretary* By: *W. B. Walbrecher* *Vice-President*

State of Maryland } ss:
County of Baltimore

On this 29th day of July, A.D. 1999, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, came W. B. Walbrecher, Vice-President and T. E. Smith, Assistant Secretary of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and they each acknowledged the execution of the same, and being by me duly sworn, severally and each for himself deposeth and saith, that they are the said officers of the Company aforesaid, and that the seal affixed to the preceding instrument is the Corporate Seal of said Company, and that the said Corporate Seal and their signatures as such officers were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

*Carol J. Fader* *Notary Public*
My Commission Expires: August 1, 2000

L1428-012-2748G

# EXTRACT FROM BY-LAWS OF FIDELITY AND DEPOSIT COMPANY OF MARYLAND

"Article VI, Section 2. The Chairman of the Board, or the President, or any Executive Vice-President, or any of the Senior Vice-Presidents or Vice-Presidents specially authorized so to do by the Board of Directors or by the Executive Committee, shall have power, by and with the concurrence of the Secretary or any one of the Assistant Secretaries, to appoint Resident Vice-Presidents, Assistant Vice-Presidents and Attorneys-in-Fact as the business of the Company may require, or to authorize any person or persons to execute on behalf of the Company any bonds, undertaking, recognizances, stipulations, policies, contracts, agreements, deeds, and releases and assignments of judgements, decrees, mortgages and instruments in the nature of mortgages,...and to affix the seal of the Company thereto."

## CERTIFICATE

I, the undersigned, Assistant Secretary of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, do hereby certify that the original Power of Attorney of which the foregoing is a full, true and correct copy, is in full force and effect on the date of this certificate; and I do further certify that the Vice-President who executed the said Power of Attorney was one of the additional Vice-Presidents specially authorized by the Board of Directors to appoint any Attorney-in-Fact as provided in Article VI, Section 2, of the By-Laws of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND.

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at a meeting duly called and held on the 10th day of May, 1990.

RESOLVED: "That the facsimile or mechanically reproduced seal of the company and facsimile or mechanically reproduced signature of any Vice-President, Secretary, or Assistant Secretary of the Company, whether made heretofore or hereafter, wherever appearing upon a certified copy of any power of attorney issued by the Company, shall be valid and binding upon the Company with the same force and effect as though manually affixed."

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the said Company, this

__________ day of APR - 4 2002 , ________.

S. D. Matis

*Assistant Secretary*