# EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ADP MARSHALL, INC., a division of
Fluor NE, Inc.,
Plaintiff/Counterclaim-Defendant,
vs. C.A. NO.: 07-129 ML
NORESCO, LLC and LUMBERMEN'S
MUTUAL CASUALTY COMPANY,

Defendants/Counterclaim-Plaintiffs/
Third-Party Plaintiffs,
ST. PAUL FIRE AND MARINE
INSURANCE COMPANY and FIDELITY
AND DEPOSIT COMPANY OF
MARYLAND,

Third-Party Defendants.

DEPOSITION OF DAVID M. PEREIRA,
in the above-entitled cause, taken on behalf of Noresco, pursuant to notice, before Jane F. Cormier, CSR, a Notary Public in and for the State of Rhode Island, at the offices of Brown Rudnick Bernack Israels LLP, 121 South Main Street, Providence, Rhode Island, on Friday, May 30, 2008, convening at 10:00 a.m.

Allied Court Reporters, Inc.
115 Phenix Avenue
Cranston, Rhode Island 02920
(401) 946-5500

A P P E A R A N C E S:

FOR ADP MARSHALL, INC...LAW OFFICE OF ANDREW J. TINE
BY: ANDREW J. TINE, ESQ.
BY: RONALD R. STUFF, ESQ.
IN-HOUSE COUNSEL FOR ADP

FOR NORESCO, LLC...... BROWN RUDNICK BERNACK ISRAELS LLP
BY: CHERYL B. PINARCHICK, ESQ.
BY: MATTHEW G. SGRO, ESQ.

ALSO PRESENT: THERESA MACKINNON AND WADE CARLETON

request was ever then resubmitted to Noresco following the submittal of the change order request that you have in front of you?

A. I wouldn't know.

MS. PINARCHICK: Let's go off the record.

(OFF THE RECORD)

MS. PINARCHICK: I want to go back on the record. Counsel and I have had a discussion off the record in terms of how to proceed, given that we have two potential or two designees who have been designated to testify as potentially overlapping subject matter.

Despite my best efforts, I have not been able to determine, based on the categories, who's going to be the appropriate designee for what, because of that, the fact that they're overlapping. So, I think counsel and I have agreed, and certainly, Andrew, let me know if I misstate this in any way, I'm going to continue asking my questions. To the extent that counsel believes that Mr. Pereira is not the appropriate designee, or is not the person who has been designated to give a response to a question that I ask, he's going to indicate so on the record. To the extent that he does not indicate so on the record, I'm going to assume that Mr. Pereira is the

appropriate designee for that question.

Andrew, is that agreeable?

MR. TINE: I think that's how we've agreed to proceed. If I can just elaborate that it's Fluor's position that the categories of testimony overlap in certain regards, and because of that, it's difficult to draw a bright line in terms of what is allocated for Dave Pereira in terms of testimony, as opposed to Dave Benoit. And I've agreed to make my best efforts to alert Cheryl, Attorney Pinarchick, when she's asking questions, as to our belief that it's not within Dave Pereira's scope of all testimony.

MS. PINARCHICK: And I'd also like to, I believe counsel and I agreed off the record, I wanted to put it on the record that, given the fact that we've got two designees and we've got some overlapping categories here, that Fluor has agreed not to specifically hold us to a seven-hour time limitation, and that counsel is going to give us additional time to complete the two depositions; correct?

MR. TINE: Yes. My understanding of the agreement is that we're not going to hold you to seven hours of combined questioning between David Pereira and David Benoit, that you may exceed the

seven hours, and that we're not agreeing on a specific amount of time by which you may exceed the seven hours, but reasonable to accomplish the questioning that's necessary to cover the categories of testimony in the notice of deposition.

MS. PINARCHICK: Can we mark this as the next exhibit, please.

(Defendant's Exhibit H marked for identification)

Q. Mr. Pereira, I'm going to hand you what has now been marked as Exhibit H to your deposition. Can you tell me whether or not you recognize that document?

A. I do.

Q. What do you recognize the document to be?

A. The Amendment to our Response to Noresco's First Set of Interrogatories.

Q. Can you turn to the signature page on that document. Can you tell me if that's your signature on the verification?

A. Yes, it is.

Q. And is that dated as of 5-29-08?

A. Yes, it is.

Q. And that was yesterday?

A. Yes, it was.

Q. And was that when the supplemental responses were prepared?

would or wouldn't be. It's possible, but unless you matched up the amounts that we felt that we were due inside for the subs inside of those numbers against what was paid for them, and against whatever exposure may be outstanding from those subs, that would probably be the amounts.

Q. Well, other than, I believe you testified to Mass. Electric and Wood & Wire, are there, are you aware of any other potential claims that may be out there against Fluor for work performed in connection with the project?

A. No, I'm not.

Q. If you would turn for me to interrogatory number 12. Interrogatory number 12 says, set forth the current locations of all documents generated or maintained by ADP during construction of the project, including without limitation the locations of all computers, external hard drives, servers, and/or other electronic storage devices which contain or may contain information related to the project. The response provides, in part, the location of actual computers and other storage devises is unknown as of this date. What information, if any, did you gather or supply with respect to the response to interrogatory number 12?

A. Made a determination that our practices in terms of removing files from the project site and from other offices' files that are relevant to the project are collected, are boxed, are put in storage, and then any relevant electronic documents, or emails or the like, are printed and included as hard copy in the files, are brought to storage, and then those documents were brought to Barrington to prepare for the dispute process.

Q. So, is it your understanding that every email sent or received in connection with the project was printed and included in the project files that went to storage?

A. Well, the practice is for us to print out any relevant email or relevant document on the computer, and put it in the hard copy files. So, I just have to assume that our practice is followed by employees, and that the documents are full, are complete.

Q. So, are you relying on each individual employee to determine who would be relevant to print and include in the project file?

A. Yes.

Q. Has Fluor ever conducted a search of its server system to determine whether or not there are emails

and/or other electronic documents stored on that server system in connection with the project?
A. I don't know.
Q. Who would know that?
A. Probably internal affairs.
Q. Do you know whether, in fact, there are electronic documents or emails for this project currently on the server at Fluor?
A. No. I don't know if there current documents on the server.
Q. You're not aware, as you sit here today, of any search that's been made to determine whether or not there are documents on the Fluor server?
A. I'm not aware of a search.
Q. Does Fluor have a document retention policy?
A. Yes, it does.
Q. Is there a formal written document retention policy?
A. I believe there is.
Q. Do you know whether or not a copy of that formal written document retention policy has been provided in connection with this litigation?
A. I don't know that it has.
Q. Are you aware that it was specifically requested?
A. I recall that that was a request. I vaguely recall that it was a request.

Q. Do you recall any decision being made not to produce the formal written document retention policy?
A. No, I don't.
Q. The document retention policy --
MS. PINARCHICK: And I'm going to make a specific request on the record for a copy, make another request on the record for a copy of the document retention and the document destruction policies of Fluor.
MR. TINE: Well, I think we have given you a response. The document retention policy which I believe you're talking about is Fluor determines used interchangeably during the deposition, there is a document retention policy for Fluor Enterprises. We have not located a document retention policy applicable to this project that was issued by Fluor Northeast or ADP Marshall. If it exists, it would be in the project records. That would be the only place. If you're requesting a copy of Fluor Enterprises' document retention policy, I'll request a copy from the people at Fluor and get it to you.
Q. Let me ask the question first, which is, were the employees for the time period specified -- or strike that, for the time period, let's say, beginning January 1, 2001, through the present, at any point

in time were the employees of Fluor New England, Inc., expected to comply with the document retention policy of Fluor Enterprises, Inc.?

A. I'm not sure. There was a separate policy of retention that, a retention policy that carried on from Marshall to ADP Marshall, and carried out through ADP Marshall, that was separate from the Fluor policy. I believe that the practice for record retention probably continue to reflect the Fluor Northeast or the old ADP Marshall record retention policy. In April of 2007 we have ceased operations in the Rumford, Rhode Island office, and have commenced aligning our record retention documentation with the overall Fluor requirements, and as those records are updated and properly documented, they have been shipped down to, from the area here Providence, I believe, down to Greenville. So, there's a, but that's more to do with probably cataloging and filing the records. What's in the records, the content of the records themselves is likely a reflection of the old ADP Marshall record retention policy.

MS. PINARCHICK: I would request, then, on the record, a copy of the old ADP Marshall document retention policy.

MR. TINE: I don't think we have a copy, but I'll make another request.
Q. Let me ask you this a little bit more generally: What was the policy and practice in effect, whether it be informal or formal, what was the practice in effect at ADP and/or Fluor New England, Inc., with respect to the retention of project documents?
A. The practice was to, as I indicated, to print out hard copies of all of our documentation, incorporate those or include those in the file, and store them in permanent storage.
Q. Was there anybody at Fluor who was responsible for insuring that that happened?
A. I'm not sure who at Fluor is specifically responsible to insure that it happened. Are you talking about Fluor Northeast, someone in Fluor responsible for Fluor Northeast or generally Fluor Enterprises?
Q. Let me ask you this, maybe I can clarify this and make this a little bit simpler. Who maintained the project records for this project from the time period January 1, 2001 through the present?
A. The documents were stored, not stored, but the documents were maintained or held by those project teams, those individuals who participated in the

A. I see that.
Q. Would you agree with me that 012R-1 is Deviation 24?
A. Yes.
Q. And if you look at Deviation 186, look at that same cover page, and if you look at the upper right-hand corner, it's got a COR of 108. Would you agree that that's the same as Deviation 186?
A. It would appear to be, yes.
Q. So, let me reread that sentence. It says, pursuant to our submitted change order requests, COR numbers 012/RI and 108, which Noresco has not yet accepted, and in accordance with our initial correspondence on this issue, per our attached letter dated March 7, 2002, ADP Marshall is formally resubmitting our claims for these funds to be approved and paid to our account. So, my question is, simply, is 498 a resubmittal of these two prior change order requests?
A. I don't know for certain, but it certainly appears that they might be. So, I would kind of defer to the person who prepared them, and ask them to go through, and they would be a better judge of that.
Q. Do you have any reason to doubt that's what's happening here, based on the letter?

A. Yeah. I see where you're going. And I understand that that's a, potentially what might have happened here, so I would have to acknowledge that. I would like to go through everything else here, though, to make sure that, you know, I'm not incorrectly second-guessing the work of someone else.

MS. PINARCHICK: Let me ask Mr. Tine that. Is he the appropriate person to be testifying as to this particular subject?

MR. TINE: I think I objected at the beginning of this that all the deviations are Dave Benoit. And I think I objected at the beginning to you asking him concerning these deviations as to the basis of the objection, and I said scope. But I think he answered the question, anyways. It appears to him as though the other two deviations were all that was resubmitted.

MS. PINARCHICK: I like the way you said it.

Q. Mr. Pereira, are you in agreement with the statement just name by your counsel?

A. Yeah. I think it's something that needs to be revisited here.

Q. But you don't have any reason to doubt that that's the case as you sit here?

A. No, I don't.
Q. If you look at Exhibit A to the damage disclosure submitted by Fluor in connection with this case, you'll see listed all three deviations, 186, 24, and 498. If you look in the middle group.
MR. TINE: If you want, Cheryl, we'll stipulate that these two deviations, 24 and 186, if they're rolled up into 498, which they appear to be, are not being claimed separately in addition to 498. And our initial disclosures will be modified at some date and refined to reflect that. There's no intention to have double recovery or a double-dip in that regard, and Mr. Benoit will probably clarify this for you when he testifies.
MS. PINARCHICK: Thank you. That will save us a little bit of time. We'll move on from there. That's my question.
Q. Mr. Pereira, are you aware of whether or not Fluor is in possession of as-builts for the project?
A. No, I'm not.
Q. Do you know whether or not Fluor has ever reviewed the drawings in its possession, custody or control to determine whether it does have as-builts for the project?
A. No. I'm not aware.

C E R T I F I C A T E

I do hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to the Rules of Civil Procedure of the Court, especially, but without restriction thereto, under Rule 30 of said Rules; that the witness was first sworn by me; that the transcript contains a true record of the proceedings.

I further certify that neither the deponent nor any party requested a review of the transcript.

Reading and signing of the transcript was requested by the deponent involved upon completion of the deposition.

IN WITNESS WHEREOF I have hereunto set my hand this 3rd day of June, 2008.

JANE F. CORMIER, CSR
NOTARY PUBLIC
MY COMMISSION EXPIRES: 1/19/2010