UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ADP MARSHALL, INC., n/k/a Fluor NE, Inc., Plaintiff/Counterclaim-Defendant | : | |
| vs. | : | C.A. NO. 07-129 ML |
| NORESCO, LLC and LUMBERMEN'S MUTUAL CASUALTY COMPANY, Defendants/Counterclaim-Plaintiffs/ Third-Party Plaintiffs, | : | |
| ST. PAUL FIRE AND MARINE INSURANCE COMPANY and FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Third-Party Defendants. | : | |

DEPOSITION OF WADE CARLETON, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Carole J. Ogden, Registered Professional Reporter, a Notary Public in and for the State of Rhode Island, at 146 Anoka Avenue, Barrington, Rhode Island, on May 22, 2008 at 10:00 a.m.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

A. I don't recall specifically.
Q. Did Noresco lose money on this project overall?
A. No. If we receive payments outstanding by the State.
Q. How much is that money that's due from the State?
A. Approximately a million and a half dollars.
Q. Okay. And what will Noresco's potential profit be if it receives a million and a half dollars?
A. I can't comment on that number, specifically. I don't know it sitting here today.
Q. Is Noresco in a loss posture without receiving the million and a half dollars?
A. Again, I can't comment without knowing -- without seeing those numbers today.
Q. You don't know sitting here today?
A. I do not know.
Q. Do you have documentation which would show that?
A. Yes.
MR. TINE: Okay. I guess I was given this document today. I might as well mark it. Will you mark that as 47?
(PLAINTIFF'S EXHIBIT 47 MARKED FOR IDENTIFICATION)
Q. Could you explain to me what Exhibit Number 47 is?
A. Exhibit 47 is a calculation of labor hours and personnel on the job that were attributed to expenses



that would not have otherwise been incurred were it not for ADP's failure to perform.
Q. Who made this determination attributable to ADP?
A. I did.
Q. And how did you go about doing that?
A. I looked at the labor rates from May of -- May 1 of 2003 going forward, with that being the date at which we expected them to be further along in the project, and I attributed a portion of the individuals associated with Noresco's work on that project to work that they would not have been required to do had ADP reached their milestone date, achieved their milestone date.
Q. So did you look at -- so for example, Steve Bosland, how did you get to 80 percent attributable to ADP Marshall?
A. By 2003, if ADP Marshall, by May 1 of 2003, if ADP Marshall had been mechanically ready, Steve Bosland's activities would have been solely dedicated towards performance testing and completion of the work. As we've seen from a lot of documentation, there was still a lot of work being performed by ADP Marshall, and Steve Bosland spent a significant amount of time working with ADP Marshall.
Q. So was it just a best guess or some sort of an



estimate?
A. It's an estimate.
Q. Did you review any time sheets or specific logs as to time entries?
A. Noresco's time card system does not specifically log against tasks on a job. I took the time sheets that were input into our database system for that particular project for the time period I referenced, for 2003, took the total hours -- Steve only worked on this job, for instance, for that time period, or primarily worked on this job. 1,200 hours were attributed to this project, and I assigned an allocation of 80 percent to Steve Bosland.
Q. 1,200 hours for what period?
A. This is May 1, 2003 until sometime in December of 2003.
Q. So is there some backup for that which would show you how you get to that number?
THE WITNESS: How we get to the 1,200 hours?
Q. Yes. Is there specific entries or something?
A. There's time sheet records showing the project number and the charge number for project management against the project number.
Q. Was Steve Bosland working with Noresco vendors for



Noresco-purchased equipment after May 1, 2003?
A. A portion the time, yes.
Q. Was Steve Bosland working with NKE or Loring on design issues after May 1, 2003?
A. A portion of his time, yes.
Q. Was Steve Bosland working on the development of change order documentation, change order analysis after May 2003?
THE WITNESS: Change order documentation or change order analysis in what regard?
Q. Well, you agree that valid change orders were issued to ADP Marshall after May 2003, right?
A. Yes.
Q. Okay. Would that be ADP Marshall's fault if Steve Bosland had to spend time working on change orders after May 2003?
A. Not on change orders that were approved.
Q. Okay. Well, you agree that there's at least one change order approved after May 2003, right?
A. Yes.
Q. Okay. And you didn't do any sort of analysis to try to exclude time spent for working on change order issues after May 2003 that are not the fault of ADP Marshall?
A. No specific analysis. Just the percentage

allocation.
Q. Was Steve Bosland involved at all in interacting with the State in relation to the operation aspect of Noresco's contract for the facility?
A. Not that I recall.
Q. What was Steve Bosland's job functions on this project?
A. He was assigned as project manager, and he oversaw the original design with NK Engineers, worked with ADP Marshall in that role, and he originally did site management.
Q. So like this -- let me go to yours. You dedicated 50 percent of your time to this job from May 1, 2003 through -- when was it?
A. This is, for me, it would have been through the end of the year.
Q. End of May of --
A. To 12/31/03 from May 1.
Q. Okay. How did you come up with 50 percent for you?
A. Again, an estimate of time spent on issues that I felt were the responsibility of ADP, and I otherwise would not have spent those hours working on those items.
Q. Is there any sort of analysis, or is it just a best estimate?



A. Best estimate.
Q. And George Emsurak you said 100 percent. Why was that?
A. Because George Emsurak would not have been involved in this project had the project gone according to the original intended milestone date, and so his involvement with the project is, according to my analysis, directly attributed to the failure to perform.
Q. So he only becomes involved in jobs that don't finish timely?
A. In this case, that's why he got involved.
Q. So was he involved in any other projects that -- or what is his position? I'm sorry. Strike that. What is his position, George Emsurak?
A. He was my boss for a period of time.
Q. And was he working directly on any other jobs at that point in --
A. Yes.
Q. So does he get involved in jobs on a project management level?
A. No.
Q. So what jobs would he have -- what would he have been doing in relation to the company, if he doesn't get involved in any jobs?



MS. PINARCHICK: Objection. What do you mean by get involved in any jobs? It's unclear. Maybe that's part of the confusion.
Q. You're saying George Emsurak wouldn't have been involved in this project at all because he's upper management?
A. He wouldn't have needed to be involved in the functions on this job because he's upper management. It would have been handled by me and completed by me without his involvement.
Q. Prior to May 1, 2003, did you report to George Emsurak what was going on in the Pastore Cogeneration facility project?
A. I don't recall specific dates, but I did update him on what was going on in the project.
Q. After May 1 of 2003, you continued to update him?
A. I continued to update him, and he had more involvement in the project personally.
Q. Did he become more involved in the project when Noresco became concerned that this project could be unprofitable for them?
MS. PINARCHICK: Objection.
A. He became more involved when we realized -- when we recognized that ADP was continuing to fail to perform, and that we had a number of issues with ADP's



performance, and he took, as a management and an administrative role, a significant role in the activities dealing with ADP Marshall directly.
Q. Was George critical of Steve Bosland's performance?
A. Not that I'm aware of.
Q. I don't know if it was clear. Was Steve Bosland terminated?
A. No. Steve Bosland was laid off as a part of a change in corporate mission to go away from energy infrastructure.
Q. Okay. You stated Anne Feeney, 25 percent. How did you get to that?
A. Additional work that she needed to perform during that same time period. On the job, supplementing ADP Marshall and their work.
Q. And again, that's just a best guess by you?
A. Same answer for every percentage, best guess.
Q. I couldn't get one document that would show me how you arrive at 25 percent other than this?
MS. PINARCHICK: Objection.
Q. And I'm identifying the document, Exhibit Number 47.
A. And time sheets attributed specifically to the job that account for the rest of the data that's here, but as to the percentage, this is an estimate based on my attributation, what I felt was attributable to ADP.

**Q. That's a number that you came up with? There is no other back-up documentation or anything else that I could use to analyze as to how you came to that percentage?**
**A. That is correct.**
**Q. What was the Theresa MacKinnon's involvement on this project after May 1, 2003?**
**A. Theresa MacKinnon is in-house counsel for Noresco and would have been responsible for cure notices, ultimately responsible for cure notices, terminations, and settlement.**
**Q. Now, are you aware that there's a waiver of consequential damages clause in the contract?**
**A. Contract with --**
**Q. ADP Marshall?**
**A. ADP Marshall? I generally believe I am.**
**Q. You just reviewed the consequential damages clause?**
**A. Yes.**
**Q. Do you believe that the consequential damages clause does not apply to Exhibit -- the damages being claimed as a part of Exhibit Number 47?**
MS. PINARCHICK: Objection.
**A. I'm not an attorney. I'm not sure I'm qualified to answer that question.**
**Q. Was it contemplated when this contract was entered into that the consequential damages clause could be enforced by other parties; do you know?**



**A. It has language, in no event shall either party be liable to the other party as part of the consequential damages section.**
**Q. What is your understanding under the contract of the purposes of the liquidated damages amount of $3,000 per day?**
MS. PINARCHICK: Objection.
**A. What is my --**
**Q. What was the purpose of establishing that figure; do you know?**
MS. PINARCHICK: Objection.
**A. My opinion is that liquidated damages were established because we wouldn't know at the time of the execution of the agreement exactly what the cost expenditures would be should someone fail to perform and meet the milestone date, and $3,000 a day was the number that was agreed upon.**
MR. TINE: I don't have any more questions.
THE REPORTER: Ms. Pinarchick, do you need to order this transcript?
MS. PINARCHICK: I do. Can you E-mail me a dirty, then send me -- I don't know how you usually -- E-tran is fine.



(DEPOSITION CLOSED AT 6:26 P.M.)



CERTIFICATE

I, Carole J. Ogden, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of Wade Carleton, a Witness in the above-entitled cause, was taken before me on behalf of the Plaintiff, at 146 Anoka Avenue, Barrington, Rhode Island, on May 22, 2008, at 10:00 A.M.; that previous to examination of said witness, who was of lawful age, he was first sworn by me and duly cautioned and sworn to testify to the truth, the whole truth, and nothing but the truth, and that he thereupon testified as in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rule 5(d) and 30(f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered to and retained by Plaintiff's attorney, Andrew J. Tine.

I have enclosed with the deposition a correction and signature page, which must be signed before a Notary Public.

IN WITNESS WHEREOF, I hereunto set my hand this 26th day of May, 2008.

CAROLE J. OGDEN, RPR, NOTARY PUBLIC
My Commission expires 10/4/08.