UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ADP MARSHALL, INC., A DIVISION OF
FLUOR NE, INC.,
        Plaintiff/Counterclaim
        Defendant,

      v.                            C.A. No. 07-129ML

NORESCO, LLC AND LUMBERMENS
MUTUAL CASUALTY COMPANY,
        Defendants/Counterclaim
        Plaintiffs/Third-Party
        Plaintiffs,

      v.

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY and FIDELITY
AND DEPOSIT COMPANY OF MARYLAND,
        Third-Party Defendants.

**DECISION AND ORDER**

Mary M. Lisi, Chief United States District Judge.

Plaintiff ADP Marshall, Inc. ("ADPM"), a subsidiary of Fluor NE, Inc., brings this action for breach of contract against defendant Noresco, LLC ("Noresco") in connection with the construction of a cogeneration facility (the "Facility") for the Rhode Island Department of Mental Health, Retardation and Hospitals ("MHRH"). ADPM has also raised claims pursuant to a payment bond issued by Noresco's surety, Lumbermens Mutual Casualty Co. ("Lumbermens"). Both Noresco and Lumbermens have asserted counterclaims against ADPM[1] as well as third-party claims against

---

[1] Lumbermens' claims against ADPM have since been dismissed. See ADP Marshall, Inc. v. Noresco, C.A. No. 07-129ML, Docket No.

ADPM's co-sureties, St. Paul Fire and Marine Insurance Company
("St. Paul") and Fidelity and Deposit Company of Maryland
("Fidelity"), together with St. Paul, the "Co-Sureties").   The
action was tried by the Court sitting without a jury and the
parties have submitted extensive post-trial memoranda.  The Court's
Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P.
52(a) are set forth below.

## BACKGROUND

### I. Procedural History

On April 6, 2007, ADPM filed a complaint in this Court against
Noresco for breach of contract, book account, unjust enrichment,
*quantum meruit*, and attorney's fees.   ADPM also asserted a bond
claim against Lumbermens.   ADPM sought payment from Noresco for
"unpaid labor, materials and costs" in connection with a
construction agreement it had entered with Noresco in April 2002.
Based on an approved contract price of $13,643,156 and ADPM's
receipt of payments totaling $12,415,451, ADPM initially sought
payment from Noresco in the amount of $1,227,705.[2] Complaint ¶¶ 14-
16.   In addition, ADPM sought $1,629,222 for what it claimed as
uncompensated increases in scope of work.[3] Id. ¶ 17.

---

107 (D.R.I. April 7, 2009).   ADPM did not pursue its counterclaims
against Lumbermens at trial.

[2]

    This amount has since been reduced to $949,132.   See ADPM's
Post-trial Brief at ¶ 47.

[3]

    This amount has now been reduced by $465,504.   See September
24, 2009 Stipulation, Tab.3; see n. 6 herein.

Noresco asserted a counterclaim for breach of contract; a claim against ADPM's payment bond; and a claim for specific performance for the delivery of "as-built" drawings of the completed Facility, certificates of inspection, operational and maintenance manuals, and a valid Certificate of Occupancy. Further, Noresco brought a third-party claim against the Co-Sureties for refusing to indemnify Noresco when ADPM failed to pay its subcontractors.

On April 7, 2009, this Court dismissed several claims which had been withdrawn or rendered moot; in the same order, the Court denied the parties' cross motions for partial summary judgment. ADP Marshall, Inc. v. Noresco, C.A. No. 07-129ML, Docket No. 107 (D.R.I. April 7, 2009). During the course of discovery, the parties engaged in settlement discussions but were unable to resolve their differences. Before commencement of the trial, both parties presented numerous motions *in limine*, which the Court took under advisement.

## II. The Trial

The Court conducted an eight-day bench trial from September 21 through September 30, 2009. Prior to trial, the parties submitted a Joint Statement of Undisputed Facts (hereinafter cited as "SUF") that listed 81 statements regarding the case on which all parties agreed. C.A. No. 07-129 ML, Docket No. 127. At the trial, ADPM presented two witnesses as part of its case-in-chief: (1) Edward McNaught ("McNaught"), who was employed by ADPM as project manager

-3-

on the Project[4]; and (2) Douglas Coppi ("Coppi"), who testified as an expert on construction scheduling.  Noresco presented four witnesses: (1) Wade Carleton ("Carleton"), V.P. of Construction for Noresco; (2) Theresa McKinnon ("McKinnon"), general counsel for Noresco; (3) Bradford Bright ("Bright"), who testified as an expert on the scope of construction projects and analysis of change orders; and (4) Kenneth Monson ("Monson"), who testified as an expert on construction schedule analysis and delay.  The parties elicited testimony from their respective witnesses with reference to more than 230 multi-page exhibits, including construction contracts and attachments; communications between the parties; change order requests with applicable backup information; daily reports; design sketches; and detailed construction plans.  In addition to Exhibits 1 through 952,[5] which were admitted by joint consent of the parties, the Court admitted into evidence approximately two dozen disputed exhibits.  On the fourth day of trial, ADPM and Noresco submitted a three-tabbed stipulation (the "Deviation Stipulation"), which listed certain change order

---

[4]
    From Fall 2002 to Spring or Summer 2003, ADPM reassigned McNaught to a different construction project and replaced him with Kris Salamon ("Salamon").  Pursuant to Article 3.6 of the construction agreement between the parties, ADPM was required to "assign a competent and experienced project manager, who shall not be removed or replaced without the prior consent of Noresco."  Ex. 14 p. 18. Art. 3.6.  Although this issue has been repeatedly alluded to by Noresco, no testimony was presented at trial as to whether McNaught was replaced without Noresco's consent.

    [5] Exhibit 121 was withdrawn by stipulation after the trial. C.A. No. 07-129 ML, Docket No. 148.

requests submitted by ADPM that were (1) approved by Noresco but not paid to ADPM; (2) not approved by Noresco and in dispute; or (3) initially claimed by ADPM but withdrawn or reduced in the course of discovery.[6]  In addition to listing the various change order requests, the jointly submitted document also describes their payment status.  For a majority of requests categorized as "Approved by Noresco but Not Paid to [ADPM]," a note indicates that Noresco paid the Subcontractors directly.  Deviation Stipulation, Tab 1. Similarly, of the disputed deviations, a number are noted to have been "[s]ettled by Noresco directly to subcontractors," or resulting in "[u]ndisputed credits to Noresco." Id., Tab 2, p. 2.

At the conclusion of the trial, the parties were requested to submit post trial memoranda for the Court's consideration.  The findings of fact that follow herein are based on the Court's thorough evaluation of the evidence and its determination of the relevancy and substance of the various witnesses' testimony.

**FACTS**

**I.  The Prime Contract**

On September 25, 2000, Noresco entered into the "Howard Center Cogeneration Project Design and Construction Agreement" (the "Prime Contract") with MHRH to "furnish turnkey construction services to design, permit, build, install, startup, test, and train operators for a cogeneration facility" (the "Facility") at the Pastore Center

---

[6]

The stipulation was handed to the Court by the parties on September 24, 2009 but was not marked in evidence or noted on the case docket.

in Cranston, Rhode Island (the "Project").   SUF ¶1, Ex. 1 p.
Noresco 0000379[7].  A cogeneration facility produces steam for heat
and electricity for use or sale to a local power grid.  See URI
Cogeneration Partners, L.P. v. Bd. of Governors for Higher Educ.,
915 F. Supp. 1267, 1273 (D.R.I. 1996).  The Project included the
construction of a new cogeneration plant with two electricity
generating turbines, two heat recovery boilers, and a stand-alone
boiler.   The Facility was to be built adjacent to an existing
boiler facility which contained older equipment and was, in part,
in disrepair.  Trial Tr. vol. I, 17:18-18:3, Sept. 21, 2009.

The price for Noresco's work under the Prime Contract was set
at $27,550,919 (the "Guaranteed Maximum Price"), subject to
approval of the performed work and authorized changes in the work.
Ex. 1 ¶ 6.1.  Attached to the Prime Contract as Exhibit I are the
technical specifications which define Noresco's scope of work and
include preliminary drawings of the Facility.   Ex. 2.   Noresco
obtained performance and payment bonds from Lumbermens for the
Project, which guaranteed payment of any subcontractor claims
asserted against Noresco.  Ex. 1, Noresco 0000454-460, Exhibit VII
to Prime Contract.   Under the terms of the bonds, Noresco was
obligated to defend and indemnify Lumbermens against such claims.

On October 10, 2001, Noresco provided a letter of intent to

---

[7]

Article and Section numbers refer to the actual documents.
Unless otherwise noted, page numbers refer to the pages of the
exhibits, not to the pages of the respective documents. Exhibits
lacking pagination are identified by Bates numbers, where provided.

ADPM, informing it that Noresco intended to enter into a subcontract with ADPM no later than October 31, 2001, in order to engage ADPM for construction management services for the Project. SUF 6. At the same time, Noresco provided to ADPM an Inspection Report (referred to by the parties as the "Vortex Report") regarding the presence of asbestos at the existing facility. SUF 5. On October 12, 2001, Noresco provided ADPM with certain design drawings for the Project, which were labeled "75% complete." SUF 7.

## II.  The Purchase Orders

Prior to ADPM and Noresco entering into the Procurement and Construction Agreement (the "Agreement") that is at the heart of this dispute, Noresco issued a series of purchase orders to ADPM which engaged ADPM's pre-agreement services. The parties understood that, once the Agreement had been executed, it would govern their relationship and the purchase orders would be incorporated into the Agreement.

On November 14, 2001, Noresco issued a $500,000 purchase order (the "Purchase Order") to ADPM and requested it "to proceed with services required prior to final contract negotiations and execution of a sub-contract for construction management services" for the Project. SUF ¶ 8, Ex. 401 p. 1. The Purchase Order provides that, if "a separate subcontract or other agreement has been entered into between the parties . . . the separate agreement shall control in the event of conflict." Id. Following issuance of the Purchase Order, ADPM prepared a Project schedule and began to hire subcontractors to perform some of the initial work on the

Project site.  Trial Tr. vol. I, 13:6-17.

On December 21, 2001, Noresco issued a revised purchase order (the "First Revised P.O.") which added $250,000 to the total cost "due to delay in contract execution."  SUF ¶ 10, Ex. 402 p. 5. Like the original Purchase Order, the First Revised P.O. states that "upon final execution of the subcontract, this purchase order shall be amended to include the firm fixed price, scope, schedule, and terms and conditions of that agreement."  ¶ 10, Ex. 401.  On the same day, ADPM's project manager McNaught presented a first payment request to Noresco for $678,127, reflecting a 5% retainage. SUF ¶ 11, Ex. 8.  As McNaught's request acknowledged, the initial contract sum, then set at $11,821,410, already encompassed the first requested payment.  Ex. 8.  Noresco paid $678,127 to ADPM on March 12, 2002. SUF ¶ 16.

On April 2, 2002, Noresco issued a second revised purchase order (the "Second Revised P.O.") to ADPM to "add all future work performed by [ADPM] as outlined in accordance with the subcontract agreement dated March 22, 2002."  Ex. 957 p. 107.  The Second Revised P.O.  reflects a fixed contract price of $12,365,105. SUF ¶ 32, Ex. 957 p. 101.  Shortly thereafter, ADPM secured performance and payment bonds in the amount of $12,365,105 from St. Paul and Fidelity as Co-Sureties and Noresco as Obligee. Ex. 406, 407.

On December 3, 2003, Noresco issued a final revised purchase order to ADPM reflecting an increase of the authorized amount under the construction contract to $13,478,498, to include approved change order work. SUF 34.  Noresco has paid a total amount of

$12,415,451 to ADPM.  SUF 35.

### III.  The Agreement

On or about April 12, 2002, ADPM and Noresco entered into the Agreement, dated March 22, 2002, which engaged ADPM "to provide comprehensive construction services, and procurement services . . . and support for its startup and testing."  SUF 17, Ex. 14 p. 9. The Agreement states that it includes "all Attachments hereto and any items specifically incorporated by reference."  Ex. 14 p. 10, Art. 1.3.  The following is a summary of the most pertinent provisions of the Agreement; additional sections will be discussed in this Decision and Order as necessary.

### A.  Scope of Work

The Agreement generally defines the work to be undertaken by ADPM (the "Work") as "collectively all services and duties, obligations, and responsibilities required to be undertaken by [ADPM] hereunder or in connection herewith, including those relating to the procurement of materials, construction and renovation, coordination and Commissioning, and calibration of skid mounted sensors and transmitters."  Ex. 14 p. 15, Art. 1.60.  The Work, which is described in further detail in Article 1.60, also includes "all equipment, labor and materials, with sole [sic] the exception of the Noresco Provided Equipment and Noresco Supplied Systems, required for a complete and fully functioning Facility. . . all as set forth in this Agreement, and its Attachments."  Ex. 14 p. 15. Art. 1.60.  Under the Agreement, ADPM also assumed the responsibility "to familiarize itself with the scope of supply of

-9-

the Noresco Provided Equipment and Noresco Supplied Systems." <u>Id.</u>
The definition of "Work" includes an acknowledgment that the Design
Documents were "in some respects conceptual." <u>Id.</u> Nevertheless,
ADPM's scope of work included "all items to be depicted on the
final drawings, except to the extent the final design materially
differs from the Design Documents." <u>Id.</u>

B. Noresco Provided Equipment

Pursuant to Article 1.44 of the Agreement, Noresco was to
provide certain equipment packages to ADPM for installation and
preparation for startup. Ex. 14 p. 13, Art. 1.44. The equipment,
which included gas turbines, heat recovery steam generators
("HRSGs"), and various boilers, compressors, pumps, and tanks, is
further described in Attachment II to the Agreement, and depicted
on shop drawings set forth in Attachment XIX. Under the Agreement,
it was ADPM's responsibility to install and start up the equipment
and to provide oil and propylene glycol as needed for lubrication
and transport. <u>Id.</u>

C. Noresco Supplied Systems

Noresco's responsibilities also extended to supplying certain
systems such as fuel oil tanks, CEMs (continuous emissions
monitors) and opacity meters, and a concrete stack with metal
liners (the "Stack"), to be installed by Noresco specialty
contractors. Ex. 14 p. 15, Art. 1.61. Under the Agreement, ADPM
was required to schedule and coordinate the installation of the
Noresco provided systems "so that it is performed efficiently and
in proper sequence." <u>Id.</u> In addition, ADPM was required to

furnish a foundation, piping connections, and power and control wiring for the fuel oil tanks; provide an electrical power circuit to the CEM Subcontractor; and supply a foundation, connecting ductwork, insulation, and expansion joints necessary for the Stack. Ex. 14. p. 16, Art. 1.61.1.

D. 75% Design Documents

The Agreement refers to certain design documents (the "Design Documents") that were issued and delivered to ADPM on or about October 12, 2001; these drawings were labeled "75% complete." Ex. 14 p. 57, Attachment I, Art. 3.  With respect to the completeness of the Design Documents, Article 1.60 provides as follows:

> It is acknowledged that the Design Documents are in some respects conceptual. However [ADPM's] scope of Work includes all items to be depicted in the final drawings, except to the extent the final design materially differs from the Design Documents.  It is acknowledged that notwithstanding any provision of the Design Documents to the contrary, [ADPM] is to provide for the Facility a pre-engineered metal building. Ex. 14 p. 15 (Emphasis added).

The Design Documents included the "Drawings and Specifications" referenced in Attachment XVIII to the Agreement and listed in Attachment I, Ex. 14 pp. 58 - 62.  [8]  ADPM received "issued for construction" drawings on March 15, 2002; these drawings purported to be 100% complete, however, they were

---

[8] Complete versions of the Drawings and Specifications were submitted at trial as Exhibits 122, 123, 124, 125, and 126 by ADPM and Exhibits 213, 214, 125, and 216 by Noresco.  ADPM also produced a reduced version of some of the drawings for the convenience of the witnesses and the Court.  After the trial, the complete sets of drawings were withdrawn and replaced by a compilation of those drawings the parties considered relevant.  Stipulation dated October 9, 2009, C.A. No. 07-129ML, Docket No. 148.

subsequently amended and reissued.   Ex. 214.   As the Project
progressed, the Design Documents were amended to incorporate
additional details necessary for construction.   ADPM was
responsible to provide weekly drawings (the "Record Drawings") that
"completely and accurately portray[ed] the work done to that time."
Ex. 14 p. 25.   At the conclusion of the Project, ADPM was required
to furnish so-called "as-built" drawings (the "as-builts") [9] to
reflect the final status of the completed Facility.   Ex. 14 p. 78,
Attachment VI, Part B.

E. Technical Specifications

Pursuant to the Agreement, ADPM acknowledged and agreed "to
perform the Work in accordance with the provisions of this
Agreement, including without limitation the Technical
Specifications attached hereto as Attachment I."   Ex. 14 p. 9.
Attachment I to the Agreement ("Attachment I") lists the technical
specifications of the Project, which include (1) the Prime Contract
and Exhibit I thereto ("Exhibit I," setting forth the Prime
Contract's technical requirements), that were "previously provided
to [ADPM];"   and (2) the "Noresco 75% design drawings and
specifications issued on October 12, 2001 [to] clarify areas of
Exhibit I that were not fully developed."   Ex. 14 p. 57.   In
addition, Attachment I contains the following language:

> It is intended that the drawings and specifications
> establish design and operating conditions and that it

---

[9]

"As-builts" serve to document the progress of construction
over the course of the Project and provide a record of the final
state of construction for operation and maintenance of the
Facility.   Trial Tr. vol. VII, 152:13-153:10.

[sic] indicate general construction and special features of the desired equipment which is complete and operable when installed and operated in accordance with the manufacturer's recommendations.  Incidental items which are essential for complete and operable units, but which may not be specifically described in the specifications or not shown in the drawings, shall be included and shall be of the best available quality at no additional cost to Noresco or to [MHRH]. Ex. 14 p. 57.

F. Fixed Price

The Agreement quotes a "Fixed Price" for ADPM's work in the amount of $12,365,105, subject to changes in the work as described therein.  Ex. 14 pp. 28-37, Art. 6.1, 7. The Fixed Price also includes a sum of $ 1,052,870 in various allowances (the "Allowances") that provide specific amounts for work that was not clearly defined at the onset of construction.  Ex. 14 p. 28, Art. 6.1.1.  Trial Tr. vol. I, 29:12-15.  To the extent allowance items exceeded or fell below the corresponding allowance amounts, the Fixed Price was to be adjusted.  Id.

G. Milestone Payments

Payment to ADPM for completed work was based on the "accomplishment of milestones and events, each of which represents a specific percentage of the Guaranteed Maximum Price[10] and the costs associated with the allowances."  Ex. 14 p. 73.  A schedule detailing such milestones and events (the "Milestone Schedule") is

---

[10] "Guaranteed Maximum Price" is not a separately defined term in the Agreement; it is, however, defined in the Prime Contract, which is incorporated into the Agreement as part of the technical specifications.  From the Milestone Schedule, it appears that the payments for certain "Elements of Work" were actually calculated as a percentage of the "Preset Price" of $11,312,235.  Ex. 14 p. 73, Attachment VI, Part B.

provided in Part B of Attachment VI to the Agreement.  The
Agreement sets forth April 2003 as the Milestone Deadline for
Mechanical Completion and Readiness for Testing [11], SUF ¶ 28, Ex.
14 p. P. 89, and it required ADPM to meet such deadlines "unless
the period for completion is extended in accordance with this
Agreement." SUF 30, Ex. 14 p. 17.  Readiness for Testing required
Noresco's written acceptance of ADPM's certification that "the
Facility is mechanically complete except for remaining Punch List[12]
items and the Facility, including all equipment and subsystems are
ready for energized and operated (Startup) as set forth in Section
12.3 of the Agreement."  Ex. 14 p. 86, Attachment VIII.

H. Bonds

Article 9 of the Agreement required ADPM to "provide a
performance and labor and payment bond in the amount of the Fixed
Price" which was to remain in effect until Final Acceptance of
APDM's performance under the Agreement.  Ex. 14 p. 39, Art. 9.1.

I. Exclusions and Clarifications

Attachment XX to the Agreement provides a list of items (the

---

[11]

Although the Milestone Schedule attached to the Agreement
refers to "Readiness for Testing," which term is used in the Prime
Contract, that term is used interchangeably with "Readiness for
Startup" in the Agreement.  See Ex. 14 p. 45, Art. 12.3, p. 86,
Attachment VIII, p. 89, Attachment XI. "Mechanical Completion,"
which is not a defined term in the Agreement or the Prime Contract,
is a prerequisite to begin starting up the Facility in order to
test it.

[12]

A Punch List reflects incomplete or partially complete work
that is required to be finalized for the Project to reach a full
and complete status.  Trial Tr. vol. VII, 139:16-21, Sept. 29,
2009.  See Ex. 2 p. 14, Art. 1.52.

-14-

"Exclusions and Clarifications") that ADPM either agreed to provide or specifically excluded from the Agreement.  Ex. 14 pp. 121-126. Pursuant to Attachment XX, ADPM was not required to perform certain tasks specified therein, which included, *inter alia*, architectural and engineering services; engineering services for the process/system work; obtaining any regulatory approvals required by federal, state or local authorities; and paying electric company charges.  Id. at 123.  ADPM excluded asbestos abatement outside the area to remain active in the existing building and on underground piping, but specifically included spot abatements for tie-ins.  Id. at 121.  Attachment XX also specifies some of the aspects of the pre-engineered structure which ADPM was required to furnish under the Agreement.  Ex. 14 p. 122.

J. Liquidated Damages

Article 10.3 of the Agreement contains the following liquidated damages provision for ADPM's failure to meet the April 2003 Readiness for Startup Milestone:

> In the event [ADPM] fails to achieve Readiness for Startup on or before the Readiness for Startup Milestone Deadline (as the same may be amended from time to time), [ADPM] shall be liable to Noresco as liquidated damages and not a penalty, the sum of Three Thousand Dollars ($3,000.00) for each day after the Readiness for Startup Milestone that Readiness for Startup is not achieved. Ex. 14 p. 42,  Art. 10.3(b).

Once MHRH acknowledged Readiness for Startup beyond the April

30, 2003[13] deadline, ADPM and Noresco were required "in good faith to endeavor to agree on the amount, if any, of liquidated damages" or to determine the matter in accordance with expedited arbitration procedures.  Ex. 14 p. 42, Art. 10.4.  All liquidated damages payable by ADPM under the liquidated damages provision of the Agreement became due "within thirty (30) days following the date Noresco submits to [ADPM] an invoice therefor." Ex. 14 p. 33, Art. 6.7.  To the extent Noresco was in default of its payment obligations to ADPM, no liquidated damages could be charged against ADPM.  Id.

   K.  Merger Clause

   Article 18.7 of the Agreement is a merger clause which states as follows:

> This Agreement, which includes the Attachments referred to herein, represents the entire understanding of Noresco and [ADPM] with respect to the subject matter hereof.  In the event of a conflict between the Agreement and the Attachments, the Agreement shall govern.  No prior oral or written understanding shall be of any force or effect with respect to any matter covered hereunder. This Agreement may not be modified or altered except in writing signed by both parties.  Ex. 14 pp. 52-53, Art. 18.7 (Emphasis added).

   L. Entire Agreement

   Finally, the Agreement lists 22 separate Attachments that are "made part of" the Agreement, including, as part of the technical specifications in Attachment I, the Prime Contract and Exhibit I

---

[13]

   Although the Agreement only specifies an April 2003 deadline, the parties agree that April 30, 2003 served as the actual date.

thereto.    Ex. 14 pp. 53-54, Art. 18.11.    Article 18.11 further
provides that "[t]o the extent of a conflict between the
[Agreement] and the Rhode Island General Conditions of Purchase [14],
the provision imposing the higher standard, duty, cost, or
obligation on [ADPM] shall govern." Ex. 14 p. 54.

### IV.   The Subcontracts

To perform most of the work required under the Agreement, ADPM
entered into various agreements (the "Subcontracts") with a number
of specialized subcontractors (the "Subcontractors"). See, e.g. Ex.
217, 218, 219, 220, 221, 222.    Payment from ADPM to the
Subcontractors for completed work was due only after ADPM had
received payment from Noresco (the "pay-when-paid" clause, which
mirrored the payment provision of the Prime Contract).    As
expressed in all of the Subcontracts, "[r]eceipts of funds by
[ADPM] from Owner[15] is a condition precedent to [ADPM's] obligation
to pay contractor under this Agreement, regardless of the reason
for Owner's nonpayment." Subcontracts Section 6.8,  Ex. 217,
Document page 6 of 9; Ex. 218, doc. p. 5 of 8; Ex. 219, doc. p. 5

---

[14]

The State of Rhode Island Office of Purchases "General
Conditions of Purchase," are set forth in Exhibit XV to the
Agreement. According to Exhibit XV to the Agreement, all purchase
orders, contracts, solicitations, delivery orders and services
requests by the State of Rhode Island are subject to the provisions
of Title 37 Chapter 2 of the General Laws of Rhode Island; specific
requirements in the applicable contract; and a list of 37 general
conditions of purchase. Ex. 14 pp. 93-106.

[15]

Although "Owner" in the Subcontract's boilerplate may refer to
the owner of the Facility, the parties clearly understood this term
to refer to Noresco.

of 6; Ex. 220, doc. p. 5 of 9; Ex. 221, doc. p. 5 of 9; Ex. 222, doc. p. 6 of 9.

The Subcontractors submitted bills to ADPM for work as they performed it and, if ADPM considered such work outside of its scope under the Agreement, it submitted a change order request ("COR") or "deviation" to Noresco and requested additional payment for the particular task. Trial Tr. vol. I, 72:19-73:3. Noresco then made its own determination of whether the work was included in ADPM's scope and either approved or disapproved the COR.

## V. Asbestos Abatement

On October 8, 2001, Noresco provided ADPM with the Vortex Report for "information and use." Ex. 741, 742, Trial Tr. vol. I, 93:10-94:14, SUF 5. The Vortex Report was based on "visually inspecting and assessing . . . the condition of all known or assumed ACBM [asbestos containing building materials]" in the existing cogeneration plant. Ex. 742 p. 2. The Report had been issued by Vortex Inc. Consulting Services Division on June 30, 1995. Ex. 741 p. 1. As related by McNaught, ADPM relied solely on the Vortex Report in determining the scope of work it was required to perform under the Agreement. Trial Tr. vol. I, 96:21-97:2. ADPM also used the Vortex Report in configuring its bid package for the asbestos abatement subcontractor, Ascension Environmental, Inc. ("Ascension"). Id. 95:3-14.

While performing the preconstruction work under the Purchase Orders, ADPM discovered that the extent of the necessary asbestos abatement was far greater than previously anticipated. Ex. 168,

Ex. 175, Trial Tr. vol. I, 99:21-104:4.  On March 2, 2002, McNaught
received a letter from Ascension, which expressed concern "over the
conditions of the work areas per the specification and most notably
the survey done by Vortex Inc." Ex. 168 p. 2.  Ascension attached
a report from MEI Environmental Inc. ("MEI"), the consultant
Ascension had hired in order to develop an asbestos abatement plan.
Ex. 168 pp. 3-5.  MEI alerted Ascension that it found the sampling
performed for the Vortex Report insufficient. MEI concluded that
"the validity of the identification and quantification of all
asbestos-containing building materials within the specified areas
is in question."  Ex. 168 p. 3. In addition, MEI noted the
discovery of "multiple potentially hazardous substances that appear
to be contaminated with asbestos-containing materials." Id.

Upon receipt of the letter from Ascension, McNaught contacted
Steven Bosland ("Bosland"), Project Manager for Noresco, and
forwarded to him the information received from Ascension and MEI.
Ex. 168 p. 1.  McNaught informed Bosland that Ascension had been
directed to "incorporate all necessary requirements" into the
asbestos abatement plan to be presented to MHRH.  McNaught also
noted that "[w]e are tracking these potential impacts as ADP
Marshall **Deviation No. 000024."**  Following a meeting with MHRH,
McNaught submitted a revised schedule for asbestos abatement to
Noresco on April 5, 2002.  The schedule reflects that the abatement
would have to be performed in stages, rather than all at once, and
McNaught notes that there will be "a cost related" to the segmented
abatement plan.  Ex. 169 p. 2.  McNaught's April 5, 2002

-19-

communication also states that development of the abatement schedule "is a complicated effort, which is further hindered by the uncertainty related to the Temporary City Water Booster Pumps." Ex. 169 p. 2.

### VI. Early Construction Delay

One of the first tasks on the Project was the relocation of site utilities, including a 16 inch waterline that was located in the footprint of the planned new building.  Trial Tr. vol. II, 33:10-18, Sept. 22, 2009. In late November 2001, ADPM directed a request for information ("RFI")[16] to Noresco, in which ADPM noted a conflict with the routing of the planned waterline.  ADPM proposed the employment of a temporary booster pump and relocation of the new main waterline around the northern side of the new boiler plant.  Trial Tr. vol. II, 37:24-38:7, Ex. 96 p. 1 and ADPM Revision to P-300.  Noresco agreed and incorporated ADPM's proposed solution into the design, adding an additional pump in the process. Id.  ADPM then encountered significant delays in the implementation of the design, in part because the temporary booster pumps could not readily be obtained or were not compatible with the dimensions of the existing waterlines.  As a result, the relocation of the waterline was not substantially completed until May or June 2002, pushing out several other subsequent activities, such as excavation

---

[16]

An RFI is the means by which ADPM obtained information from the Project Engineer, Architect, or MHRH, regarding questions about construction details or drawings.  McNaught estimated that the Project entailed between 300-400 RFIs.  Trial Tr. vol. I, 150:6-15.

of the new building footprint.  Trial Tr. vol. II, 39:16-40:12.

VII.  **Readiness for Startup**

Construction eventually progressed throughout 2002 and well into the second half of 2003.  On September 7, 2003, more than four months after the April 2003 Readiness for Startup deadline had passed, ADPM submitted a "Certificate of Readiness for Startup" to Noresco, certifying that the Facility was "Mechanically Complete, except for remaining Punch List items" and that it was ready to be energized and operate.  Ex. 436.

In response, Noresco informed ADPM by letter dated October 2, 2003, that it would not accept ADPM's certificate because "the activities that we are able to complete in a start up capacity are very limited and require significant work around effort on those items necessary for mechanical completion that are not complete." Ex. 437 p. 1.  Attached to Noresco's response letter is a six page list (the "Incomplete Work List") with outstanding items related primarily to the two HRSGs and Boiler No. 8.  Noresco noted that "[n]one of the attached checklists have been officially submitted by ADPM for acceptance" and that no startup checklists for the major electrical equipment had been provided.  Ex. 437 p.1.  The attached Incomplete Work List, which details "significant work items that are incomplete, many of which have a direct impact on Mechanical Readiness for Start up," id. at 2, includes the HRSG, an essential piece of equipment in the Project.  Trial Tr. vol. II, 10:15-24.

Between November 3, 2003 and December 18, 2003, ADPM submitted

a series of additional punchlists, detailing the developing status of outstanding items required for acceptance of ADPM's Certificate of Mechanical Readiness for Start-Up.  Ex. 472, 473, 474, 475, 476, 477, 478.

On November 13, 2003, Noresco delivered to MHRH a signed Certificate of Readiness for Testing for the Gas Turbine Generators and the HRSGs.  The accompanying coverletter notes that a separate certificate will be delivered with respect to Boiler No. 8, which is "currently being tuned with different firing tips."  Ex. 149 p. 1.

## VIII. The Subcontractors' Litigation

In September 2003, ADPM submitted to Noresco an application for payment of $690,374 related to work performed on the Project, App. 18, Ex. 133 p. 1.  The payment application was not accepted nor paid by Noresco.  Trial Tr. vol. I, 72:10-14, Ex. 135 p. 1. ADPM then submitted two additional payment applications for October and November 2003, for which Noresco also declined payment. Ex. 133 pp. 4-6.  On December 9, 2003, McNaught submitted revised summary payment applications for September, October, and November 2003, now totaling $1,449,223.  Ex. 37 p. 2.  McNaught followed up with a letter to Carleton on December 12, 2003, expressing his concern that "the Subcontractors are chasing ADP Marshall for open Change Orders, which have not been approved and are not billable, and it makes it more difficult to fend them off if we are not paying them for billable items as well."  Ex. 135 p. 1.

A December 15, 2003 letter from McNaught to Carleton again

requested payment of $1,449,223 for the months of September, October, and November 2003.  In the letter, McNaught urged that "it is imperative Noresco provide these funds no later than Wednesday, December 17th, in order to assure we are able to fund our Subcontractors."   Ex. 37 p. 1.   According to McNaught, the Subcontractors "were more difficult to deal with" if ADPM did not pay them, and McNaught was concerned that ADPM would not be able to issue checks so close to year's end.  Trial Tr. vol. I, 68:8-69:1.

On December 18, 2003, McNaught submitted a "Deviation Status Report" to Noresco, summarizing all the currently open change orders.   ADPM now claimed that $1,812,098 were outstanding, including $329,362 for early construction delay and $123,060 for Asbestos Abatement "due to Vortex Report Issues." Ex. 113 pp. 2-3.

While ADPM made such increasing requests for payment to Noresco, ADPM refrained from paying its Subcontractors, relying on the pay-when-paid clause in the Subcontracts.   At the time of McNaught's December 18, 2003 letter, ADPM was a month and a half late paying the Subcontractors for September 2003.  Trial Tr. vol. I, 68:25-69:11.

Previously, during the course of construction, Subcontractors had repeatedly requested relief from the pay-when-paid provisions in the Subcontracts.  McNaught received permission from his Project Director to pay some of the Subcontractors immediately, particularly those whose work at the Project had been completed. Trial Tr. vol. II, 92:25-93:14.  ADPM, in turn, had appealed to Noresco for relief from the Milestone payment provision in the

-23-

Agreement, and Noresco allowed ADPM to make partial billings against the Milestones after only a percentage of the work was completed. Id. at 96:21-97:8. Nevertheless, with respect to Subcontractors who were still working on the Project and who were now owed considerable sums of money, ADPM was unable to fund their payments out of pocket. Id. at 93:15-94:1.

As McNaught conceded, APDM's problems over paying its Subcontractors stemmed, at least in part, from the inconsistency of the payment provisions in the Agreement and the Subcontracts. Trial Tr. vol. II, 99:7-100:23. Although Article 2.1 of the Agreement required the Subcontracts to be consistent with the Agreement, the Subcontracts provided a pay-when-paid clause instead of a Milestone schedule, which resulted in Subcontractors not being paid for completed work if Noresco declined payment applications submitted by ADPM. Id.

On December 31, 2003, Noresco served ADPM with a "Notice to Cure Default for Non-Payment of Subcontractor," demanding that ADPM satisfy a claim for compensation made by Atlantic Contracting & Specialties, LLC ("AC&S") for work performed on behalf of ADPM's Subcontractor Arden Engineering ("Arden"). Noresco stated that, if ADPM failed to cure the default, Noresco would either withhold money from ADPM's next payment or make demand on ADPM's payment bond issued by the Co-Sureties. Ex. 440. After Noresco served a second notice to that effect, see Ex. 640, ADPM responded that it was Noresco that was in default of its payment obligations under the Agreement. Ex. 645. ADPM stated that Noresco's failure to

make timely payments to APDM was "at the root" of AC&S's claim and that "any further withholding of funds by Noresco will only result in additional claims from subcontractors and vendors who do not get paid." Ex. 645.

Beginning in March 2004, Subcontractors began filing bond claims in Rhode Island state court against ADPM, Noresco, Lumbermens, and/or the Co-Sureties for non-payment of labor and materials provided to the Project.  SUF 56 - 58; see certified copies of civil docket sheets, Exhibits 223-230, see certified copies of Complaints, Exhibits 231, 233, 236, 238, 240, 242, 244, 246.  In their defense, APDM and its Co-Sureties relied on the pay-when-paid clauses in the Subcontracts.  SUF 61.  ADPM also filed cross-claims against Noresco and Lumbermens in most of the Subcontractor claims.  SUF 59.

On April 6, 2005, the Rhode Island Superior Court issued a decision in one of the bond claims related to the Project, HydroChem Indust. Serv., Inc. v. Lumbermens Mut. Cas. Co., et al, PC 2004-1992 (R.I. Super. April 6, 2005), Ex. 235.  HydroChem, which had been hired through ADPM's Subcontractor Arden, sought payment of $35,651 pursuant to a purchase order issued by Arden for the "pre-operational degreasing of the boilers" that HydroChem had performed.  HydroChem Transcript of Decision at 2, Ex. 235.  The state court decision notes that ADPM and its Co-Sureties agreed to cooperate in the prosecution of HydroChem's claim on Lumbermens' bond "'because Noresco has never paid [ADPM] for the services provided by [HydroChem].'" HydroChem Tr. 4, Ex. 235.

-25-

In response to HydroCHem's motion for summary judgment, Lumbermens suggested that Noresco was not required to pay HydroChem because the degreasing procedure provided by HydroChem was different from the "boil-out" required under the Agreement. The court rejected Lumbermens' argument and pointed out that Rhode Island law does not require acceptance of a plaintiff's labor or material to entitle the plaintiff to payment for completed work under a bond claim. HydroChem 11, citing R.I. Gen. Laws § 34-28-30. The court held that, because HydroChem established that Lumbermens issued a bond to secure payment for work performed on the Project, and HydroChem had performed and completed the work requested by Arden, HydroChem was entitled to summary judgment on its timely filed bond claim. HydroChem 9-11.

Following the HydroChem decision, and anticipating a similar outcome in the other Subcontractor claims, Noresco settled the remaining cases and paid a total amount of $840,000 in settlement of all their claims. SUF 78 - 81. (With the exception of one of these Subcontractor claims, ADPM agrees that the amounts expended by Noresco to pay the claims were reasonable. ADPM suggests that Noresco's payment of $120,677.11 to R.P. Iannuccillo & Sons Construction Company ("Iannuccillo") resulted in overpayment because the amount due to the Subcontractor was only $88,874. Trial Tr. vol. VIII, 55:3-56:2, Sept. 30, 2009.

Based on the forum selection clause in the Agreement, which expressly requires litigation in this Court, ADPM's and the Co-Sureties' cross-claims in the Subcontractor litigations were

dismissed by the state court on October 2, 2006.  Noresco's counterclaims against ADPM and its Co-Sureties remain pending in state court.

**ANALYSIS**

This is a diversity case pursuant to 28 U.S.C. 1332, in which the Court must apply the choice of law rules of the forum state, i.e. Rhode Island.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).  The Agreement at issue, which was negotiated, executed, and intended to be performed in Rhode Island, provides that it "shall be governed by and interpreted under the laws of the State of Rhode Island." Ex. 14 p. 53, Sec. 18.8.  Consequently, this Court will apply Rhode Island law in this case.

## I.  Breach of Contract

For all the complexities of the parties' arguments and the overwhelming amount of trial evidence, this is essentially a breach of contract case between the general contractor of a large construction project and its primary subcontractor. In order to prevail in a breach of contract claim, the plaintiff has the burden to prove, by a preponderance of the evidence, that it has complied with the contract's provisions and that the defendant has failed to perform its own obligations.  DelFarno v. Aetna Cas. & Sur. Co., 673 A.2d 71, 72 (R.I. 1996).

As established by the parties' jointly submitted undisputed facts, the Agreement constitutes a valid contract that governs the

-27-

obligations of the parties.  SUF 17 through 22.  See <u>Rhode Island Five v. Med. Assoc. of Bristol</u>, 668 A.2d 1250, 1254 (R.I. 1996)("The long-recognized essential elements of a contract are 'competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation.'")(citation omitted).  Consequently, the determination this Court must undertake is whether the parties have performed their respective obligations under the terms of the Agreement or whether the conduct of either party constitutes a breach of the Agreement and whether damages are to be awarded accordingly.  <u>Women's Dev. Corp. v. City of Central Falls</u>, 764 A.2d 151, 158 (R.I. 2001)(Factfinder in breach of contract case to determine whether party "has substantially performed or materially breached its contractual obligations.")

In addition, it falls to this Court to ascertain whether any of the Agreement's provisions or terms are ambiguous, and to interpret such terms as necessary for the resolution of the parties' claims.  <u>Clark-Fitzpatrick, Inc./Franki Foundation v. Gill</u>, 652 A.2d 440, 443 (R.I. 1994)("Contract interpretation is a question of law; it is only when contract terms are ambiguous that construction of terms becomes a question of fact").  A contract is "viewed in its entirety and the words used in the contract are given their ordinary meaning." <u>Sturbridge Home Builders, Inc. v. Downing Seaport, Inc.</u>, 890 A.2d 58, 62-63 (R.I. 2005).

The Court's main objective when construing contract terms is to "ascertain the parties' intent." <u>The Elena Carcieri Trust -</u>

<u>1988 v. Enterprise Rent-A-Car</u>, 871 A.2d 944, 947 (R.I. 2005).  If the language of a written contract clearly divulges the intention of the parties, "the words of the contract are assigned their plain and ordinary meaning." <u>Id.</u>  To the extent a contract contains an ambiguity, the Court may consider "the construction placed upon the terms by the parties" and "the circumstances surrounding the execution of the contract." <u>Johnson v. Western Nat. Life Ins. Co.</u>, 641 A.2d 47, 48 (R.I. 1994).

The Agreement between Noresco and ADPM incorporates, by reference, the Prime Contract and its Exhibits and, particularly, Exhibit I.  Ex. 14 pp. 52-53, Art. 18.7, Art. 18.11.  A reference in a subcontract to the main contract, "made for a particular purpose, makes it part of the subcontract only for the purpose specified." <u>A.F. Lusi Constr., Inc. v. Peerless Ins. Co.</u>, 847 A.2d 254, 261 (R.I. 2004)(citing <u>Guerini Stone Co. v. P.J. Carlin Constr. Co.</u>, 240 U.S. 264, 277, 36 S.Ct. 300, 60 L.Ed. 636 (1916)).  The Agreement defines "Technical-Specification" as "the information, engineering data, drawings and conditions, including civil, electrical and mechanical specifications describing the Work, set forth in Attachment I, and in this Agreement."  Ex. 14 p. 14, Art. 1.50.  The technical specifications are listed in Attachment I to the Agreement, which states that Exhibit I was "[p]reviously provided to [APDM]," and set "the project scope of supply and the systems for the project."  Ex. 14 p. 57, Attachment I.  Accordingly, this Court holds that the incorporation by reference of Exhibit I serves to set the scope and quality of

performance of ADPM's work under the Agreement.

The second determination by this Court regarding the Agreement relates to the Agreement's merger provision. Pursuant to Article 18.7, the Agreement, including all the attachments thereto, "represents the entire understanding of Noresco and [ADPM] . . . No prior oral or written understanding shall be of any force or effect with respect to any matter covered hereunder." Ex. 14 pp. 52-53.

It is well established that "a complete written agreement merges and integrates all the pertinent negotiations made prior to or at the time of execution of the contract." Fram Corp. v. Davis, 401 A.2d 1269, 1272 (R.I. 1979). Once the parties in this case adopted the writing as their "entire understanding," the Agreement became integrated. Golden Gate Corp. v. Barrington College, 199 A.2d 586, 590 (R.I. 1964)(Integrated agreement is "one where the parties thereto adopt a writing or writings as the final and complete expression of the agreement")(quoting Restatement (First) of Contracts § 228, p. 307). Any other oral or written expressions "that occurred prior to or concurrent with the integrated agreement, are not viable terms of the agreement." Filippi v. Filippi, 818 A.2d 608, 618 (R.I. 2003).

The merger clause of the Agreement clearly expresses the intent of both parties to be bound by terms contained therein, including the fixed price. Whatever understanding ADPM had prior to entering the Agreement, and regardless of the content of negotiations between the parties and their performance under the Purchase Orders, barring any written amendments executed by the

-30-

parties, the integrated Agreement is the sole document that governs the performance of these parties.

## II. The Parties' Claims

ADPM asserts that it has substantially fulfilled the terms of the Agreement and is entitled to payment of the full contract price, as well as additional compensation for change order work. Complaint ¶¶ 13-19. ADPM has also raised claims of unjust enrichment and *quantum meruit*. In defense, Noresco asserts that ADPM cannot recover for (1) delay damages that arose prior to the execution of the Agreement, (2) any work ADPM performed that was already covered and compensated under the terms of the Agreement, and (3) work performed by ADPM's subcontractors that was ultimately paid for by Noresco. In its counterclaim, Noresco seeks specific performance from ADPM, including the delivery by ADPM of "as-built" drawings. Amended Counterclaim ¶¶ 32-38. Noresco also seeks liquidated damages under the Agreement for a four month delay with respect to the April 30, 2003 deadline for Readiness for Testing. Id. ¶ 11.k.[17] Both parties have requested reasonable attorney's fees pursuant to R.I. Gen. Laws §9-1-45.

## III. The Change Order Process

Generally, the disagreements between Noresco and ADPM require

---

[17] While Noresco's counterclaim does not explicitly request liquidated damages as a remedy, it does assert that "ADPM materially breached various terms and conditions of the [Agreement], including, but not limited to: . . . failing to timely achieve Mechanical Readiness and Readiness for Testing." Amended Counterclaim ¶ 11.k.

discrete determinations of which party was responsible, under the Agreement, to perform certain work or to furnish certain materials or equipment.  ADPM's claims are primarily based on the contention that Noresco failed to pay ADPM the agreed upon contract price or compensate it for work that ADPM deemed outside of its contractual obligations.  ADPM asserts that such work was not covered by the Agreement's fixed price or that it resulted from additional requests or material changes to ADPM's scope of work.  ADPM's related demands for additional payment are documented by numerous change order requests ("CORs") which ADPM submitted to Noresco over the course of the Project.

Because the design drawings made available to ADPM were only 75% complete at the commencement of the Project, not every detail of the Facility was apparent.  In addition, as the Project developed, amendments were made to the design drawings, e.g. to overcome difficulties in implementing the specifics of the design; to adhere to the obligations under the Prime Contract; to comply with Rhode Island code regulations; or to accommodate certain equipment that was differently sized than anticipated.

If modifications in the construction process became necessary, Noresco informed ADPM accordingly, and ADPM directed the appropriate Subcontractor to perform the work and/or to provide additional materials.  Trial Tr. vol. II, 21:12-22:7.  If the work was not specifically included in the scope of the applicable Subcontract, the Subcontractor requested additional payment, which ADPM passed on to Noresco as a COR, referencing a specific

deviation number.  It was standard practice for the COR to include the actual charge for the work done by the applicable Subcontractor, as well as a general conditions charge and a liability insurance charge, plus ADPM's fee for work performed under the Agreement.  See, e.g. Ex. 364 p. 1, Trial Tr. vol. II, 113:15-114:13.

If Noresco determined that the work was outside of ADPM's scope of work under the Agreement because it constituted a material change from the design, see Ex. 14, Art. 1.60, Noresco approved the COR and ADPM received additional payment, a portion of which it passed down to the Subcontractor.  If Noresco determined that the work was already included in ADPM's scope of work or that the necessary material or equipment was required to be provided by ADPM under the fixed-price Agreement, the COR would be disallowed. Pursuant to Article 7.5 of the Agreement, Noresco was required to provide a notice of acceptance or rejection within fifteen days after receipt of a COR. Ex. 14 p. 36, Art. 7.5.  In the event the parties disagreed about the COR, either party was entitled to submit the matter to dispute resolution. Id.

### IV.  Testimony by Wade Carleton

Noresco's Vice President of Construction systematically described the process of assessing whether CORs submitted by ADPM reflected work that fell within or outside of its contractual obligations.  Carleton testified regarding his reasons for accepting or rejecting approximately three dozen CORs.  To determine whether a particular COR reflected work included in

-33-

ADPM's scope of work, Carleton conducted a review of the Agreement, the Exhibit I documents, and the 75% complete drawings, including subsequent amendments to such drawings.  Trial Tr. vol. IV, 133:20-135:12, Sept. 24, 2009.

Generally, Carleton rejected any CORs for work related to the asbestos abatement work because he determined that ADPM was responsible for abatement of <u>all</u> asbestos contained in the active area of the Facility and was not limited to the presence of asbestos as described in the Vortex Report.  Trial Tr. vol. IV, 135:13-136:16, Exhibits 381, 338, 339, 353, 384 (Deviation Nos. 490, 32, 37, 247, 501, respectively).  In a February 5, 2003 letter to then ADPM construction manager Salamon, Carleton explained his reasons for denying asbestos abatement CORs by stating that "ADPM has requested change orders for work that Noresco believes is clearly part of the base bid scope of supply."  Ex. 413.  In support of Noresco's position, the letter includes references to those sections in Exhibit I which specifically address asbestos abatement.  Ex. 413, Ex. 2.

Another series of CORs rejected by Carleton was related to the early construction delay resulting from the waterline relocation. <u>See, e.g.</u> Exhibits 347, 374, 393, 360, 372, 372, 388 (Deviation Nos. 161, 465, 551, 378, 461, and 536, respectively).  Because the submitted CORs were based on events that occurred prior to the Agreement and that were not specifically addressed at the time the Agreement was negotiated and executed, Carleton rejected APDM's claims.  Trial Tr. vol. IV, 143:17-144:7.  Carleton pointed out

-34-

that Noresco was never provided with a schedule analysis regarding responsibility for the early construction delay.  Id. at 144:14-20.

Carleton also rejected ADPM's request for "general conditions for staffing and expenses," which ADPM claimed to have incurred beyond August 2003, because it related to the early construction delay.  Ex. 374 (Dev. 465), Trial Tr. vol. IV, 145:5-18. For the same reason, and because Article 8.3 of the Agreement required APDM's provision of builder's risk insurance through substantial completion[18] of the Facility, Carleton rejected ADPM's request for extension of such coverage.  Ex. 388.

Carleton further rejected ADPM's CORs related to lowering the roofline of the prefabricated metal building that ADPM was required to provide under the Agreement. Ex. 341, Ex. 14 p. 122, Ex. 2 pp. 203, 205, 208.  In rejecting these CORs, Carleton took the position that ADPM was aware of the height of the equipment to be installed in the prefabricated building and that any required field modification was ADPM's responsibility.  Trial Tr. vol. V, 26:22-32:7.

In a similar vein, Carleton rejected CORs for other work he deemed to be included in ADPM's scope of work or that ADPM was otherwise responsible for under the Agreement, as well as items

---

[18] According to Carleton, MHRH never formally acknowledged "substantial completion" to signify that construction of the Facility had been substantially completed and that any remaining work was "not impacting the intent or performance of the Facility." Trial Tr. vol. V, 6:9-10, Sept. 25, 2009.  Carleton acknowledged that MHRH received "beneficial use" of the Facility on December 26, 2003, when the boilers and turbines were operational, although some temporary systems remained in place.  Id. at 6:4-8.

that were required for Rhode Island code compliance.   see e.g.
Exhibits AA, 357, 341, 349, 355, 356, 343, 375, 348, 351, 373, 386,
382, 344, 350, 366, 378 (Deviation Nos. 349, 81, 191, 273, 3326,
106, 468, 173, 227, 462, 530, 499, 147, 201, 420, and 482,
respectively).

A number of CORs were rejected by Carleton for insufficient or
inconsistent backup documentation that was not provided even after
it had been requested by Noresco. See, e.g., Exhibits 340, 359,
365, 387, 363, 380 (Deviation Nos. 44, 361, 407, 532, 398, and 496,
respectively).  Carleton also rejected a COR for reimbursement for
a pricing and activity proposal which Noresco and ADPM jointly
provided to the State. Trial Tr. vol. V, 71:12-72:12, Ex. 367
(Deviation No. 422).

Finally, Carleton rejected several CORs submitted for
additional funds to insulate Noresco provided equipment. See, e.g.
Exhibits 358, 371, 377, 379, 357 (Deviations 351, 461, 474, 483,
349, respectively).  Pursuant to Article 1.44 of the Agreement,
Noresco was responsible to provide the equipment as described by
the shop drawings in Attachment XIX, and ADPM was responsible for
installing and starting up the equipment. Trial Tr. vol. V, 8:2-
14:3, Ex. 14 p. 13.  Although Noresco was required to supply the
HRSGs and other equipment, a review of the construction drawings,
the vendor manuals, and the trim/materials lists informed APDM that
certain equipment would be provided without insulation.  Such
insulation was necessary, however, due to the high temperatures to
which the components or equipment would be exposed.  Trial Tr. vol.

-36-

V, 14:3-13:24, Ex. 627, Ex. RR.

## V.  Expert Testimony by Bradford Bright

The majority of the eight-day bench trial was spent in separately reviewing more than 65 CORs, together with the applicable background information and the various provisions of the Agreement which relate to the work details at issue.  The Court declines to engage in a similar exercise in this Decision and Order.  Instead, the Court will proceed to address the alleged discrepancies between ADPM's contractual scope of work and the work for which ADPM claims additional compensation by applying the COR categories developed by Noresco's expert witness Bradford Bright, whose testimony the Court found to be relevant, coherent, and elucidating.

Bright, who has spent almost 30 years in the construction industry, including two years as a field engineer on two separate power plant projects, was retained by Noresco to  (1) analyze ADPM's claims related to construction delays;[19] (2) analyze deviations submitted by ADPM for work ADPM considered outside of its scope; (3) review Noresco's claims for payment to Subcontractors for work it considered within ADPM's scope; (4) determine the reasonableness of Noresco's settlement payments to Subcontractors; (5) review CORs and allowance items; (6) compute liquidated damages; and (7) analyze the punch list to determine

---

[19]

Bright's colleague, Kenneth Monson, focused on analysis of the construction delays.

whether ADPM was responsible for unfinished items.  Trial Tr. vol. VII, 65:24-67-1; Ex. WW.

In order to conduct his analyses, Bright reviewed (1) the relevant provisions in the Agreement; (2) the technical specifications of Exhibit I; (3) the vendor packages for Noresco supplied equipment; (4) the Subcontracts; (5) the 75% complete construction drawings and subsequent versions thereof; (6) and various Project records supplied to him by Noresco and ADPM.  Trial Tr. vol. VII, 67:6-68:20.

Bright organized the various deviations submitted by ADPM to Noresco into six distinct categories: (1) deviations related to Noresco supplied equipment; (2) deviations resulting from the asbestos remediation and related re-insulation of abated areas; (3) deviations for work on pumps, tanks, and associated utilities; (4) a single deviation for flex connectors; (5) deviations related to the pre-engineered metal building provided by ADPM; and (6) deviations related to electrical work.  Trial Tr. vol. VII, 80:23-82:14.  Bright explained that he grouped the ADPM submitted deviations in their respective groups because the deviations tended to be described by referring to the same provisions in the Agreement or to other related documents.  Trial Tr. vol. VII, 82:15-25.  A summary of the analyses regarding the various categories was provided as part of Bright's expert report. Ex. YY.

The first category, related to Noresco Supplied Equipment, includes deviations set forth in exhibits 357, 358, 371, 377, and 379 (Deviations Nos. 349, 351, 445, 474, and 483, respectively).

Trial Tr. vol. VII, 81:8-9.  Article 1.60 of the Agreement defines the work ADPM was required to perform, and the description of duct work insulation is contained in Exhibit I.  Id. at 86:1-8, Ex. 14 p. 15, Ex. 2 p. 79. In addition, the manufacturer of the Noresco supplied boiler provided a "trim list" that was furnished to ADPM, together with other manuals and documentation.  Trial Tr. vol. VII, 86:9-15, Ex. QQ.

Generally, vendor supplied trim lists and drawings specify which of their components are delivered with factory installed insulation.  If a certain component is delivered uninsulated but, based on its function, requires insulation, the party responsible for the installation of that component was responsible to insulate it.  Trial Tr. vol. VII, 88:15-89:12.  At the time it entered the Agreement, ADPM had been provided with all the vendor manuals, trim lists, construction drawings and other items necessary to determine whether a particular component to be installed by ADPM would be delivered insulated or not.  Id. at 89:18-90:9.  Attachment II to the Agreement specifically referred ADPM to "shopdrawings describing the Noresco supplied equipment" provided as Attachment XIX.  Ex. 14 p. 63.

Pursuant to Item D.8 of Exhibit I to the Agreement, the scope of work includes to "[f]urnish and install thermal insulation on equipment, piping, and ductwork."  Ex. 2 p. 79.  Each of the deviations submitted by ADPM in the Noresco supplied equipment category relates to components that had to be installed by ADPM. Although those components were delivered without factory installed

insulation, their intended function rendered insulation necessary. Accordingly, under the terms of the Agreement, ADPM was required to insulate the components before installing them.  Ex. YY p. 2. Because the work described in this series of deviations was included in ADPM's scope of work under the Agreement, ADPM is not entitled to additional payments for such work.

The second category, related to asbestos abatement work, includes Exhibits 338, 339, 352, 353, 381, and 384 (Deviations Nos. 32, 37, 246, 247, 498, and 501, respectively).  Exhibit I to the Agreement requires that "[t]he Active Areas of the Facility shall have all asbestos removed."  Trial Tr. vol. VII, 93:1-94:4,  Ex. 2 p. 15., Section 28.1. (Emphasis added).  Exhibit I also provides for the delineation of the Facility into "active" and "inactive" areas and for rehabilitation of the "active" area to include "[r]emediation of all asbestos containing materials. Reinstallation of all piping, ducts and vessels to be retained." Ex. 2 pp. 5, 72, Section 5. (Emphasis added).  The Exclusions and Clarifications provision, included by ADPM in the Agreement as Attachment XX, only excluded asbestos abatement outside of the area to remain active.  Trial Tr. vol. VII, 94:5-95:6,  Ex. 14 p. 121. In other words, the Agreement required that ADPM undertake asbestos abatement work of all active areas of the Facility.  Consequently, and notwithstanding ADPM's stated reliance on the Vortex Report, Noresco rightfully rejected ADPM's related CORs.

Category 3, referred to by Bright as "pads, pumps, and tanks," includes Exhibits 364, 348, 359, 365, and 387 (Deviation Nos. 400,

173, 361, 407, and 532, respectively).  These deviations primarily relate to the size and orientation of certain concrete "housekeeping" pads, on which equipment had to be installed.  Trial Tr. vol. VII, 99:14-100:2.  Pursuant to Section 1.09 A 2 in Exhibit I, ADPM was required to "[m]ount equipment and panels on concrete housekeeping pads." Ex. 2 p. 82.  ADPM's Subcontractor Arden performed mechanical work related to the pads; Massachusetts Electric provided electrical work; and Iannuccillo poured the concrete pads.  Trial Tr. vol. VII, 100:3-14.  Bright concluded that all work detailed in the deviations were ADPM's responsibility, primarily based on the depiction of the pads on the 75% complete construction drawings.  Id. at 101:1-104:3, Ex. 123, p. M510.  The drawings  only show the pads' general location and arrangement, but the actual configuration and orientation of such pads were not finalized until the particular equipment to be installed was identified.  Trial Tr. vol. VII, 104:12-108:15.

As explained by Bright, a contractor working with a 75% complete drawing that shows only a general configuration of such pads is expected to anticipate where suitable placement of the pads will eventually occur.  Id. at 106:10-22.  By example, the 75% complete drawings show a group of four concrete pads for the installation of four separate tanks. Ex. 123 p. M510.  However, as depicted on the backup information attached to Deviation 400, eventually a single concrete pad was installed to accommodate placement of five tanks.  Ex. 364 p. 34.  To the extent the pads were not actually installed and then removed and relocated, ADPM's

work did not constitute a material change in work.  Moreover, the installation of only one larger pad instead of a configuration of four such pads actually resulted in less work.  Trial Tr. vol. VII, 106:16-107:10.  As long as the pad was placed in the same general location as originally depicted, neither the mechanical nor the electrical services attached to the equipment would have been affected.  Id.  Because ADPM was required to provide equipment pads for certain equipment, and because the work performed did not reflect a material change from the original 75% plan, the deviations related to the housekeeping pads were rightfully rejected by Noresco.  Id. at 104:4-108:15.

The fourth category includes only one deviation related to flexible retrofit connectors on the soft water pumps.  Trial Tr. vol. VII, 109:22-110:8, Ex. 375 (Deviation No. 468).  Section 1.09 of Exhibit I specifically requires the provision of "flexible connections so piping can be easily assembled and disassembled."  Ex. 2. p. 82, Section 1.09, Item A 13.  In addition, Section 3.03 of Exhibit I calls for installation of "vibration insulators such as flexible connectors to ductwork, piping and wiring" for operating equipment that "can transmit objectionable vibration and noise." Ex. 2 p. 92, Section 3.03, Item A 1.  As Bright explained, the soft water pump at issue required a flexible connector because the pump vibrates when it "kicks in".  Trial Tr. vol. VII, 112:25-113:4.  Based on the provisions in Exhibit I to the Agreement, ADPM was required to provide flexible connectors as part of its scope of work.

The fifth category includes deviations resulting from work on the pre-engineered building ADPM was required to provide under the Agreement.  The deviations are set forth in Exhibits 340,[20] 341, 349, 354, and 355 (Deviation Nos. 44, 81, 191, 269, and 273, respectively).  Specifically, Exhibits 341 and 354 relate to the penetration of a flue and a silencer through the roof of the building.  The 75% drawings depicted the location of that equipment within the new building and the vendor drawings detailed what components were designed to penetrate the roof.  Trial Tr. vol. VII, 115:11-116:5.

In October 2001, the roof of the pre-engineered building was designed with a building height of approximately 33 feet.  Id. at 120:1-3.  However, after determining that Rhode Island code would require a building of that height to contain a costly sprinkler system, it had been decided by the parties as early as November or December 2001 that the height of the building would be reduced. Trial Tr. vol. VII, 120:3-19.  In other words, all information about the height of the building, as well as the location and size of the equipment to be installed therein, was known to ADPM prior to entering the Agreement and should have been provided to the manufacturer of the pre-engineered building prior to construction. Id. at 120:15-23.  Any field modifications to the manufactured building was the responsibility of ADPM.

---

[20]

Deviation 44, Ex. 340, was rejected by Noresco because the requested amounts were inconsistent with the provided back-up documents.

Other deviations in the fifth category related to certain duct metal supports that were not provided by the supplier of the metal building, but that were depicted on construction drawings.  As set forth in Section 13121 of Exhibit I, ADPM was required to "[f]urnish all labor, materials, equipment and incidentals required and design, fabricate, deliver to project site and erect the pre-engineered metal building system and as specified herein."  Ex. 2 p. 203, Trial Tr. vol. VII, 123:7-125:7.  In addition, the building was to be designed to withstand the weight of "concentrated loads from piping and equipment that will be attached to the building," Ex. 2. p. 204, and it required framed openings to "carry loads and vibrations imposed, including equipment furnished under process, mechanical or electrical work." Ex. 2 p. 208, Trial Tr. vol. VII, 125:21-126:20.  As Bright explained, the Specifications in Exhibit I required the contractor and the building supplier to evaluate the affect of dead weight and wind load of equipment to be attached to the building and design the structure accordingly. Id. at 127:3-128:17.  Because ADPM was required to perform such assessment prior to construction, any deviations requesting additional funds for providing adequate support for duct work attached to the building were rightfully rejected.

The sixth category of deviations, related to electrical work, includes Exhibits 344, 350, 362, 363, 366, 368, 369, 370, 376, 380, 387, and 394,(Deviation Nos. 147, 207, 391, 398, 420, 429, 444, 472, 496, 532, and 552, respectively) and Exhibit 496.  For the most part, Bright agreed with Carleton's assessment about the

merits of these deviations, based on a determination that the electrical work was included in ADPM's scope of work under the Agreement and Exhibit I, and was, therefore, not compensable. Trial Tr. vol. VII, 131:18-132:5.

However, Bright also concluded that ADPM was entitled to payment for some of these deviations, e.g. for the replacement of light fixtures. Id. at 132:6-133:4. With respect to Deviation 391, Ex. 362, Bright accepted the entire amount of $2,611. Likewise, he accepted in full Deviation 429, Ex. 368 ($3,112), Deviation 439, Ex. 369 ($700), and Deviation 472, Ex. 376 ($5,580). With respect to Deviation 496, Ex. 380, which was a request for $7,644 related to rewiring the city water booster pump VFD (variable frequency drive), Bright allotted 50% of the value, based on his determination that the request was excessive and lacked sufficient documentation. Trial Tr. vol. VII, 135:6-136:7. Bright conceded that he did not undertake a separate cost analysis, but that, based on his own construction experience, he stated that the deviation contained a "lot of unexplained hours" for the work performed and that further explanation for that level of effort and cost should have been provided. Trial Tr. vol. VIII, 66:7-67:19. Bright also concluded that ADPM was entitled to full payment for Deviation 552, Ex. 394 ($1,547), that was previously included in COR No. 6, which had been accepted by Noresco but not yet paid. Trial Tr. vol. VII, 136:13-137:5.

Based on Bright's detailed analysis of the deviations, the Court concludes that ADPM is entitled to payment only for those

-45-

deviations specifically identified by Bright.  The work reflected by those deviations was outside of ADPM's scope of work or constituted a material change under the Agreement.  Accordingly, ADPM is due $17,372 from Noresco on these claims.

In addition to the categorized deviations subjected to Bright's analysis, ADPM seeks payment for a number of miscellaneous deviations.  See September 24, 2009 Deviation Stipulation, Exhibits 342, 343, 351, 356, 361, 367, 373, 378, 382, and 386 (Deviations 97, 106, 227, 336, 382, 422, 462, 482, 499, and 530, respectively). One of the largest of these deviations is a request for $25,747 to reimburse ADPM for temporary electrical power to complete certain work.  Deviation 499, Ex. 382.  Although MHRH was to "provide electrical energy at no cost to Noresco," Ex. 2 p. 75, Sec. 1.05 B.2., the Agreement itself required ADPM to "provide and pay for all facilities and conveniences that it may require for the performance of its work including, but not limited to, . . . light, power, and heat."  Ex. 14 pp. 21-22, Art. 3.19.  ADPM points out it had specifically excluded "Electric Company Charges" in Attachment XX, however, the Agreement clearly provides that "[i]n the event of a conflict between the Agreement and the Attachments, the Agreement shall govern."  Ex. 14 pp. 52-53, Art. 18.7.  Accordingly, ADPM's recovery for those electrical bills is foreclosed by the terms of the Agreement.

With respect to Deviations 97, 106, 227, 336, 382, 422, and 482, ADPM has failed to provide sufficient evidence to support its assertion that the performed work was not within its contractual

scope of work.

However, Deviations 462 and 530, related to clean-up of the Project site, appear to represent costs outside of ADPM's obligations.  Noresco insists that the "unambiguous language" of the Agreement imposes responsibility on ADPM "for all cleaning of the Project site," Noresco's Post-trial Brief ¶¶ 247-248.  Article 3.23 of the Agreement states that "[i]n addition to its own cleaning obligations, [ADPM] shall follow Noresco's cleanup directions, and. . . [a]t all times keep the building and premises free from debris and unsafe conditions <u>resulting from [ADPM's] work</u>." Ex. 14 p. 22, Art. 3.23.1. (Emphasis added).  The Agreement does not expressly require ADPM to undertake, or pay for, cleanup of the Project site resulting from work performed by Noresco's own subcontractors.  Moreover, the backup documentation for those deviations support ADPM's contention that the cleanup involved, at least in part, debris generated by other parties.  Accordingly, ADPM is entitled to recover $9,514 for Deviations 462 and 530.

## VI. Testimony by Edward McNaught

In general, the testimony by McNaught, ADPM's principal construction manager on the Project, did little to controvert Carleton's testimony or Bright's thorough and systematic analysis of CORs that were disallowed by Noresco.  Although McNaught established, *inter alia*, that the work reflected in various CORs was performed by ADPM and that Noresco had declined payment for such work, such testimony failed to get at the core of the dispute between the parties.  Noresco does acknowledge that ADPM performed

-47-

much of the work for which it now seeks payment. Noresco
maintains, however, that the fixed price of the Agreement already
included such work, together with materials that ADPM was required
to furnish.

As McNaught understood it, the equipment supplied by Noresco
was to be delivered complete with all their necessary components
such as insulation, ductwork, and connectors, as depicted on the
75% drawings. Accordingly, McNaught did not consider any work
pertaining to that equipment, other than assembly and installation,
to be included in ADPM's scope of work. Trial Tr. vol. I, 154:24-
155:6. Based on that understanding, McNaught submitted CORs for
items which he considered to fall under Noresco's responsibility.
For example, since Noresco supplied certain equipment such as
turbines together with expansion joints, McNaught submitted a COR
for furnishing and applying insulation blankets to the expansion
joints. Id. at 156:20-157:1, Ex. 377 p. 1, Deviation 474.
Similarly, McNaught submitted a change order request for insulating
Noresco supplied ductwork as part of the HRSGs. Trial Tr. vol. I
161:16-22, ex. 379, Deviation No. 483.

The terms of the Agreement, however, support Noresco's
contention that ADPM was already obligated to supply the work and
materials for which ADPM seeks additional payment. Specifically,
Exhibit I to the Agreement states that thermal insulation is to be
provided on "equipment, piping, and ductwork." Ex. 2 p. 79,
Section 01920, 1.01 D.8. Prior to executing the Agreement, Noresco
provided ADPM with Exhibit I, as well as a vast array of manuals,

-48-

trim lists, and drawings.  A thorough review of such documentation would have alerted ADPM to determine the extent to which it had to supply certain materials or components and would have enabled ADPM to negotiate a contract price that would have compensated it accordingly.  In fact, the Agreement itself required ADPM to "familiarize itself with the scope of supply of the Noresco Provided Equipment and the Noresco Supplied Systems."  Ex. 14 p. 15.

Similarly, ADPM submitted a number of CORs for the installation of concrete "housekeeping" pads on which chemical storage tanks were to be located.  See e.g. Exhibits 364, 366, 387.  However, Exhibit I to the Agreement specifically requires ADPM to "[m]ount equipment and panels on concrete housekeeping pads."  Ex. 2 p. 82, Section 01920, 1.09 A.2.  Moreover, Bright's undisputed testimony established that ADPM's work did not involve relocation of pads that had been previously installed and then been removed.  Trial Tr. vol. VII, 107:14-108:15.  Instead, ADPM installed the pads in a finalized configuration that had only been approximated in the 75% complete drawings.  As such, the work on the pads did not constitute a "material change" for which ADPM would be paid outside of the Agreement.

In sum, ADPM has generally failed to provide sufficient evidence supporting its claims for additional payment for change order work.  With the exception of those CORs which, as acknowledged by Noresco's expert or determined by this Court, reflected tasks outside of ADPM's scope of work, Noresco has

-49-

demonstrated that the submitted deviations reflected work that ADPM was obligated to perform, or materials that ADPM was required to provide, under the fixed-price Agreement.

## VII.  Early Construction Delay

The question of delay during the initial construction period is of twofold significance.  First, ADPM claims that it incurred additional costs related to continuing work beyond the anticipated end date of the Project.  Second, ADPM seeks to extend the Milestone Deadlines in order to avoid an obligation for liquidated damages.  ADPM would be entitled to additional payment and to an extension of the Project deadlines only if it can show that the delay was excusable and compensable.

In order to recover for the asserted delay, ADPM must prove that the delayed activity was on the critical path of the Project.[21] Mega Constr. Co., Inc. v. United States, 29 Fed. Cl. 396, 424-425 (Ct. Fed. Cl. 1993)("It is not enough that an activity is delayed: there must be delay of an activity on the critical path for there to be project, or compensable, delay"); R.P. Wallace, Inc. v. United States, 63 Fed. Cl. 402, 409 (Ct. Fed. Cl. 2004)("Contractor

---

[21]

As explained by Noresco's expert on scheduling delays, the critical path is "the path of activities that controls the end date of a job.  The activities are linked together by various relationships and the longest path of activities is the critical path of the project."  Trial Tr. vol. VIII, 84:810-14.  The United States Court of Claims offers the following definition: "The project can be represented by a network of discrete paths that sequence interdependent tasks or milestones leading to project completion. The critical path, the longest path at any point in time, determines the project's expected completion date."  Gulf Contracting, Inc. v. United States, 23 Cl.Ct. 525, 529 n. 2 (Cl.Ct. 1991).

must prove that . . . the delay affected activities on the critical path"). In addition, ADPM has the burden to demonstrate that the delay was solely attributable to Noresco. Mega Constr. Co., Inc. v. United States, 29 Fed. Cl. at 425; PLC Constr. Serv. Inc. v. United States, 47 Fed. Cl. 745, 801 (Ct. Fed. Cl. 2000)(Only if delay was solely caused by defendant will contractor be entitled to extension of time and recovery of additional costs caused by delay). In other words, ADPM must show that Noresco was the "sole proximate cause" of the delay and that no concurrent cause would also have resulted in a delay of the Project. PLC Constr. Serv. Inc. v. United States, 47 Fed. Cl. at 801.

Before beginning work on the Project, ADPM created a baseline time schedule labeled CG01 (the "Schedule"). Under the Agreement, ADPM was required to update the Schedule on a monthly basis and submit it to Noresco. Each subsequent Schedule was sequentially numbered, e.g. the first updated version of the Schedule was labeled CG02. Trial Tr. vol. II, 31:19-32:13. Initially, ADPM expected to complete the construction approximately 12-14 months after the December 2001 start date. Id. at 59:25-60:9. The evidence submitted at trial demonstrated, however, that ADPM's projections failed to take into account the progress, or lack thereof, that was already obvious to anyone involved in the Project.

The baseline Schedule, CG01, current as of December 3, 2001, anticipated the commencement of electrical work in April 2002, to be finished by December 2002, which was generally consistent with

the 12-14 months time frame for the Project.  Trial Tr. vol. II, 67:7-9.  However, ADPM did not hire an electrical contractor to perform the work until October 15, 2002, nearly six months after the electrical work was scheduled to start.  Id. at 74:15-75:21. Similarly, ADPM anticipated asbestos abatement to begin on February 1, 2002 and take approximately one month.  Id. at 70:13-24. However, by March 2002, the final plan for asbestos abatement had not yet been submitted by ADPM.  Id. at 76:25-77:10.

A subsequent version of the Schedule, labeled CG05, also reflected that many of the commencement dates for construction activities had already expired by the time ADPM and Noresco entered into the Agreement.  Id. at 80:14-81:8.  As early as March 4, 2002, ADPM notified Noresco about the delay problem related to the temporary water pumps.  Ex. 347 p. 6, Ex. 454 p. 5-8.  Around the same time,  ADPM learned that the Vortex Report provided inadequate information about the extent of asbestos in the existing building and that the required abatement work would be more extensive than ADPM had anticipated.

Nevertheless, ADPM did not immediately request extensions for the April 30, 2003 Milestone deadlines, nor did it negotiate additional payment for the increased work prior to executing the Agreement on April 12, 2002.  Instead, ADPM only requested an extension of the milestone deadline a month and a half after the Milestone date had already passed. See Ex. 360, Deviation No.  378. Similarly, ADPM proceeded with its work on the Facility and did not request additional funds for the early construction delay until a

year after the delay had first been identified.  Ex. 347 p. 25.

In July 16, 2003, ADPM submitted Deviation 161 to Noresco, seeking recovery for a four month delay that occurred early on in the construction process.  The delay was the result of (1) the relocation of the waterline at the Project site;  and (2)  the construction of the Stack by Noresco[22].  Deviation 161, Ex. 347, Trial Tr. vol. II, 55:18-56:5.  In Deviation 161, ADPM sought additional payment of $329,362 for cost of APDM personnel and site equipment.  Specifically, Deviation 161 calculates the time spent by ADPM staff "for added or inefficient onsite labor during the delay (to help resolve the situation)."  Ex. 347 p.3.  An accompanying back-up letter from McNaught to Carleton, dated June 17, 2003,  states that ADPM "will continue to work with Noresco to resolve this open issue." Id. at 4.  McNaught's letter explains that ADPM initially asserted a six months delay, but that, based on conversations between the parties, ADPM would "agree to a delay period of four (4) months from March 2002 [sic] to June 2002 [sic]." Ex. 347 p. 4. McNaught also proposed that ADPM generate a further COR "to contractually extend our Readiness for Start-Up date from April 30, 2002 [sic] to August 30, 2002 [sic].[23]" Id. The

---

[22]

ADPM initially submitted a separate COR related to the construction of the Stack.  Ex. 346, Dev. 160.  ADPM's claim related to that COR was subsequently withdrawn because the delay in question overlapped with the delay related to the temporary water pumps.

[23]

As McNaught acknowledged at trial, the 2002 dates were editing errors and should have read March and June 2003, April 30, 2003 and August 30, 2003.  Trial Tr. vol. II, 141:6-21.

intended purpose of the second COR was to "stop the Liquidated
Damages from accruing until the new milestone date." Id.

McNaught attached a February 21, 2003 communication to his
letter, in which then acting Project Manager Salamon relates the
history and development of the delay.  Ex. 347 pp 6-9, Ex. 454 pp.
1-4.  In it, Salamon describes how the original plan for relocating
the waterline was not workable and that ADPM proposed an
alternative plan in late November 2001.  ADPM's alternative plan
resulted in the development of a final design in late February
2002, as part of the 90% complete design drawings.  Ex. 454 pp. 5-
8.

Salamon's February 21, 2003 letter also references a March 4,
2002 letter from McNaught to Carleton.  Ex.  347 p. 6, Ex. 454 p.
1.  In that March 4, 2002 letter, McNaught states that the letter
is intended to "formally document the issues" leading to a February
2002 work stoppage and "the resultant schedule implications."  Ex.
454 p. 5.  McNaught specifically identifies a  power road closure;
a 16 inch water main relocation; a gas main relocation; a temporary
electric relocation; and the north oil tank removal as items that
would result in significant delays prior to commencing the actual
construction of the facility.  Ex. 454 pp. 5-6.

On cross examination, McNaught conceded that all the issues
identified in his March 4, 2002 letter occurred prior to execution
of the Agreement and were known to ADPM prior to execution of the
Agreement.  Trial Tr. vol. III, 22:24-23:25, Sept. 23, 2009.  At
the time of McNaught's letter, ADPM was performing work pursuant to

-54-

the Purchase Orders, for which it was paid before the Agreement was entered. Id. at 24:9-21.  The sums paid under the Purchase Orders were intended to be incorporated into the final price of the Agreement.  Id. at 26:24-28:19, Ex. 11.  As McNaught acknowledged, although ADPM was aware of the issues raised in Deviation 161 while the Agreement was being negotiated, ADPM did not negotiate with Noresco for an increase in the fixed price of the Agreement or for compensation outside of the Agreement.  Trial Tr. vol. III, 30:19-32:10.

With respect to the waterline relocation, McNaught explained that the waterlines were located in the footprint of the planned building and had to be removed prior to excavation.  However, pursuant to Exhibit I to the Prime Contract, which was specifically incorporated into the Agreement, ADPM was obligated to ensure uninterrupted utility services to the campus that the Facility is designed to supply.  Ex. 2 p. 7, Trial Tr. vol. III, 34:4-8. Noresco originally provided the design for the relocation and ADPM had difficulties implementing Noresco's design.  Id. at 42:24-43:15.  When ADPM suggested an alternative solution as early as November 2001, see Ex. 96, it did not request a corresponding increase in compensation from Noresco.  Trial Tr. vol. III, 50:17-20.

The actual implementation of ADPM's alternative solution was also fraught with difficulties.  *Inter alia*, ADPM experienced significant work delays with Iannuccillo, one of its Subcontractors.  The manufacturer of the temporary booster pumps

-55-

supplied incorrect data related to the pump curve.  Trial Tr. vol. III, 52:1-11.  The temporary pumps failed to deliver 1500 GPM (gallons per minute) required for approval by MHRH's engineer.  Id. at 56:9-23.  The variable frequency drives ("VFDs"), which had to be installed in connection with the pumps in order to regulate the pump motor speed, had to be returned because the drive size was inadequate and one of VFDs was delivered with the wrong computer chip.  Redelivery of the VFDs resulted in a further two month delay.  Id. at 61:10-65:18, Ex. 423.

A final solution to the waterline relocation was not achieved until August 15, 2002. Trial Tr. vol. III, 59:6-12.  As McNaught conceded, none of these difficulties and resulting delays were caused by Noresco; instead, they were all part of ADPM's responsibility under the Agreement.  Id. at 66:17-67:22.

Although APDM only sought an extension of the April 30, 2003 deadline to August 30, 2003, it continued to work on the Project to achieve Readiness for Startup well after August 2003. On September 12, 2003, shortly after presenting the Certificate of Readiness, together with a list of unfinished items, ADPM submitted COR Deviation No. 465, Ex. 374.  In that deviation, ADPM requested payment of $121,603 for general costs of staffing and expenses for 13 weeks from September 1, 2003 to November 30, 2003, the date ADPM anticipated finishing its work on the Project.  Ex. 374, Deviation No. 465, Trial Tr. vol. II, 57:24-58:21.  In addition, ADPM requested $90,274 for the cost of extending the builder's risk insurance coverage it was required to maintain under the Agreement

as long as ADPM was on site.  Ex. 372, Deviation No. 461, Trial Tr. vol. II, 108:9-25.  On January 9, 2004, ADPM submitted a further COR, Deviation 551, in which it sought general conditions (staffing or general costs) of $56,160 for the period from December 1, 2003 to January 31, 2004.  Ex. 393, Deviation No. 551, Trial Tr. vol. II, 59:2-20.

The evidence submitted by the parties in this case reveals that ADPM's expectations regarding the time line of the Project were unrealistic from the very beginning.  Although ADPM was aware of a significant delay during the preconstruction period, it failed to adjust the time line accordingly or to request an extension of the Readiness for Testing Milestones before entering the Agreement.  Instead, ADPM continued to proceed with the construction, apparently with the expectation that, by submitting CORs later in the process, it could recover additional costs resulting from the initial delay and avoid liquidated damages for failing to meet its deadlines.  It is this Court's conclusion that, because ADPM failed to provide evidence that it was entitled to time extensions or damages resulting from preconstruction delays, it is likewise not entitled to payments related to general conditions or for the cost of extending the Builder's Risk Insurance.

### VIII.  Expert Testimony by Douglas Coppi

Coppi testified as ADPM's expert in scheduling and delay analysis. Prior to trial, Coppi's testimony was the subject of two separate motions *in limine*. First, Noresco sought to exclude

testimony by Coppi regarding three newly developed theories of purported delay that were disclosed in a supplemental disclosure shortly before trial and months after the close of discovery and Coppi's deposition. Noresco also objected to the inclusion of a "new" summary schedule analysis in the supplemental disclosure. The Court took that motion under advisement.

Secondly, immediately before Coppi's testimony on the fourth day of trial, Noresco filed a further motion *in limine* pursuant to Fed. R. Evid. 702, which sought to exclude Coppi's testimony in its entirety, on the ground that delays in the Project construction were undisputed and that Coppi's testimony was not expected to offer factual or expert opinion regarding the cause of such delays. Following Coppi's testimony and arguments by counsel, Noresco's second motion was denied by the Court after determining that the motion concerned the weight of the evidence, not its admissibility.

However, after listening to Coppi's testimony and reviewing the record post trial, the Court is inclined to conclude that Coppi's opinion offered little in way of substance.  Rule 702 provides that a qualified expert witness may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  The expert's testimony must be "based upon sufficient facts or data,""the product of reliable principles and methods," and the expert must "appl[y] the principles and methods reliably to the facts of the case." Id.

In determining whether expert testimony is helpful to the

trier of fact, _i.e._, whether it is reliable and relevant to the facts of the case, the Court performs a gatekeeping function. Bogosian v. Mercedez-Benz of North America, Inc., 104 F.3d 472, 476 (1st Cir. 1997).   To be admissible, expert testimony must be relevant "in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue."   Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998). The Court is afforded "substantial latitude in the admission or exclusion of opinion evidence."  Crowe v. Marchand, 506 F.3d 13, 16 (1st Cir. 2007).

At trial, Coppi testified that he reviewed Project correspondence; the Agreement; APDM daily job reports; deviation files; the MHRH RFP (request for proposal); Project monthly reports; the baseline CPM (critical path method); Design Drawings, and meeting minutes of all involved parties.  Trial Tr. vol. IV, 72:7-73:2.   In addition, Coppi reviewed the Project schedule, beginning with the baseline schedule, titled CG01, through the final updated schedule, titled CG33.  Id. at 73:3-7.   Coppi explained that he reviewed the developing Project schedule to see the progress on the Project as well as the critical path.   Id. at 75:19-23.

In order to determine the occurrence of and reasons for construction delays, Coppi undertook a "time window analysis." Id. at 78:25-79:8.  Coppi's analysis was intended to determine what significant events happened during a particular timeframe of the

Project and whether they had an impact on the project completion. Id. at 79:9-17.  Coppi identified ten such time windows during which the Project schedule was delayed for varying lengths, specifying a time frame for each window and the event to which he attributed a resulting delay. Coppi's overall conclusion was that the Project was delayed 227 days with respect to Readiness for Testing and 372 days with respect to Substantial Completion.  Id. at 94:4-19.

On cross examination, Coppi acknowledged that his engagement by ADPM was limited to "identify[ing] whether there was a delay to the completion date and whether the delay was on the critical path."  Id. at 98:20-99:1.  Nevertheless, Coppi maintained that, "based on the general information in the documents [he] reviewed," he formed a "general opinion" whether the delays were or were not ADPM's responsibility.  Id. at 98:14-19.  Coppi conceded, however, that he was not offering an opinion as to who was responsible for the delay "in a strict engineering supported stamped analysis," id. at 99:8-11, and that he had not performed any independent analyses to determine fault.  Id. at 99:18-100:21.  Instead, Coppi's analysis consisted of a general review of the Project record, limited to those documents that were supplied to him by ADPM's counsel.  Id. at 106:18-113:1.

At the conclusion of Coppi's testimony under cross examination, Noresco's counsel renewed his motion *in limine* on the grounds that (1) Coppi's opinion merely confirmed that the Project was subject to delays; and (2) Coppi failed to undertake an

independent analysis to confirm that the CG01 baseline schedule was reasonable.  Determining that Noresco's objection addressed the weight of Coppi's testimony as opposed to its admissibility, the Court again denied the motion.  Id. at 118:2-119:25.

Having now had the opportunity to digest all of the evidence presented, the Court is of the opinion that the testimony presented by Coppi carried little weight because Coppi failed to offer an opinion on the cause of the various delays during the Project. Instead, Coppi's testimony merely confirmed certain facts that are essentially undisputed in this litigation, i.e., that the Project was significantly delayed and that the Milestone deadlines were not met.

Coppi conceded on cross examination that, in order to establish that a delay is compensable, a claimant must prove, inter alia, that the delay was not the claimant's responsibility.  Trial Tr. vol. IV, 96:20-98:7.  Coppi's findings, which were entirely based on selected Project records and documentation, shed no light on the cause of such delays, nor did Coppi ascribe responsibility for such delays to a particular party.  Given the lack of any independent analyses, including whether the CG01 baseline schedule could be reasonably achieved, Coppi's "general opinion" as to responsibility for the delays is insufficient to support ADPM's claims related to Project delays.

## IX.  Testimony by Kenneth Monson

Noresco Expert Monson's analysis focused on determining whether ADPM's delay claims against Noresco, as set forth in the

Coppi Report, were excusable or compensable.  Trial Tr. vol. VIII,
80:17-81:15.  Monson first explained that excusable delays are
delays that are beyond a contractor's control and that, therefore,
entitle the contractor to an extension of the contract milestones.
Id. at 80:25-81:4.  In order for such a delay claim also to be
compensable, the contractor is required to show that the delay was
solely caused by the party from whom the contractor is seeking
damages.  Id. at 81:5-8.  Monson reviewed the Coppi Report; the
documents referenced therein; documents produced by ADPM and
Noresco; and the Project construction schedules generated by ADPM,
which range from the initial  CG01 schedule, through the monthly
updates, to the final CG33 schedule.  Trial Tr. vol. VIII at 81:16-
24.  In addition, Monson interviewed Carleton and visited the
Project site.

     In order to prove excusable and/or compensable delay, ADPM was
required to demonstrate that (1) the baseline schedule was
reasonable; and  (2) the delayed activities were located on the
critical path.  Id. at 84:1-7.  According to Monson, ADPM failed
(1) to confirm the reasonableness of the Project schedule; (2) to
account for concurrent delay; and (3) to demonstrate that the
delays were caused by others.  Id. at 86:7-18.

     Several items on the Project Schedule related to commencement
of construction appear to call the reasonableness of the Project
schedule into question.  By example, APDM proposed the use of a
temporary city water booster pump as early as November 26, 2001,
but the activity was not reflected in baseline Project Schedule

CG01 dated December 3, 2001, which rendered the schedule inaccurate from the beginning. Ex. 96, Ex. 1058, Trial Tr. vol. VIII, 89:3-91:13. As the construction progressed, the use of the booster pumps resulted in one of the most significant delays on the Project, preventing timely completion of initial construction activities, such as relocation of the 16 inch waterline and general excavation for the new building.

ADPM's baseline schedule also indicated that spot asbestos abatement was to begin on December 19, 2001. Trial Tr. vol. VIII, 92:10-18. The spot abatement, in turn, was necessary to locate temporary waterpumps in the basement of boiler room No. 3. Id. 93:10-14. However, ADPM did not submit an asbestos abatement plan until January 2002 and the plan developed by ADPM's Subcontractor Ascension was not submitted until March 19, 2002. Id. at 94:8-95:7, Ex. 1212.

Moreover, the Project Schedule closest in date to the execution of the Agreement also appears to have failed the reasonableness test. Id. p. 96:6-97:5. At the time Schedule CG05, dated March 31, 2002, was developed, ADPM had already incurred a delay of approximately 97 calendar days relative to Schedule CG01. Id. at 97:6-9. Specifically, excavation and installation of the concrete foundation were held up by the difficulty in finding and installing temporary city water booster pumps. Id. at 97:10-15. Schedule CG05, however, reflected only a 27 day shift of the milestone by simply compressing the expected duration of upcoming activities, which appears to be unsupported, unrealistic and,

therefore, unreasonable.  Id. at 97:18-98:15.

In sum, based on a review and analysis of the submitted documentation, this Court agrees with Monson's overall conclusion that "ADPM failed to satisfy the elements of proof necessary to demonstrate entitlement to either excusable or compensable delay." Id. at 86:7-11.  The evidence submitted in this case clearly supports Noresco's contention that the early construction delay was already apparent and known to ADPM prior to entering the Agreement. With respect to the other delays occurring over the course of construction, Monson's detailed critical path analysis revealed that the delays were neither excusable nor compensable. Accordingly, ADPM is not entitled to an extension of the Milestone Deadlines or to recovery of any of the additional costs it claims to have incurred as a result of construction delays.

## X.  Asbestos Abatement

Another significant claim by ADPM relates to the $123,060 COR ADPM submitted to Noresco for the alleged increased work involved in removing asbestos from the Facility.  Ex. 381 (Dev. No. 498). Noresco rejected the claim on the grounds that (1) the abatement is included in ADPM's scope of work under the Agreement; and (2) ADPM was aware of the extent of the work and the additional costs prior to entering into the Agreement.

Under the express terms of the Agreement and the therein referenced Exhibit I, ADPM was required to remove "all asbestos" in the active area of the Facility.  Specifically, Exhibit I to the Prime Contract, which incorporates by reference the technical

-64-

specification of the Prime Contract into the Agreement, provides that the existing cogeneration facility was "to be divided into Active and Non-Active Areas for delineation of asbestos related occupancy requirements." Ex. 2 p. 5, Section 1.1.  ADPM's scope of work included removal of "all asbestos" from the active area of the Facility.  Ex. 2 p. 15, Sec. 28.1.

In order to estimate the extent of the asbestos abatement work, ADPM and Ascension conducted a visual inspection of the Project Site, see SUF 48, and ADPM provided a copy of the Vortex Report to Ascension as part of the bid package.  After Ascension learned from its consultant, MEI, that the Vortex Report was outdated and inadequate and that the presence of asbestos was more widespread than anticipated, Ascension increased its contract price considerably.  On March 2, 2002, Ascension forwarded the MEI report to ADPM, informing ADPM that the Vortex Report was "incomplete and grossly inadequate."  Ex. 381, p 06.  On March 7, 2002, McNaught informed Noresco about the issues regarding the Vortex Report and MEI's concerns with the scope of work.  Ex. 381 p. 5.  McNaught also noted that "[w]e are tracking these potential impacts as ADP Marshall **Deviation No. 000024**."[24]  Id.

On March 10, 2002, Ascension provided McNaught with an itemized list of additional costs associated with "abatement, removal, disposal, sampling and survey not within the base scope of

---

[24]

Deviation 24 was eventually rolled into Deviation 498.  Ex. 381.

-65-

work defined in the Vortex Report," which amount to $132,575.  Ex. 404, Trial Tr. vol. III, 79:19-80:6.  On March 25, 2002, ADPM and Ascension entered into a contract (the "Ascension Subcontract") to perform the asbestos abatement.  Ex. 219 p. 4, Trial Tr. vol. III, 69:23-70:9.  The Ascension Subcontract provides that "[a]ll work shall be performed in strict accordance with the following described specifications, drawings and other documents, which by this reference are made a part hereof."  Ex. 219 p. 6, Art. 2.0. Under "Specifications," the Ascension Subcontract includes (1) MHRH "project specifications for Pastore Center Cogeneration Project 75% Design," which McNault interpreted as the 75% complete design, and (2) Manufacturer's Instructions.  Id., Art. 2.1. The contract base price for the asbestos abatement was initially set at $27,400.  Ex. 219 p. 3, Art. 4.0.  In addition, Article 3.2 of the Subcontract lists eight items of "alternate work" priced at $151,772, bringing the total price of the Ascension Subcontract to $179,172.  Ex. 219 p. 8, Trial Tr. vol. III, 70:12-21.

As Noresco established at trial, neither the Agreement between Noresco and ADPM, nor any of the numerous attachments thereto refer to the Vortex Report, on which ADPM relied in assessing its scope of abatement work and in obtaining a subcontractor bid from Ascension.  Id. at 77:25-78:16.  Although Noresco furnished the Vortex Report to ADPM for "information and use," see Ex. 741, the Agreement itself provides that "[e]xcept for Representations expressly set forth in this Agreement, Noresco makes no representations and . . . [ADPM] may not rely upon any statement.

-66-

. . now or hereafter made by an officer, employee, agent or representative of Noresco." Ex. 14 p. 17, Art. 3.2, Trial Tr. vol. III, 79:4-17.  In other words, although APDM may have relied on the Vortex Report in attempting to define its scope of work with respect to asbestos abatement, the Agreement specifically precluded ADPM from relying on that report.

Moreover, ADPM learned that the asbestos abatement work was more extensive than anticipated <u>before</u> it entered the fixed-price Agreement.  As McNaught conceded on cross examination, ADPM "was made aware of the delta between the Vortex" and "what was really in the plant" prior to the signing of the Agreement. Trial Tr. vol. IV, 12:16-13:22.  In addition, ADPM was informed by Ascension that the cost of the abatement had been increased by $132,000.  Id. at 13:7-13.  Nevertheless, and although ADPM communicated with Noresco regarding the asbestos issue, ADPM did not negotiate to have the increase included in the Agreement's fixed price.  Trial Tr. vol. III, 81:4-82:21, Trial Tr. vol. IV, 13:18-14:2.  Instead, ADPM sought to recover the additional cost of abatement in October 2003, when it presented COR Deviation No. 498[25] for a sum of $123,060 to Noresco.  Ex. 381, Trial Tr. vol. IV, 16:10-17:16.

In light of the evidence submitted to this Court, it is apparent that, under the express terms of the Agreement, ADPM was responsible for removing all asbestos from the active area of the Facility.  At the time ADPM entered into the Agreement, it was

---

[25] Deviation 498 included Deviation 24.

aware that (1) the Vortex Report was insufficient for an assessment of the work; (2) the abatement necessary was more extensive than anticipated; and (3) the cost of the abatement was increased by approximately $132,000.  Nevertheless, ADPM agreed to perform the work without negotiating additional payment or requesting an extension of the contractual deadline.  Under those circumstances, the Court finds that ADPM is not entitled to recover additional payment from Noresco for the asbestos abatement or an extension of the construction deadlines.

**XI.  ADPM's Claims for Unjust Enrichment and Quantum Meruit**

A plaintiff is required to prove three elements to recover for unjust enrichment: "(1) a benefit must be conferred upon the defendant by the plaintiff, (2) there must be appreciation by the defendant of such benefit and (3) there must be an acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof."  Bouchard v. Price, 694 A.2d 670, 673 (R.I. 1997)(citation omitted).  To recover in *quantum meruit*, ADPM must prove that Noresco derived some benefit from ADPM's services and "would be unjustly enriched without making compensation thereof." Nat'l Chain Co. v. Campbell, 487 A.2d 132, 135 (R.I. 1985).

As determined by this Court, the majority of claims which ADPM has raised against Noresco and addressed at trial are based on work that was included in ADPM's scope of work under the fixed-price Agreement.  The testimony and evidence submitted at trial demonstrated that ADPM understood that the parties' relationship

would be governed by the negotiated Agreement.  With the benefit of hindsight, it is clear that ADPM should have taken the opportunity to incorporate any side issues while the negotiations between the parties were taking place.  It is not, however, the Court's role to reform the bargain that was struck by the parties.  See e.g. RCI Northeast Serv. Div. v. Boston Edison Co., 822 F.2d 199, 205 (1st Cir. 1987)("It is no appropriate part of judicial business to rewrite contracts freely entered into between sophisticated business entities").  ADPM and Noresco are both sophisticated corporations who entered into a commercial transaction while represented by counsel and after months of negotiations.  Under the circumstances of this case, it would not be inequitable for Noresco to retain the benefits for which it had bargained, nor was Noresco unjustly enriched by ADPM's performance of such work.  Therefore, ADPM cannot recover under either theory.

## XII.  Noresco's Counterclaims

### (1) Reimbursement for Subcontractor Payments

In order to meet its obligations under the Prime Contract, Noresco hired a number of Subcontractors to complete work it expected ADPM to perform under the Agreement.  Noresco now seeks reimbursement from ADPM for those expenditures.  Inter alia, Noresco issued a $44,780 purchase order to Anchor Insulation Co, Inc. ("Anchor") to install insulation on the HRSG.  Ex. 622, Trial Tr. vol. VI, 21:14-16, Sept. 28, 2009.  A circular duct was delivered uninsulated, per the previously submitted materials list.  Trial Tr. vol. VII, 164:24-165:1.  However, because Noresco was

responsible for some of the work, it only paid $33,860 to Anchor.
Exhibits 317, 318, 320.

Carleton explained in detail how he determined which portion
of the HRSG insulation fell under ADPM's scope of work.   Trial Tr.
vol. VI, 23:17-24:20.   In addition to Articles 1.44 and 1.6 of the
Agreement, which address Noresco-provided equipment and define the
"work" to be performed by ADPM, Carleton relied on a particular
provision in Exhibit I:   Section 01920 addresses Steam and Power
Generation Systems scope of work, which includes the
"[f]urnish[ing] and install[ation of] thermal insulation on
equipment, piping and ductwork." Ex. 2 p. 79, Sec. 101 D 8.   The
HRSG assembly drawing, Ex. 627, requires insulation of a heat duct
section; however, the corresponding materials list provided by the
vendor, Ex. RR, shows that the duct section will be delivered
uninsulated.

Carleton then listed the various other Subcontractors Noresco
had hired in order to perform work that Noresco contends was ADPM's
responsibility under the Agreement, and for which Noresco is
seeking a total sum of $260,411 in reimbursement from ADPM. For
each item, Carleton pointed to provisions in the Agreement and its
various attachments to support Noresco's conclusion that the
subcontracted work was within ADPM's scope:

(1) Noresco hired Solar Turbines to perform inlet ductwork
after notifying ADPM that it considered such work to be included in
ADPM's scope of work under the Agreement. Trial Tr. vol. VI, 25:13-
28:5, Exhibits 311 - 314, Ex. SS.   Noresco provided the turbine

under the Agreement and the duct work was shown on the construction drawings, but not supplied by the vendor.  On February 5, 2003, Carleton informed then Project Manager Salamon that the duct work would have to be supplied by ADPM. Ex. SS pp. 2-3.  In his letter, Carleton points out that ADPM was provided with a full set of Solar drawings in December 2001 which "do NOT show the ductwork in question as provided by Solar." Ex. SS p. 2.  The letter also states that Carleton reviewed the bid package ADPM submitted to its Subcontractor for the Solar work, which indicates that the duct work is to be supplied by ADPM.  Carleton concludes that "if the drawings provided to ADPM in December 2001 had been utilized as a basis of bid to the subcontractors, this would not be an issue today."  Ex. SS p. 3. Solar Turbines charged $86,590 for its work.

(2) Noresco hired General Glass to perform window work in the active area of the boiler plant for a total of $69,482.  Trial Tr. vol. VI, 28:6-10, Ex. 324 - 326.  This work was deemed to fall within ADPM's scope of work because Exhibit I required repair of all broken interior or exterior windows in the existing building, or replacement with steel or aluminum windows.  Trial Tr. vol. VI, 29:22-30:13, Ex. 2 p. 105, Sec. 2.03(b), p. 107, Sec. C.  Carleton explained that the work had been discussed in an onsite meeting in late fall of 2001 in which McNaught participated.  Trial Tr. vol. VI, 30:14-31:7.  Because the extent of the work was difficult to determine at that time, a $45,000 allowance was set aside for repair to exterior walls, without a reference to window repair or replacement.  Ex. 14 p. 28, Art. 6.1.1.a.  Updated design drawings

delivered to ADPM on August 12, 2002, specified that ADPM was to "[c]over existing window opening with exterior grade plywood, painted" and "[p]rovide new plate glass in existing windows." Ex. 215 p. 5. However, once construction proceeded, it appeared that the windows needed to be replaced altogether, as provided in Exhibit I. The allowance for exterior repairs had been exhausted at that time, and Carleton concluded that the work fell under ADPM's general scope of work under the Agreement.

(3) Noresco hired Goldenrold Welding to fill in several window openings to seal up the inactive area of the Facility. Goldenrod charged $9,600 for its services. Trial Tr. vol. VI, 33:16-34:5, Ex. 336.

(4) Noresco paid $2,964 to Interstate Electrical for wiring electric window operators. Trial Tr. vol. VI, 35:11-24, Ex. 336.

(5) Noresco hired Arden Engineering to clean out piping by steam blow process. Arden charged $8,315 for the blow-out. Trial Tr. vol. VI, 36:8-37:1, Ex. 602.

(6) Noresco hired R.J. Sanders to install a temporary steam silencer for the steam blow. R.J. Sanders charged $5,600 for its service. Trial Tr. vol. VI, 38:6-23, Ex. I.

(7) Noresco paid $29,000 to Acme Boiler for the rental of temporary equipment in order to maintain plant capacity during the asbestos abatement when Boiler No. 7 needed to be shut down during asbestos abatement. Trial Tr. vol. VI, 41:3-14, Ex. 321 - 322. Pursuant to Exhibit I, "firm electrical capacity" and "firm steam capacity" of the Facility had to be maintained throughout the

Project.  Ex. 2. p. 69, Item 1.01. "[W]ith the exception of minor agreed to outages during the construction of the facility," ADPM was required to "provide temporary equipment to meet the existing firm capacity." Ex. 2 p. 72, Item 5.d.

Finally, Noresco claimed that a boil-out performed by ADPM's Subcontractors was inadequate and that Noresco had to perform a second boil-out, at an estimated cost of $15,000. Trial Tr. vol. VI,43:22-44:22.

In sum, the work performed by the various Subcontractors all served to fulfill Noresco's obligations under the Prime Contract. Noresco does not allege that it already paid ADPM for this work, rather, it hired Subcontractors to complete various tasks that ADPM had left unfinished.  The fact that Noresco paid the Subcontractors directly instead of flowing the payments through ADPM, as originally provided under the Agreement, does not result in additional costs to Noresco, unless such payments exceed the fixed-price of the Agreement.  In other words, Noresco would be entitled to reimbursement of the payments it made to Subcontractors for work within ADPM's scope only to the extent such payments, together with the amounts already paid to ADPM for billed work or paid in settlement of Subcontractor litigation, exceed the total amount Noresco owed to ADPM under the Agreement.

**(2)  Specific Performance**

"[S]pecific performance is appropriate when adequate compensation cannot be achieved through money damages." Yates v. Hill, 761 A.2d 677, 679 (R.I. 2000).  The remedy of specific performance "'rests within the sound discretion of the trial

justice.'"   DePetrillo v. Lepore, 871 A.2d 907, 909 (R.I. 2005)(citation omitted).

In Spring 2004, Carleton began creating a punch list of work that needed to be completed on the Project.  As items on the list were completed, they were deleted from the list.  Trial Tr. vol. VI, 44:23-45:9, Ex. 144.  Noresco also hired a startup and commissioning engineer and began forwarding updated versions of the punch list to MHRH in order to close out the Project. Trial Tr. vol. VI, 45:19-46:12.  On its part, MHRH continued to withhold money from Noresco based on outstanding punch list items.  Id. at 46:13-16, Ex. UU.

In May 2008, Carleton prepared a final punch list that included the estimated cost to complete the Project by ascribing a specific sum to each unfinished task.  With respect to the monetized values on the list, Carleton offered that some of the amounts were based on CORs submitted by ADPM for particular tasks, and that he "estimated" the value of other tasks.  Trial Tr. vol. VI, 47:13-20.  ADPM concedes that the work on the punch list was within its scope of work, but takes exception to the values Noresco has placed on the various list items.  Trial Tr. vol. VII at 161:4-17.

Bright's testimony also supports the conclusion that ADPM was responsible for items on the monetized punch list Noresco had prepared in the context of this litigation.  Ex. VV, Trial Tr. vol. VII, 140:18-25.  The so called "as-builts," drawings documenting the finalized construction, were to be provided by ADPM under the

-74-

Agreement.   Particularly, Article 3.32 requires APDM to prepare record drawings documenting the work done on a weekly basis.  Ex. 14 p. 25, Trial Tr. vol. VII, 150:6-151:7.  The Drawdown Schedule, included as Attachment VI to the Agreement, features as the last item to be provided by ADPM for payment delivery of the "as-builts."  Ex. 14 p. 78,  Trial Tr. vol. VII, 145:3-14.  In addition, Exhibit I to the Agreement specifies that ADPM "shall furnish two copies of shop drawings, which depict and describe all equipment and fabricated items furnished in the work," Ex. 2 p. 74 Section 1.04 A 1., and requires ADPM to provide "a set of reproducible as-built drawings."  Ex. 2 p. 74-75, Sec. 1.04 C 1 .

With respect to the monetized value of the "as-builts," Bright conceded that those values had been estimated by Carleton and that Bright himself did not attempt to estimate their actual value. Trial Tr. vol. VII, 147:6-13.  Bright explained that to reconstruct the "as-built" drawings of the completed Facility would be nearly impossible and prohibitively expensive.  Id. at 147:22-148:18.  In other words, the monetized value of $50,000 for the "as-builts" depicting underground work, sewer, gas, electric and water, is based on educated guesswork rather than accurate assessment.  Ex. YY, document page 19.  The Court notes that the Agreement does provide for a payment of $52,036 (0.46% of the $11,312,235 Preset Price) for the Milestone of ADPM's delivering to Noresco "the complete set of 'As Built' drawings and confirmed specifications."

Ex. 14 p. 78, Attachment VI, Part B.[26] However, the Court finds it plausible that it would be more costly, if not entirely impossible, to generate such documentation after the fact.

Based on the specifications contained in Exhibit I to the Agreement, ADPM was required to repair or replace the ID (induced draft) fan for Boiler No. 7. Ex. VV, document page 21, Item 1. Pursuant to Section 1.1.4. of Exhibit I, general modifications to the existing Facility include replacement of the "Boiler 7 ID fan motor as it cannot be reconnected for 480V operation." Ex. 2 pp. 6-7. Trial Tr. vol. VII, 154:2-156:7.  Similarly, the section addressing electrical design criteria states that "Boiler No. 7 fan motor which cannot be reconfigured for operation at 480 volts is to be replaced."  Ex. 2 p. 152. Noresco set a monetary value of $91,399 for this punch list item, based on a proposed deviation submitted by ADPM for the same work. However, the deviation was later withdrawn by ADPM, presumably because the work was not actually performed by ADPM, which landed it on the punch list. ADPM's counsel objected to the proposed value at trial and the Court agreed, on the basis that the deviation was no longer a part of the case. However, it would seem to be a reasonable estimate, given that ADPM calculated the cost for the work.

Two other significant items on the punch list concern the emergency diesel generator outside the Facility, which had to be

---

[26]

The Agreement also calls for payment of $31,674 (0.28% of the Preset Price) for delivery of Operation and Maintenance Manuals. Ex. 14 p. 78, Attachment VI, Part B.

tied to the internal switchboard.  Ex. VV, document page 21, Items 4 and 6.  Bright conceded that he did not determine the value of this work.  He explained that connecting the generator would have been relatively easy during construction but that the work must now be done on an accelerated basis because it requires an interruption of the power supply.  Trial Tr. vol. VII, 163:7-164:9.

The submitted May 2008 punchlist is of little assistance to this Court, as it contains numerous items that are likely to have been completed at this time, see e.g. General Punchlist Item No. 8 ("Manhole cover outside of Turbine Hall #1 is below grade, manhole fills with water when it rains;" Estimated Costs to Complete Project - $4,000) Ex. UU p. 1.  Moreover, the majority of items on the punchlist cannot be reconciled with the specific requirements under the Agreement, and no testimony was elicited from Noresco's witnesses regarding the status of those items.  In addition, Noresco's witnesses both conceded that the monetary valuations of the items were the result of guesswork, not independent analysis or any other reliable pricing mechanism.

Based on the provisions of the Agreement and the testimony regarding specific items of the punchlist, the Court concludes that ADPM is required to provide the "as-builts" and the "Operations and Maintenance Manuals" to Noresco.  Pursuant to the Drawdown Schedule, Noresco would ordinarily be required to pay ADPM for the as-builts and manuals, see Ex. 14 p. 78.  However, the amounts Noresco has paid to ADPM for completed work and to the Subcontractors in settlement of their claims or to complete work

that fell within ADPM's scope already exceed the fixed price of the
Agreement.  Therefore, ADPM shall provide the as-builts and manuals
to Noresco without receiving further compensation.  In the event
ADPM fails to provide such documentation to Noresco, it shall pay
to Noresco the amounts specified in the Agreement's Drawdown
Schedule.

In addition, ADPM shall repair or replace the ID fan for
Boiler No. 7 or reimburse Noresco for such repair or replacement as
supported by invoice, up to the amount of $91,399.  With respect to
the other items Noresco has requested in its First Amended
Counterclaim, Noresco has provided no testimony or evidentiary
support that it is entitled to those items; they are, for the most
part, not contained on the punchlist; and the Court is disinclined
to search through the considerable record in order to evaluate the
validity of Noresco's requests.

### XIII.  Liquidated Damages

A liquidated damages clause is enforceable when "the harm
caused by the breach is difficult to estimate and when the amount
fixed as liquidated damages is a reasonable forecast of the actual
harm." Howarth v. Feeney, 1992 WL 813502 at *3 (R.I. Super. Jan.
15, 1992)(citing Restatement (First) of Contracts § 339(1)(1932)).
Under Rhode Island law, the loss resulting from delay in a
construction contract is related to the value of the use of the
property.  Psaty & Fuhrman, Inc. v. Housing Auth. of City of
Providence, 68 A.2d 32, 38 (R.I. 1949)(upholding liquidated damages
provision of $250.00 per day in contract for construction of 744

rental units).  In the event actual damages cannot be reasonably established, a fair liquidated damages provision is valid.  Id.  To be considered reasonable, the amount specified must "approximate actual loss or loss anticipated at the time the contract was executed." Space Master Int'l, Inc. v. City of Worcester, 940 F.2d 16, 17 (1st Cir. 1991).  In addition, "'[t]he greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty . . . the easier it is to show that the amount fixed is reasonable.'" Id. at 17-18 (quoting Restatement (Second) of Contracts § 356 cmt b.)

The purpose of a liquidated damages provision is to compensate for loss, not to exact punishment for breach.  If no loss has been sustained as a result of the breach, a liquidated damages provision may amount to an unenforceable penalty.  Howarth v. Feeney, 1992 WL 813502 at *3, see Restatement (Second) of Contracts § 356 cmt (e) (1981)("If . . . it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable"); Space Master Int'l, Inc. v. City of Worcester, 940 F.2d at 18 (finding liquidated damages provision to be "unenforceable penalty because no loss had been sustained as a result of the breach")(citing Priebe & Sons, Inc. v. United States, 332 U.S. 407, 413, 68 S.Ct. 123, 127, 92 L.Ed. 32 (1947)).

Bright calculated that the period during which liquidated damages were incurred lasted from April 30, 2003 through November 17, 2003. Trial Tr. vol. VII, 75:3-16.  Article 12.3 of the Agreement called for Mechanical Completion and Readiness for

Startup on April 30, 2003 and Bright opined that those deadlines were not achieved until November 17, 2003, when Boiler No. 8 was ready for startup.  Trial Tr. vol. VII, 75:23-78:20, Ex. 14 p. 45, Ex. 149.  Based on the calculated 201 day delay and a $3,000 *per diem* liquidated damages rate provided by Article 10.3(b) of the Agreement, Bright determined a liquidated damages amount of $603,000.  Trial Tr. vol. VII, 80:1-8, Ex. 14 p. 42.

Pursuant to the Prime Contract, Noresco itself was liable to MHRH for liquidated damages if it failed to achieve Substantial Completion of the facility on or before the applicable deadline. Art. 10.3(b), Ex. 1 doc. p. 24.  The specified amount of $5,000 per day could be reduced to $3,000 per day for the first six months past the deadline, provided Noresco implemented reasonable procedures to correct its delay and the Existing Facility continued to operate at capacity.  Art. 10.3(c), Ex. 1 doc. p. 25.

The Prime Contract's Substantial Completion Deadline was set at 19 months after "the later of receipt of permit to construct from the Rhode Island Department of Environmental Management or Notice to Proceed."  Ex. 1 doc. p. XI-1, Noresco 0000469 ("Exhibit XI Milestone Schedule").  The environmental permit was received on March 10, 2002, and Noresco informed ADPM of that fact.  Joint Pretrial Memorandum p. 2, SUF ¶ 15.  Accordingly, Noresco was required to bring the Project to Substantial Completion on or before October 10, 2003.  Under the Prime Contract, Readiness for Testing was required 17 months after receipt of the permit, or August 10, 2003. Ex. 1 doc. p. XI-1.  The parties agree that MHRH

has never formally acknowledged Substantial Completion of the Facility, which was operational on December 26, 2003, nor has MHRH sought liquidated damages from Noresco under the Prime Contract.

Although ADPM takes the position that the Facility was essentially mechanically complete on September 7, 2003 and that Noresco could begin the startup and testing of the equipment, it is undisputed that ADPM did not meet the Agreement's Milestone Deadline of April 30, 2003. Trial Tr. vol. III, 11:21-12:10. Pursuant to Articles 3.1, 12.3, and Attachment XI to the Agreement, APDM was contractually obligated to certify the Facility as mechanically complete and ready for testing on April 30, 2003, unless the period for completion was extended by Noresco. ADPM submitted a Certificate of Readiness on September 7, 2003. Ex. 436, which was promptly rejected by Noresco because the certification lacked start-up checklists for major electrical equipment and because significant work items remained incomplete.  Ex. 437. On November 13, 2003, Noresco confirmed to MHRH that the Facility was ready for start-up, with the exception of the Noresco supplied Boiler No. 8. Ex. 149.

ADPM also acknowledged that it was responsible to complete the unfinished work and provide the appropriate documentation required under Article 12.3.  Ex. 14 p. 45.  Several communications by McNaught to Noresco establish that ADPM continued to work on delivering the missing items for at least two months after issuing the completion certificate.  Trial Tr. vol. III, 12:4-10, Ex. 472-478.  Moreover, there has been no assertion that Noresco granted an

extension of the milestone deadlines to ADPM or that it relieved ADPM of the liquidated damages provision under the Agreement.

Noresco provided no proof at trial that it has incurred any loss as a result of ADPM's failure to meet the April 30, 2003 deadline. Carleton conceded that Noresco never provided ADPM with a written document specifying the liquidated damages it now claims, nor did Noresco provide ADPM with an invoice as described in Article 6.7 of the Agreement. Trial Tr. vol. VI, 122:8-15, Ex. 14 p. 33. Bright also confirmed that he was not provided with an invoice related to liquidated damages. Trial Tr. vol. VIII, 23:13-17. Instead, he merely established that the deadline was not met by ADPM and he explained his method for calculating the liquidated damages sum under the Agreement provisions.

As Noresco acknowledged, it has not been assessed any liquidated damages by the State of Rhode Island for failing to meet construction deadlines imposed by the Prime Contract. SUF 75. Under those circumstances, the Court finds that an imposition of liquidated damages would amount to a penalty, not compensation for damages.

Moreover, it is not clear that the liquidated damages provision was triggered in this case. The Agreement provides that, in the event the April 30, 2003 Milestones were not met, the parties should attempt to agree on the amount of liquidated damages once MHRH acknowledged that the Facility was ready for testing. If the parties were unable to agree within ten days of receiving MHRH's confirmation, then "upon submission by either party the

-82-

matter shall be determined in accordance with the expedited procedures set forth in the Construction Industry Arbitration Rules of the American Arbitration Association." Ex. 14 p. 42, Article 10.4. The parties agree that MHRH did not provided formal notice of Readiness for Testing. In addition, no evidence has been submitted to this Court that the parties have complied with the provision of Article 10.4, which provides for good faith negotiation and, if such negotiations have failed, for determination of the matter by arbitration.

In sum, although it is undisputed that ADPM failed to meet the Readiness for Startup deadline, no evidence has been submitted that Noresco suffered a loss from such delay, or that MHRH acknowledged eventual achievement of that milestone, which would have triggered calculation of the liquidated damages. The parties concede that neither of them submitted the issue of liquidated damages to arbitration as mandated by the Agreement. Ex. 14 p. 42, Art. 10.4. Accordingly, Noresco's claim is denied without prejudice to submit the matter to arbitration as provided in Article 10.4 of the Agreement.

### XIV. Cost of Defense in Subcontractors' Litigation

Noresco seeks to recover $373,670.50 from ADPM for attorney's fees Noresco incurred in defending itself in the Subcontractor litigation. Noresco asserts in its post-trial brief that it is entitled to indemnification by ADPM based on Article 14.1 of the Agreement, which provides for indemnification of Noresco and MHRH

against third party claims.  Noresco's Post-trial Brief, pp. 81-82, ¶¶ 55 - 60. Ex. 14 p. 47.  This specific claim was first alluded to at trial, where Noresco's general counsel testified that Noresco's claim for attorney's fees in the Subcontractor litigation was based on the indemnification provision in Article 14.1.  Trial Tr. vol. VII, 11:10-12:12, Ex. 14 p. 47, Art. 14.1.  Article 14.1 of the Agreement states in pertinent part:

> Indemnification. [ADPM] hereby agrees and covenants to indemnify, defend, and hold harmless Noresco and [MHRH], to the extent of [ADPM's] responsibility, from and against any liability of whatsoever kind or character, including but not limited to, attorneys' fees and expenses, <u>arising from any claim by a third party arising out of all accidents, injuries, or damages of any kind to the extent caused, or claimed to be caused, in whole or in part by the negligence, or willful misconduct of [ADPM], its agents, employees, vendors or subcontractors</u>.  Ex. 14 p. 47, Art. 14.1. (Emphasis added).

It is an established rule of law that "indemnification provisions are to be strictly construed against the party asserting a right of indemnification."  <u>Sansone v. Morton Mach. Works, Inc.</u>, 957 A.2d 386, 393 (R.I. 2008); <u>Gordon v. Campanella Corp.</u>, 311 A.2d 844, 849-50 (R.I. 1973)("Where money is sought because of an indemnity provision in a contract, we have emphasized that such clause will be strictly construed against the indemnitee.").

The language of this provision, broadly worded as it is, indicates that it is intended to provide indemnification for claims arising in tort, not from breach of contract or for claims asserted through mechanics liens.  ADPM's obligation to indemnify Noresco or MHRH under this particular provision is limited to claims by third

-84-

parties for accidents, injuries or damages caused by negligence or willful misconduct.  The indemnification clause is silent with respect to any obligation on ADPM's part to indemnify Noresco (or MHRH) for third party claims arising out of contractual breach.

Noresco provided no evidence at trial to support its recently invoked legal theory for imposing indemnification obligations on ADPM in connection with the Subcontractor litigations.  Noresco's blank assertion that "ADPM's failure to pay the Subcontractors for work performed by them on the Project constitutes willful misconduct, or, in the alternative, negligence," Noresco post-trial brief p. 82, ¶ 58, is as unconvincing as it is unsupported.  ADPM's efforts in obtaining payment from Noresco in order to pay its Subcontractors are well-documented, see e.g., Ex. 135, Ex. 37, and Noresco has made no allegations that ADPM's failure to pay its Subcontractors promptly was the result of negligence or willful refusal rather than lack of sufficient funds.  In other words, the Agreement's indemnification clause provides no basis for a direct indemnification claim against ADPM.[27]  Consequently, Noresco's claim against ADPM for attorney's fees incurred in the Subcontractor litigation is denied.

## XV.  Calculation of Damages

Pursuant to the Agreement, ADPM was required to perform all

---

[27]

In its third-party complaint against the Co-Sureties, Noresco also seeks damages for the Co-Sureties' refusal "to honor their contractual obligations under the ADPM Bonds and hold Noresco harmless from the Subcontractors' claims."  Answer and Third-Party Complaint p. 17, ¶ 16.

work specified therein for the fixed price of $13,487,498, subject to any change orders approved by Noresco.   To the extent the payments made by Noresco (1) to ADPM for completed and billed work, (2) to the Subcontractors in settlement of their claims for completed work, and (3) to complete tasks that fell within ADPM's scope of work exceed that fixed price, Noresco has suffered certain damages and is entitled to compensation from ADPM. In addition, it has been established that Noresco may incur additional costs to complete the repair or replacement of Boiler No. 7 and to obtain as-builts and Operations and Maintenance Manuals, all of which ADPM was required to perform or furnish under the Agreement.

ADPM and Noresco have submitted, in their post-trial briefs, detailed calculations regarding their respectively asserted damages.   According to ADPM, by late 2003, it had billed Noresco $13,182,256 for completed work and had received $12,415,451 in payments. ADPM Brief ¶ 8. ADPM further asserts that "[t]he amount billed to Noresco for work completed but unpaid to [ADPM] as of December 30, 2003 was $766,805." ADPM Brief ¶8.

According to McNaught's testimony, ADPM submitted its last monthly billing requisition ("Requisition No. 24") to Noresco on December 30, 2003. Trial Tr. vol. I, 46:5-20, Ex. 39. Requisition No. 24 quotes a sum of $13,182,256 for "Total Completed & Stored to Date;" prior payments of $12,742,173; and an agreed upon 2 1/2%

retainage[28] of $329,556.   Ex. 39, second page of unpaginated
exhibit.   The current payment due is set at $110,527, with a
balance to finish of $625,798.   McNaught explained that $100,661
worth of scope work had not been completed, including the delivery
of Operations Maintenance Manuals and As-Builts. Trial Tr. vol. I,
49:23-50:25.   Further incomplete items include $171,444 for
Allowance work, and $24,137 for change order work. In other words,
the "balance to finish" of $625,798 was comprised of the retainage
and the value of the work that had not yet been completed by ADPM
($329,556 for retainage + $100,661 for unfinished base work +
$171,444 for unfinished allowance work + $24,137 for change order
work = $625,798).

ADPM did not establish at trial, and it remains unclear, why
ADPM did not receive payment for work that it claimed to have
already completed and for which it had billed Noresco accordingly.
Nor did ADPM support its claim that its obligations under the
Agreement had been "substantially completed." ADPM's certification
of completeness was promptly rejected by Noresco, and, although
ADPM had received a large percentage of the fixed price due under
the Agreement, a significant number of tasks remained that were

---

28

  Article 6.4 of the Agreement provides for Noresco to "withhold
a retainage amount of five percent (5%) of each monthly payment."
The retainage was intended to be applied by Noresco to "complete
the performance of [ADPM's] obligations pursuant to this Agreement
if [ADPM] defaults in the performance of its obligations
hereunder."  Ex. 14 p. 32.  Payment of the retainage to ADPM was to
be included in the final payment after both parties executed a
Certificate of Final Acceptance.     Ex. 14 p. 33, Art. 6.5.
Apparently, the retainage was subsequently reduced to 2 1/2% by
agreement of the parties.

essential for completion of the Project. ADPM's submitted testimony and evidence was primarily focused on outstanding payments for deviations that, according to ADPM, resulted from material changes to the scope of work set forth in the Agreement.

However, as Noresco apparently agrees, without further argument, that ADPM is owed $766,805 for completed work, that amount serves as a starting point for the Court's calculation of damages. Likewise, Noresco agrees that ADPM is owed $162,327 for approved deviations.[29] ADPM's Brief ¶ 21, Ex. B to Noresco's Brief p. 2. In addition, as established by Noresco's own expert, ADPM is owed $17,372[30] for deviations for work outside the Agreement. For reasons detailed in Sections V, VII, and X herein, ADPM has failed to prove that it is entitled to payment for any of the remaining CORs. As explained in Section VII of this Decision and Order, ADPM has also failed to prove that it was entitled to an extension of the milestone deadlines. It is, therefore, not entitled to additional payments for costs of ADPM personnel and site equipment or for the cost of extending the builder's risk insurance coverage.

---

[29]

Neither party addresses whether any of the approved deviations are already included in the $13,478,498 fixed price of the Agreement, or whether they result in a further increase of the fixed price.

[30]

Noresco's calculation spread sheet specifies only $15,825, which does not include $1,547 for a further deviation which had been accepted by Noresco as part of Change Order No. 6. Trial Tr. vol. VII, 136:10-137:5, Dev. 552, Ex. 394. In addition, the Court determined that ADPM was owed $9,514 related to clean-up of debris generated by other Noresco subcontractors, see Dev. 462, Ex. 373, Dev. 530, Ex. 386, for a total of $26,886.

With respect to a payment request of $20,000 for completion of switchgear change order work in January 2004, as reflected by Deviation 87, Ex. 1141, <u>see</u> ADPM's Brief p. 4, ¶ 17, ADPM failed to establish at trial that it was still owed payment for such work. Testimony by McNaught was inconclusive whether the work had been actually performed and he could not recall whether payment had been received for the work. Trial Tr. vol. I, 60:15-20, 61:19-24.

In sum, based on the testimony and evidence submitted at trial, as well as the stipulated facts submitted by the parties, this Court concludes that ADPM is owed a sum of $956,018 from Noresco. ($766,805 for completed work + $162,327 approved deviations + $26,886 for disputed deviations = $956,018).

Noresco, on its part, has submitted uncontroverted evidence that it has expended $840,000 to pay Subcontractors for work they performed on ADPM's behalf.[31]   As noted before, apart from maintaining that one of the Subcontractors was overpaid, a contention for which it provided no further evidentiary support, ADPM agreed that the work performed by the Subcontractors was within the scope of the Agreement.

Further, Noresco has submitted evidence that it paid a total of $260,411 to complete work on the Project which fell within ADPM's scope of work.

---

[31]

It is unclear whether, in light of the different payment schedules under the Agreement and the Subcontracts, Noresco had already made any payments to ADPM for the work the subcontractors had performed on behalf of ADPM.

Regarding Noresco's claim for monetary damages or specific performance for items on the punch list, Noresco has demonstrated that it is entitled to certain items on the list which ADPM is obligated to deliver under the Agreement. See Section XII supra. However, Noresco's value assessment of the remaining punch list items is largely based on guesswork and, therefore, insufficient to support its claim for monetary compensation of those items. Therefore, Noresco's claim for $505,949 for incomplete punch list items is denied. However, in the event ADPM fails to replace or repair the Boiler No. 7 ID fan, as provided in Section VII (2) of this Decision and Order, Noresco shall be entitled to reimbursement for the cost of repairing or replacing the fan; such reimbursement is not to exceed the amount of $91,399. Likewise, if ADPM fails to provide Noresco with the as-builts or Operations and Maintenance Manuals, it shall pay to Noresco the amounts specified therefor in the Drawdown Schedule.

With respect to liquidated damages, as detailed in Section XIII herein, Noresco has made no showing that it suffered any damages as a result of ADPM's failure to miss the Milestone deadlines. Moreover, the parties have not engaged in arbitration to resolve this issue, as mandated by the Agreement. Therefore, no sums will be awarded to Noresco for liquidated damages at this time.

Noresco also seeks to recover $144,058 in "undisputed credits" from ADPM, as itemized in Deviations 545, 546, 547, and 548 (Exhibits 389, 390, 391, and 392, respectively). None of these

deviations were addressed at trial.   Instead, they belong to the more than 900 exhibits which were entered into evidence with the consent of Noresco and ADPM but without further explanation. Nevertheless, the jointly submitted Deviation Stipulation states that these deviations were "[u]ndisputed credits to Noresco" related to "Allowance Resolution."   Deviation Stipulation, Tab 2, p. 2.   Moreover, a review of the deviations reveals that they were signed by McNaught on January 9, 2004 and that they reflect "work not executed," resulting in a "return to Noresco."   In addition, McNaught testified at trial that Noresco was entitled to $829 in connection with work performed by Arden, as documented in Deviation 152, Ex. 345.   Trial Tr. vol. I, 143:19-25.   Based on the joint submissions by Noresco and ADPM, and in the absence of any challenge to these deviations, the Court finds that Noresco is entitled to a credit of $144,058.

Finally, Noresco seeks a credit of $25,223 for payment it made to ADPM under Deviation 412, Ex. AA, while reserving its right to determine whether the work was within ADPM's scope.[32]   ADPM submitted a COR for insulating HRSG risers in August 2003.   Dev. 412, Ex. AA.   After reviewing the applicable provisions in the

---

[32]

In its brief, Noresco refers to the Deviation Stipulation in support.   The Deviation Stipulation, however, only reflects that Noresco is owed $25,977 for Dev. 520 related to electrical work and Dev. 453 related to asbestos removal (Exhibits 981 and 986), which were not discussed at trial.   Noresco's Brief at p. 100, ¶ 10. It is unclear whether Noresco seeks credit for these two deviations as well; nor can it be determined, absent any explanatory testimony, whether such credit has already been received by Noresco.

Agreement, the materials supplied by Energy Recovery International, and the trim list for Norceso supplied equipment, Carlton determined that the work was within ADPM's scope.   However, he approved the deviation with a note of reservation because he "needed to have this insulated to keep the job moving."   Trial Tr. vol. V, 24:20-25:17.   The note states that "Noresco and [ADPM] will reach final resolution on ownership before money is to be released for this."   Ex. AA.   Subsequently, Noresco paid ADPM for the work but now seeks a credit.

Although Carleton's testimony on this point was not further disputed at trial, it was insufficiently specific to allow a determination whether ADPM was responsible for insulating the HRSG risers, nor was this deviation addressed by Noresco's expert.   In addition, no testimony was presented whether the parties came to a resolution of the issue prior to payment of the COR by Noresco, as indicated by the note.   Therefore, Noresco's request for the return of its payment for Deviation 412 is denied.

In sum, Noresco is entitled to credit or payments from ADPM in the amount of $1,244,469. ($840,000 for settlement payments + $260,411 to complete work on the Project + $144,058 in undisputed credits = $1,244,469) As previously stated, Noresco owes to ADPM payment in the amount of $956,018.   It is, therefore, this Court's determination that ADPM shall pay to Noresco the sum of $288,451.

**XVI.   Attorney's Fees in the Instant Case**

Pursuant to Section 9-1-45 of the Rhode Island General Laws, the Court may award reasonable attorney's fees to the prevailing

party in a breach of contract action only if the Court finds that "there was a complete absence of judiciable issue of either law or fact raised by the losing party." R.I. Gen. Laws § 9-1-45 (1956). The award of attorney's fees rests within the discretion of the Court. <u>Greensleeves, Inc. v. Smiley</u>, 754 A.2d 102, 103 (R.I. 2000).

In this breach of contract case, both Noresco and ADPM have prevailed on some of their claims, based on validly raised and amply supported questions of fact and law. Noresco is correct in pointing out that, in the course of litigation, ADPM reduced the size of its claims significantly and also conceded that Noresco was entitled to reimbursement for the Subcontractor settlements and for performing work that had not been completed but fell within ADPM's scope. However, it has also been established, in the course of this litigation, that ADPM was entitled to payment of more than $950,000 for completed work and approved deviations. Therefore, this Court is of the opinion that neither position can be described as frivolous and that the statutory prerequisite standard of Section 9-1-45 has not been met. Accordingly, no award of attorney's fees is warranted in connection with this litigation.

## XVII. Third Party Cross Claim

Noresco seeks indemnification from the Co-Sureties for payments it made to settle the Subcontractor litigation. As already determined by this Court, Noresco was ultimately required to pay for work the Subcontractors performed on behalf of ADPM. <u>See</u> Section XII herein. Without the Subcontractor litigation and resulting settlements, such payments would have simply flowed

through ADPM as part of the regular billing process. However, because such work was included in ADPM's scope of work, Noresco is now entitled to, and has been awarded by this Court, a credit of $840,000 which it expended on paying the Subcontractors for their completed work.

Therefore, the dispute between Noresco and the Co-Sureties is limited to claims for $373,670.50[33] in attorney's fees incurred by Noresco in the Subcontractors litigations.

**(1) The Performance Bond**

Although the Performance Bond at issue contains no choice of law provision, it is intended to insure performance of the Agreement, which is governed by Rhode Island Law. Ex. 14 p. 51, Art. 18.1. Therefore, Rhode Island law applies to the Performance Bond as well. Marshall Contractors, Inc. v. Peerless Ins. Co., 827 F. Supp. 91, 93-94 (D.R.I. 1993)(performance bond is "to be construed in accordance with 'the law governing the principal's obligation which the [performance bond] was intended to secure'"). It is a long established rule under Rhode Island law that a surety bond is to be strictly construed and that, "[i]n the absence of ambiguity, the extent of the liability of the surety on a common-law bond is determined solely by the language of the bond." Narragansett Pier R. Co. v. Palmer, 38 A.2d 761, 763 (R.I. 1944); State of Rhode Island Dept. of Corr. v. ADP Marshall, Inc., 2004 WL

---

[33]

Following the trial, Noresco revised its earlier figure of $382,753. Trial Tr. vol. VII, 21:3-7.

877560 *8 (R.I. Super. March 29, 2004).

A. Performance Bond Provisions

In April 2002, the Co-Sureties issued a Performance Bond and a Payment Bond with ADPM as Contractor and Noresco as Obligee[34] for the Project.  Exhibits 406, 407.  Pursuant to the Performance Bond, if ADPM defaulted under the Agreement, and subject to certain conditions, the Co-Sureties were obligated for (1) correction of defective work and completion of the Agreement; (2) additional legal, design professional and delay costs resulting from ADPM's default; and (3) liquidated or actual damages caused by delayed performance or non-performance of ADPM.  Ex. 406 p. 2, ¶ 6.1 -6.3.

The Co-Sureties' obligations were triggered only if Noresco was not in default under the Agreement.  Owner default is defined in the Performance Bond as "failure . . . to pay [ADPM] as required by the [Agreement] or to perform and complete or comply with the other terms thereof." Ex. 406 p. 3, ¶ 12.4.  In addition, Noresco was required to comply with the following conditions:  First, Noresco had to notify ADPM that it considered declaring a Contractor default and attempt to arrange a conference with ADPM and the Surety within 15 days of such notice. Ex. 406, p. 2 ¶3.1. Second, Noresco had to declare a Contractor default and formally terminate ADPM's right to complete the Agreement.  Id. p. 2 ¶ 3.2.

---

[34]

While the cover pages of the bonds specifically identify Noresco as the "Obligee," the provisions in the documents refer to Noresco as the "Owner" of the respective bonds.  See Ex. 406 p.1, 2 and Ex. 407 p.1, 2.

Third, Noresco had to agree to pay the balance of the Agreement price to the Co-Sureties. Id. p. 2 ¶ 3.3.

Once Noresco met those conditions, the Co-Sureties were required to elect whether to (1) arrange for ADPM, with Noresco's consent, to perform and complete the Agreement, ¶ 4.1; (2) undertake performance and completion of the Agreement themselves, through agents or independent contractors, ¶ 4.2; (3) arrange for a replacement contractor acceptable to Noresco, ¶ 4.3; or (4) waive their rights as set forth in the preceding sections and (a) determine the amount of the Co-Sureties' liability and tender payment to Noresco, or (b) deny liability and notify Noresco accordingly. Id. ¶ 4.4.

Any legal proceedings under the Performance Bond were expressly limited to initiation within two years following the earlier of these three trigger events: (1) ADPM was in default of the Agreement; (2) ADPM ceased working; or (3) the Co-Sureties refused or failed to perform their obligations under the Bond. Ex. 406 p. 2, ¶ 9.

B. Factual Background

McKinnon, general counsel for Noresco, initially reviewed the Subcontractor claims that were brought against Noresco and Lumbermens beginning in March 2004. Trial Tr. vol. VII, 6:21-7:2. By letter dated June 17, 2004, McKinnon informed St. Paul and Fidelity that ADPM "failed to complete its performance" on the Project. Ex. 942. McKinnon's letter asserted that the Project was "incomplete" and that ADPM "has not been actively engaged in the

project for several months." Id. McKinnon warned that, unless ADPM "resumes performing its obligations under the contract immediately, Noresco will terminate the contract and invoke performance provisions under the above referenced performance bond." She also requested a meeting between Noresco and the Co-Insurers to "discuss methods for completing the project." Id. McKinnon's letter references 400SP8413-10/8642263, which is the number of both the performance bond and the payment bond issued by the Co-Sureties to ADPM. Id. Ex. 406, 407. According to McKinnon, she received no response to her correspondence from the Co-Insurers. Trial Tr. vol. VII, 8:25-9:4.

By letter dated August 12, 2004, Noresco informed ADPM that Noresco was terminating the Agreement based on ADPM's failure to adhere to the Milestone Schedule, resulting in a continuing default under the Agreement. Ex. 944. Prior to this termination, Noresco requested that ADPM finish incomplete punch list items identified by Noresco, and provide a complete ADPM generated punch list. Id. Noresco's August 12, 2004 letter states that "Noresco will deduct all costs incurred in correcting the remaining deficiencies from the monies due. Should the amount expended thereby exceed the unpaid balance of the [Agreement], Noresco shall make demand on ADPM's Payment Bond issued by St. Paul Fire and Marine Insurance Company." Id. (Emphasis added).

Following this communication from Noresco, St. Paul responded by letter dated September 7, 2004, in which it asserted that "Noresco has not yet met the conditions precedent of the AIA 312

Performance Bond; at this time, the Surety has no obligation to take any action." Ex. 945. St. Paul also voiced its understanding that ADPM and Noresco "are mediating their disputes September 8-10, 2004" and that the parties anticipated a resolution of their differences without the Surety's involvement.  Id.

In the interim, Noresco and Lumbermens filed cross-claims against ADPM and its Co-Sureties in several of the Subcontractor actions.  Noresco and Lumbermens' cross-claims for breach of contract by ADPM and the Co-Sureties solely reference the Payment Bond.  See e.g. Ex. 946 pp. 6-7, ¶¶ 5, 10; Ex. 947 pp. 8-9. ¶¶ 5, 12; Ex. 948 pp. 5-6, ¶¶ 5,11; Ex. 949 pp. 6-7, ¶¶ 5, 10; Ex. 950 pp. 5-6, ¶¶ 5, 10.  On their part, the Co-Sureties filed cross-claims and a third party complaint against Noresco and Lumbermens in the Hydrochem litigation on July 30, 2004, in which they asserted that APDM's performance had been satisfactory; that Noresco caused any delays resulting in additional costs to ADPM; and that Noresco had wrongfully refused to pay ADPM's invoices.

C. Arguments by the Parties

The Co-Sureties have consistently argued that any claims Noresco has raised in this litigation under the Performance Bond are barred by the two-year statute of limitations set forth in Section 9 therein.  The Co-Sureties also submit that Noresco failed to comply with conditions precedent contained in the Performance Bond.  Particularly, they allege that Noresco was in default under the Agreement; that it asserted a claim under the Payment Bond only; and that it did not agree to pay the balance of the Agreement

-98-

price to the Co-Sureties, as required by Paragraph 3.3 of the Performance Bond.

In response, Noresco maintains that it "timely filed its claims against the Sureties in state court." Noresco Brief p. 95, ¶ 109. Noresco also suggests that the limitations period should be tolled because its cross-claims in state court were never dismissed, and are therefore still pending. Id. ¶ 110.[35] Noresco further suggests that the Co-Sureties were in default for failing to participate in a requested conference with Noresco and ADPM, and that Noresco was excused from agreeing to pay the balance of the Agreement price because no such balance existed.

D. Discussion

The evidence and testimony relating to Noresco's claims under the Performance Bond is essentially undisputed. On June 17, 2004, Noresco declared ADPM in default of its obligations under the Agreement. Ex. 942. The submitted correspondence does not clearly establish the exact date on which ADPM ceased working on the Project. By the time the Co-Sureties filed cross-claims and counterclaims in the Subcontractor cases in July, 2004, it was

---

[35]

It is undisputed, however, that Noresco did not amend its cross-claims in Rhode Island Superior Court to include claims under the Performance Bond until more than two months after the trial in this Court was concluded. Noresco Brief 95, ¶ 112. Noresco's reference to the amendment of its cross-claims in its post trial brief is subject to a motion to strike by the Co-Sureties that was filed a month after the post trial briefs were submitted. C.A. No. 07-129ML Docket No. 162. As previously noted by this Court at trial, the mere assertion of a claim related to the Performance Bond falls short of providing support for a tolling argument. See Trial Tr. vol. VII, 20:16-19.

evident that they refused to make payment under the Performance Bond. Subsequently, on August 12, 2004, Noresco terminated the Agreement after ADPM allegedly failed to cure the deficiencies listed in Noresco's Notice to Cure Default letter dated July 14, 2004. Ex. 944.

Noresco appears to concede that its termination of the Agreement on August 12, 2004 triggered the limitations period during which Noresco could institute "legal or equitable proceedings, under this Bond . . . in any court of competent jurisdiction." Ex. 406 p. 2,¶ 9 (Emphasis added). Noresco Brief p. 95, ¶ 109. Therefore, Noresco was limited to commence proceedings against the Co-Sureties under the Performance Bond by August 12, 2006, at the latest. Noresco's claims against the Co-Sureties were first asserted in this Court on June 11, 2007 in its answer and counterclaim, ten months after the contractual deadline for instituting such litigation had passed.[36]   Although Noresco argues for a tolling of the statute of limitations based on its pending cross-claims in state court, such claims were raised solely under the Payment Bond, which is separate and distinct from the Performance Bond. Noresco's belated amendment of its pleadings in state court to include claims against the Performance Bond provides no basis for ignoring the plain language of the Performance Bond,

---

[36]   The Court notes that, although Noresco's counterclaim makes reference to both bonds, see Noresco's First Amended Counterclaim at 4, its asserted "Count II - Breach of Contract" claim again only specifies the ADPM Payment Bond. Id. at 6, ¶ 13.

which unambiguously limits the time period during which claims against it may be raised.

Based on the established timeline of Noresco's claims against the Co-Sureties, the Court concludes that Noresco's claim under the Performance Bond is barred by the contractual time limitation contained therein. Because a determination that Noresco's claim on the Performance Bond was untimely is decisive on the matter, the Court need not address the additional arguments raised by the parties.

**2. The Payment Bond**

The obligation of a surety under a payment bond is distinct and separate from its obligation under a performance bond. While a performance bond is intended "to secure to the [owner] the faithful performance of all obligations which a contractor may assume towards it," the payment bond is intended "to protect third persons from whom the contractor may obtain materials or labor...'" Equitable Sur. Co. v. McMillan, 234 U.S. 448, 454, 34 S.Ct. 803, 805, 58 L.Ed. 1394 (1914); First Nat'l Ins. Co. of America v. Lynn, 525 F.2d 1, 3-4 (1st Cir. 1975).

The Payment Bond, which was issued simultaneously with the Performance Bond, binds ADPM and the Co-Sureties to Noresco to pay for "labor, materials and equipment furnished for use in the performance of the [Agreement]." Ex. 407 p. 2 ¶ 1. Specifically,

the Payment Bond secures payment by the Co-Sureties to "Claimants"[37]
for work such Claimants have performed or for materials they have
furnished.  With respect to Noresco, the obligation under the
Payment Bond is "null and void" if (1)  ADPM promptly pays all
Claimants for sums due; and (2) APDM defends and indemnifies
Noresco from all claims for payment for labor, materials and
equipment provided under the Agreement; and (3) "provided there is
no Owner Default," Ex. 407 p. 2, ¶¶ 2.1, 2.2., which is defined as
failure by Noresco to "pay [ADPM] as required under the Agreement
or to perform and complete or comply with the other terms thereof."
Id. p. 3, ¶ 15.3.  Likewise, the Co-Sureties' obligation to pay the
Claimants is "null and void" if ADPM "promptly makes payment,
directly or indirectly, for all sums due."  Ex. 407 p. 2, ¶ 3.

     Once proper notice is given of a claim under the Payment Bond
(which includes notice by Noresco to ADPM or the Co-Sureties), the
Co-Sureties must either (1) provide an answer to the Claimant,
"stating the amounts that are undisputed and the basis for
challenging any amounts that are disputed;" or (2) "[p]ay or
arrange for payment of any undisputed amounts."  Id. ¶ 6.1, 6.2.
The Payment Bond also provides that "[a]mounts owed by [Noresco] to
[ADPM] under the [Agreement] shall be used for the performance of
the [Agreement] and to satisfy claims, if any, under the

---

[37] The term "Claimants" is defined under the Payment Bond as
"[a]n individual or entity having a direct contract with [ADPM] or
with a subcontractor of [ADPM] to furnish labor, materials or
equipment for use in the performance of the [Agreement].  Ex. 407
p. 3, ¶ 15.1.

Construction Performance Bond." <u>Id.</u> ¶ 8.  Unlike the Performance Bond, the Payment Bond contains no provisions that address the issue of legal expenses incurred by the Claimants.

Noresco's sole argument for recovery under the Payment Bond is that, under the principle of equitable subrogation, it assumed the Subcontractors' rights to payment by the Co-Sureties once Noresco paid the Subcontrators' claims in settlement.  Noresco Brief, pp. 96-98.  The Co-Sureties respond that Payment Bonds are intended for the benefits of labor and materialmen; that Noresco is not a proper "Claimant;" and that, generally, obligees have no right of recovery under a payment bond.  Co-Sureties Brief p. 19.

Subrogation is intended to reimburse a party compelled to discharge a debt owed by another party.  <u>Pearlman v. Reliance Ins. Co.</u>, 371 U.S. 132, 136-37, 83 S.Ct. 232, 235, 9 L.Ed. 190 (1962). Although subrogation may originate from a contractual agreement, "'[i]t is a creature of equity; it is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties.'" <u>Pearlman v. Reliance Ins. Co.</u>, 371 U.S. at 137 n. 12. "Traditionally sureties compelled to pay debts for their principal have been deemed entitled to reimbursement . . . there are few doctrines better established that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed."  <u>Id.</u> at 137, 83 S. Ct. 235. <u>See</u> <u>U.S. Fidelity & Guar. Co. v. Rhode Island</u>, 167 A. 143, 146 (R.I. 1933)("A surety which has to pay out money as surety on a

building contractor's bond is entitled to be subrogated to the rights of the contractor in any balance due him."). Conversely, claims by owners/obligees under a payment bond are not favored by caselaw. See, e.g., Fed. Ins. Co. v. Maine Yankee Atomic Power Co., 183 F. Supp.2d 76, (D. Me. 2001)(collecting cases); Am. Mfrs. Mut. Ins. Co. v. Sherborn Meadows, 2008 WL 5396479 *6 (D.Mass Dec. 22, 2008)(unpublished decision).

In this case, Noresco paid certain amounts to the Subcontractors directly for completed work on the Project which it, otherwise, would have paid to ADPM under the Agreement and which ADPM would have used, in part, to pay the Subcontractors. Because the Subcontractors' work was performed on behalf of ADPM and within ADPM's scope of work, Noresco is entitled to a credit against any claims ADPM has raised against it. Noresco has been awarded by this Court the amount of $840,000 which Noresco paid to Subcontractors in settlement. Therefore, subrogation of Noresco to the rights of the Subcontractors is not implied by equity considerations.

The remaining question in this case is whether Noresco is entitled to equitable subrogation with respect to the attorney's fees it has incurred in defending the Subcontractor litigation. The Co-Sureties' obligations under the Bond are limited to (1) paying Subcontractors for claimed amounts that are undisputed or (2) providing a basis for those amounts which they challenge. Those obligations do not extend to providing reimbursement of legal expenses incurred by the Subcontractors for raising claims against

-104-

the Bond or to defending and/or indemnifying Noresco from claims for labor or materials.  As Noresco has pointed out, its cross-claims against ADPM and the Co-Sureties remain pending in the state court, and Noresco is not precluded from seeking reimbursement for its litigation expenditures there.

For the foregoing reasons, Noresco's claims for equitable subrogation under the Payment Bond are denied and judgment shall enter in favor of the Co-Sureties.

CONCLUSION

This Court has been presented with extensive testimony and an overwhelming evidentiary record generated in the course of the Project.  To address each and every claim by the parties, no matter how insignificant, is beyond the capability of a trial and the precise assessment of damages would require a team of accountants.

The picture that emerged during the trial is that ADPM agreed to undertake a complex construction project pursuant to design plans that were only 75% complete.  If ADPM completed the construction as specified in the Agreement in a timely fashion and for less than the fixed price, it stood to reap the benefits of a higher profit.  Likewise, ADPM assumed the risk that its profits would be reduced or eliminated by increased costs and unforeseen delays.

Prior to entering into the Agreement with Noresco, ADPM examined the site of the Project, reviewed the provided 75% design plans and conducted meetings with the State "to get a better understanding of the existing facilities."  Trial Tr. vol. I,

31:25-32:3.   In addition, APDM received Exhibit I to the Prime
Contract which provided detailed technical specifications of the
Project.   Id. at 32:4-33:7.   The construction documents in this
case are almost as complex as the Project itself.   In order to
determine the extent of its obligations, ADPM had to review not
only the Agreement with its numerous attachments and referenced
exhibits, but it also had to review documentation provided by
various manufacturers, and cross reference specific provisions with
construction design plans.

From the outset, it appears that ADPM failed to explore and
fully understand the extent of its contractual obligations, or to
appreciate that the continuing development of the 75% design plans
would require ADPM to supply items or perform work not necessarily
specified at the time the Agreement was executed.   As soon as ADPM
commenced the preconstruction work, it learned that the asbestos
abatement work was more extensive than anticipated.   Although ADPM
informed Noresco accordingly, it failed to negotiate inclusion of
the resulting additional cost of such work into the Agreement.

Similarly, although ADPM became aware early in the Project
that the site utilities relocation work would result in significant
construction delays and additional costs, it failed to negotiate an
amendment to the April 2003 Milestone Deadlines prior to executing
the Agreement.   In addition, the Subcontractors' obligations under
the Subcontracts apparently did not satisfy the obligations ADPM
had under the Agreement, leaving work to be performed by ADPM for
which the Subcontractors demanded additional payment that Noresco

declined to pay.

Once the Subcontractors commenced litigation against Noresco, and in light of the unfavorable outcome of the <u>Hydrochem</u> case, Noresco had no alternative than to settle the Subcontractors' outstanding claims. Moreover, in order to fulfill its own obligations under the Prime Contract, Noresco was required to hire Subcontractors directly to continue and finish construction of the Facility. As this Court repeatedly indicated to the parties, Noresco would have been required to pay for such work in any case, by flowing the payments through ADPM. However, because the direct payments to ADPM, the amounts paid in settlement, and the cost of finishing the Project, together, exceed the amount owed to ADPM under the fixed-price Agreement, Noresco has established that it was damaged, at least in part, by making such payments. As previously stated, Noresco is, therefore, entitled to recover the sum of $288,451 from ADPM.

Regarding Noresco's claims for specific performance, Noresco has supported its claims only with respect to (1) delivery of "as-builts" and "Operations and Maintenance Manuals," and (2) repair or replacement of the ID fan for Boiler No. 7. Because Noresco has conceded that the monetary values assigned to the remaining Punch list items are the result of guesswork and not further supported by analysis, no monetary award is appropriate for such work.

With respect to Noresco's claim for liquidated damages, Noresco has failed to submit any evidence of a loss resulting from ADPM's failure to meet the Milestone deadline. Moreover, the

Agreement requires the parties "in good faith [to] endeavor to agree on the amount," or, otherwise, submit the matter to arbitration.

Noresco's claim against ADPM for legal costs incurred in the Subcontractor litigation pursuant to an indemnification provision in the Agreement is unsupported by the plain language of the provision or by any evidence Noresco presented at trial.

With respect to Noresco's third party claims against the Co-Sureties, it is apparent that Noresco failed to assert a timely claim under the Performance Bond, and that it is precluded from recovery under the Payment Bond on a contractual or an equitable basis.

For the reasons stated herein, the Court decides as follows:

(1) Judgment shall enter in favor of ADPM for the amounts owed to ADPM for billed and finished work and those CORs which this Court deemed to be meritorious, for a total of $950,018.

(2) Judgment shall enter in favor of Lumbermens for any claims ADPM has raised against it.

(3) Judgment shall enter in favor of Noresco for payments to any Subcontractors (a) in settlement of their claims against Noresco; (b) for work performed to fulfill Noresco's obligations under the Prime Contract or (c) resulting in an undisputed credit, for a total amount of $1,244,469.

(4) Judgment shall enter in favor of Noresco on Noresco's claim for specific performance as specified herein. ADPM is ordered to provide, within 90 days of this Decision and Order, the

–108–

"as-builts" and "Operations and Maintenance Manuals."  In the event ADPM fails to provide the as-builts and/or the Operations and Maintenance Manuals to Noresco, it shall instead pay to Noresco the respective amounts specified in the Drawdown Schedule.

In addition, ADPM shall repair or replace the ID fan for Boiler No. 7 or reimburse Noresco for the cost of repair or replacement, as supported by invoice or appropriate backup documentation, up to the amount of $91,399.

(5) The Court denies Noresco's claim for liquidated damages, without prejudice to submitting its claim to arbitration in accordance with the Agreement.

(6) The Court denies Noresco's indemnification claims against ADPM under Article 14.1 of the Agreement for costs Noresco incurred in the Subcontractor litigation.

(7) The Court finds in favor of the Co-Sureties on Noresco's third party claims pursuant to the Performance Bond and the Payment Bond.

(8) The Court declines to award attorney's fees to either

party.


SO ORDERED.


_____
Mary M. Lisi

Chief United States District Judge

April 30, 2010